1 | Mary E. McAlister
2 | California Bar Number 148570
3 | Liberty Counsel
4 | P.O. Box 11108
5 | Lynchburg, VA 24506
6 | (434) 592-7000 (telephone)
7 | (434) 592-7700 (facsimile)
8 | court@lc.org Email
9 | Attorney for Plaintiffs
10 |
11 |
12 | UNITED STATES DISTRICT COURT
13 | EASTERN DISTRICT OF CALIFORNIA
14 | SACRAMENTO DIVISION
15 |
16 | DAVID PICKUP, CHRISTOPHER H.
17 | ROSIK, PH.D., JOSEPH NICOLOSI, PH.D,
18 | ROBERT VAZZO, NATIONAL ASSOCIATION FOR
19 | RESEARCH AND THERAPY OF HOMOSEXUALITY
20 | (NARTH), AMERICAN ASSOCIATION OF CHRISTIAN
21 | COUNSELORS (AACC), JOHN DOE 1, by and through JACK
22 | AND JANE DOE 1, JACK DOE 1, individually, and
23 | JANE DOE 1, individually,
24 | JOHN DOE 2, by and through JACK
25 | AND JANE DOE 2, JACK DOE 2, individually, and
26 | JANE DOE 2, individually
27 |
28 | Case No.:_____
29 | Plaintiffs,
30 | v.
31 |
32 | EDMUND G. BROWN, Jr. Governor of the State
33 | of California, *in his official capacity*; ANNA
34 | M. CABALLERO, Secretary of the State and
35 | Consumer Services Agency of the State of
36 | California, *in her official capacity*,
37 | KIM MADSEN, Executive Officer of the
38 | California Board of Behavioral Sciences, *in*
39 | *her official capacity*; MICHAEL ERICKSON,
40 | PH.D, President of the California Board of
41 | Psychology, *in his official capacity*; SHARON LEVINE,
42 | President of the Medical Board of California, *in her official*
43 | *capacity*.
44 |
45 | Defendants.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS .......................................................................................... 2

   Professional Counselor Plaintiffs, Minor Plaintiffs, And Parent Plaintiffs ..................... 2

   SB 1172 And Background ........................................................................... 11

   Professional Ethical Codes ........................................................................ 13

LEGAL ARGUMENT .............................................................................................. 17

I.   Plaintiffs Have A Substantial Likelihood Of Prevailing On The Merits. ...................... 17

    A.   SB 1172 Unconstitutionally Discriminates on the Basis of Viewpoint. ........................................................................................................ 18

      1.   Supreme Court And Ninth Circuit Precedent Establish That SB 1172's Prohibition On One Type Of Therapy Discriminates On The Basis Of Viewpoint. ................................................................................ 19

      2.   SB 1172 Is Not Narrowly Tailored To Achieve A Compelling Government Interest Even If It Were Only Content and Not Viewpoint-Based.............. 25

        a.   The State Cannot Prove that SB 1172 Prevents any Actual Harm to Minors. .............................................................................. 26

        b.   The State Cannot Prove that SB 1172 is Narrowly Tailored and Necessary to Prevent Harm to Minors. ......................................... 30

    B.   SB 1172 Is Unconstitutionally Vague and Overbroad. ...................................... 32

      1.   Because SB 1172 Does Not Define "Sexual Orientation," Therapists Must Guess About Whether They Have Triggered SB 1172's Prohibitions. ........ 32

      2.   Because SB 1172 Does Not Adequately Define "Sexual Orientation Change Efforts," Therapists Must Guess What Counsel Is Prohibited. ..................... 34

    C.   SB 1172 Unconstitutionally Usurps The Fundamental Rights Of Parents To Direct The Upbringing And Education Of Their Children. ........................................... 37

      1.   California's Parents Have A Fundamental Right To Make Mental Health Decisions For Their Children. ........................................................ 38

      2.   SB 1172 Infringes Upon The Fundamental Right Of Parents To Make Mental Health Decisions For Their Children. .................................................. 39

      3.   The State Cannot Satisfy Strict Scrutiny Because SB 1172 Is Not Necessary To Achieve A Compelling State Interest. .............................................. 41

    D.   SB 1172 Unconstitutionally Infringes Upon Minors' First Amendment Right To Receive Information Regarding Available Treatment Methods............... 42

II.   PLAINTIFFS WILL CONTINUE SUFFERING IRREPARABLE HARM IF THE INJUNCTION IS NOT ISSUED. .......................................................................... 45

    A.   Plaintiffs-Therapists Will Suffer Irreparable Harm If SB 1172 Is Not Enjoined. ................................................................................................ 46

1
     **B.**     **Plaintiffs-Parents Will Suffer Irreparable Harm if SB 1172 Is Not Enjoined.**
2
          ............................................................................................................ **52**
3
     **C.**     **Plaintiffs-Minors Will Suffer Irreparable Harm if SB 1172 Is Not Enjoined.**
4
          ............................................................................................................ **53**
5
**III. PLAINTIFFS' CONTINUING IRREPARABLE INJURY OUTWEIGHS ANY**
6
     **HARM TO DEFENDANTS.** ............................................................ **54**
7
**IV. THE INJUNCTION WILL SERVE THE PUBLIC INTEREST** ................................... **56**
8
**CONCLUSION** ....................................................................................................... **58**
9

10

Memorandum In Support of Preliminary Injunction

# TABLE OF AUTHORITIES

**CASES**

*Alliance for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ............................................. 17

*Associated Gen. Contractors v. Coal. for Econ. Equity*,
 950 F.2d 1401 (9th Cir. 1991) ............................................ 46

*Associated Press v. Otter*,
 682 F.3d 821 (9th Cir. 2012)............................................. 17, 53

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
 457 U.S. 853 (1982)........................................................... 42, 45

*Broadrick v. Oklahoma*,
 413 U.S. 601 (1973)........................................................... 32, 35

*Brown v. Hot, Sexy & Safer Prods., Inc.*,
 68 F.3d 525 (1st Cir. 1995)................................................ 40

*Children of the Rosary v. City of Phoenix*,
 154 F.3d 972 (9th Cir. 1998) ............................................. 20

*City Council of Los Angeles v. Taxpayers for Vincent*,
 466 U.S. 789 (1984)........................................................... 19

*Clear Channel Outdoor, Inc. v. City of Los Angeles*,
 340 F.3d 810 (9th Cir.2003) .............................................. 17

*Conant v. Walters*,
 309 F.3d 629 (9th Cir. 2002) ......................... 23, 24, 43, 44, 46, 53

*Connally v. Gen. Const. Co.*,
 269 U.S. 385 (1926)........................................................... 32

*DiLoreto v. Downey Unified School District Board of Education*,
 196 F.3d 958 (9th Cir. 1999). ........................................... 19, 20

*Elrod v. Burns*,
 427 U.S. 347 (1976)........................................................... 45, 53-55

*Fields v. Palmdale Sch. Dist.*,
 427 F.3d 1197 (9th Cir. 2005) .......................................... 38, 40

Memorandum In Support of Preliminary Injunction

*Florida Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995)................................................................ 23

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994). ................................................ 56

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972)................................................................ 32

*Guzman v. Shewry*,
  552 F.3d 941 (9th Cir. 2009) ................................................. 17

*In re Custody of Smith*,
969 P.2d 21 (Wash. 1998) (*en banc*), *aff'd sub nom*
*Troxel v. Granville, 530 U.S. 57 (2000)* ............................... 38

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992)................................................................ 19

*ISKON v. Lee*,
  505 U.S. 672 (1992)................................................................ 20

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967)................................................ 30, 32, 34, 35

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
  508 U.S. 384 (1993)................................................................ 19

*Legal Services Corporation v. Velazquez*,
  531 U.S. 533 (2001)........................................................... 22, 45

*Lydo Enters., Inc. v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) ........................................... 46, 53

*Martin v. City of Struthers*,
  319 U.S. 141 (1943)................................................................ 42

*Melendres v. Arpaio*,
  ___ F.3d ___, 2012 WL 4358727 (9th Cir. 2012) ............... 45, 52

*Meyer v. Nebraska*,
  262 U.S. 390 (1923)....................................................... 37, 39, 42

*Monteiro v. Tempe Union High Sch. Dist.*,
  158 F.3d 1022 (9th Cir. 1998). .............................................. 42

Memorandum In Support of Preliminary Injunction

*Monterey Mech. Co. v. Wilson,*
   125 F.3d 702  (9th Cir. 1997) ................................................... 46, 54

*NAACP v. Button,*
   371 U.S. 415 (1963)................................................................. 32

*Nat'l Ass'n for Advancement of Psychoanalysis v. Ca. Bd. of Psychology,*
   228 F.3d 1043 (9th Cir. 2000) ........................................ 24, 25, 45

*New York Times Co. v. United States,*
   403 U.S. 713 (1971)............................................................ 46, 53

*Parham v. J.R.,*
   442 U.S. 584 (1979)................................................................. 38

*Pierce v. Soc'y of Sisters,*
   268 U.S. 510 (1925)....................................................... 37, 38, 40

*Pimentel v. Dreyfus*
   670 F.3d 1096 (9th Cir. 2012) ................................................ 17

*R.A.V. v. St. Paul,*
   505 U.S. 377 (1992)...................................................... 19, 24, 30

*Reno v. Flores,*
   507 U.S. 292 (1993).......................................................... 38, 42

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
   515 U.S. 819 (1995)................................................................. 19

*Sable Commc'ns of Cal., Inc. v. F.C.C.,*
   492 U.S 115 (1989).................................................................. 25

*Sammartano v. First Judicial District, in & for Cnty. of Carson City,*
   303 F.3d 959 (9th Cir. 2002). ............................................. 55, 56

*Schneider v. New Jersey,*
   308 U.S. 147 (1939)................................................................. 55

*Stanley v. Georgia,*
   394 U.S. 557 (1969)................................................................. 42

*Troxel v. Granville,*
   530 U.S. 57 (2000)........................................................ 37, 38, 41

Memorandum In Support of Preliminary Injunction

*Turner Broadcasting sys., Inc. v. F.C.C.*,
    512 U.S. 622 (1994) ........................................................................... 26

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000) ...................................................................... 25, 26

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ..................................................................... 42-44

*Video Software Dealers Ass'n v. Schwarzenegger*,
    556 F.3d 950 (9th Cir. 2009) ................................................ 26, 28, 29

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ........................................................................... 32

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ............................................................................... 17

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................ 37, 38, 42

**STATUTES**

Cal. Bus. & Prof. Code § 2(a) .................................................................. 41

Cal Bus. & Prof. Code § 865-865.2, SB 1172 ................................... *passim*

Cal. Bus. & Prof. Code § 2936 ........................................................... 29, 31

Ca. Health & Safety Code § 124260(b) .................................................... 45

**ETHICAL CODES**

American Association of Marriage and Family Therapists Code of Ethics Principle 1.2 .......... 49

American Association of Marriage and Family Therapists Code of Ethics Principle 1.8 ...... 15, 49

American Counseling Association Code of Ethics, Section A.2.d ........................................ 15, 48

American Counseling Association Code of Ethics, Section A.4.a ...................................... 15, 30

American Counseling Association Code of Ethics, Section B.5.b ...................................... 15, 48

American Medical Association Code of Ethics, Opinion 10.01(2) ...................................... 14, 48

American Medical Association Code of Ethics, Opinion 10.016 ................................................ 49

American Psychological Association Code of Ethics, Section 3.04 ........................................... 30

American Psychological Association Code of Ethics, General Principle E ................................ 47

American Psychiatric Association Guidelines, Section 1(a) .................................................. 14, 48

American Psychiatric Association Guidelines, Section 1(c) ......................................................... 31

Code of Ethics of the National Association of Social Workers, Section 1.01 ............................ 49

Code of Ethics of the National Association of Social Workers, Section 1.02 ............................ 49

Code of Ethics of the National Association of Social Workers, Section 1.03 ....................... 16, 50

**OTHER AUTHORITIES**

Jim Crogan, *California Law Barring Parents from "Curing" Gay Children Moves through Legislature*, FoxNews.com (Aug. 18, 2012), www.foxnews.com/politics/2012/08/18/California-law-barring-parents-from-curing-gay-children-moves-through/) ....................................................................................... 13

Kim Reyes, *Controversy Follows Effort to Ban Gay Conversion Therapy*, Orange Cnty. Reg., (July 27, 2012)........................................................................................... 13, 37

Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation (2009)........................................ 26-28, 30, 33, 36

Sean Young, Note, *Does "Reparative" Therapy Really Constitute Child Abuse?: A Closer Look*, 6 YALE J. HEALTH POL'Y L. & ETHICS 163, 202 (2006). ................................. 29

What We Offer," available at http://narth.com/menus/goals.html (last visited Sept. 25, 2012)....................................................................................... 20

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, by and through counsel and pursuant to Fed. R. Civ. P. 7 and 65 and Eastern District Court L.R. 230 and 231, file this memorandum in support of their Motion for a Preliminary Injunction.

### INTRODUCTION

Plaintiffs are asking this Court to enjoin SB 1172, which is an unprecedented and unconstitutional intrusion into the sacrosanct relationships between psychotherapists and their patients and between parents and their children. SB 1172 infringes on the right of psychotherapists to speak or provide information to their clients and on the right of parents and minors to receive information. It prohibits "mental health providers," under threat of loss of their professional licenses, from offering minors a particular type of therapy, known as Sexual Orientation Change Efforts ("SOCE"), even if the therapy is desired by the clients and their parents and even if the mental health professional believes, in his professional judgment, that the therapy will be beneficial to the client. SB 1172 places mental health professionals in a Catch-22: they cannot recommend SOCE to clients without risking their professional licenses and, as discussed in detail below, they cannot refrain from recommending SOCE without risking their professional licenses.

Plaintiffs, mental health professionals, their minor clients and parents, face imminent and irreparable harm unless SB 1172 is enjoined. Mental health professionals will be precluded from continuing psychotherapy or counseling that is beneficial to their clients and from presenting that therapy option to clients seeking it, which violates their ethical codes of conduct and destroys the psychotherapist-patient/counselor-counselee relationship. Current clients will have to abruptly stop ongoing SOCE therapy that they have requested and are benefitting from and thereby face

1  adverse health consequences and increased mental health complications, while future clients will

2  be denied the opportunity of choosing a type of therapy that could improve their mental health.

3  These clients will be deprived of their right to self-determination and will be unable to receive

4  counseling consistent with their religious and moral values. The state does not and cannot offer a

5  compelling, or even rational, reason for its sweeping, intrusive legislation, save a politically-

6  driven agenda to normalize and even prioritize same-sex sexual attractions regardless of its

7  consequences.

8       SB 1172 is also unconstitutionally vague and overbroad in that it fails to properly define

9  the extent and scope of the prohibition, and it prevents far more speech than necessary to achieve

10  any alleged government interest. On its face and as applied, SB 1172 will prohibit a mental

11  health professional from addressing SOCE therapy in any form in any venue, thereby subjecting

12  professionals to discipline anywhere in the world.

13  **STATEMENT OF FACTS**

14  **PROFESSIONAL COUNSELOR PLAINTIFFS, MINOR PLAINTIFFS, AND PARENT**
15  **PLAINTIFFS**

16       Plaintiff David Pickup is a California Licensed Marriage and Family Therapist who

17  specializes in SOCE therapy. He is a member of National Association for Research and Therapy

18  of Homosexuality ("NARTH"), the California Association of Marriage and Family Therapists,

19  the American Association of Christian Counselors, and the International Institute of

20  Reorientation Therapies. Declaration of David Pickup "Pickup Decl." at ¶ 3. In compliance with

21  the ethical codes governing his profession, Mr. Pickup uses SOCE therapy only when clients

22  consent to it after having received the information necessary to make an informed decision. *Id.* ¶

23  12. Many of the minor clients that request SOCE therapy do so out of a desire to conform to their

1   sincerely-held religious beliefs. *Id.* ¶ 9. Mr. Pickup credits the SOCE counseling he personally
2   received with saving his life. *Id.* ¶ 6.

3        Mr. Pickup is passionate about SOCE because he is a testament that SOCE works for
4   people who want to reduce or eliminate unwanted same-sex attractions. *Id.* ¶ 7. As a five-year-
5   old boy, Mr. Pickup was sexually molested by a male high school student at least two or three
6   times, and he considers this abuse to be the main cause of his subsequent same-sex attractions.
7   *Id.* ¶ 4. Mr. Pickup underwent SOCE as an adult, and ultimately resolved and eliminated his
8   unwanted same-sex attractions. *Id.* ¶¶ 5-6. SOCE also helped Mr. Pickup understand and deal
9   with his same-sex attractions and to significantly increase his attractions for women. *Id.* ¶ 7.

10        Plaintiff Christopher Rosik, Ph.D., is a professional counselor licensed in California as a
11   Clinical Psychologist. He practices psychology at the Link Care Center in Fresno, California.
12   Declaration of Christopher Rosik "Rosik Decl." at ¶ 4. Dr. Rosik also teaches a psychology
13   research practicum at Fresno Pacific University. *Id.* ¶ 6. Dr. Rosik has published over forty
14   scholarly articles in peer-reviewed journals, many of which address the topics of homosexuality,
15   same-sex attractions, and SOCE. *Id.* ¶ 6. Dr. Rosik is also a member of the Christian Association
16   of Psychological Studies, where he has served on the board of directors and as its president, and
17   is currently the President of NARTH. Generally, five to ten percent of the 25 to 30 clients that
18   Dr. Rosik sees each week report unwanted same-sex attractions and about half of those are under
19   age 18. *Id.* ¶ 7. When Dr. Rosik first meets with clients who report unwanted same-sex
20   attractions, he initially inquires about the client's ultimate goals. *Id.* If the client and, where
21   applicable, his parents, want to receive SOCE therapy, then Dr. Rosik begins that therapy, but if
22   the client does not want to undergo SOCE therapy, then he will not engage in SOCE therapy,
23   even if the parents want their child to have it. *Id.* at ¶ 8. When Dr. Rosik counsels someone

Memorandum In Support of Preliminary Injunction

1  regarding SOCE therapy, he obtains what he calls advanced informed consent. *Id.* at ¶ 9. This

2  "advanced informed consent" documents the controversies and disagreements surrounding

3  SOCE, explains the nature of the course of treatment and potential risks and benefits, and

4  complies with the ethical standards for counselors when they are engaging in emerging or

5  controversial areas of practice. *Id.* at ¶ 9.

6      Dr. Joseph Nicolosi is a licensed psychologist in the state of California. Declaration of

7  Joseph Nicolosi "Nicolisi Decl." at ¶ 3. Dr. Nicolosi received his Master's degree from the New

8  School for Social Research and earned his Ph. D. in Clinical Psychology from the California

9  School of Professional Psychology. *Id.* Dr. Nicolosi is the Founder and Clinical Director of the

10  Thomas Aquinas Psychologists Clinic in Encino, California. *Id.* Dr. Nicolosi specializes in the

11  treatment and counseling of males who struggle with unwanted same-sex sexual or romantic

12  attractions and who seek to develop and foster healthy, heterosexual relationships. *Id.* ¶ 5. He has

13  published numerous scholarly works on the topic of homosexuality and counseling for those who

14  seek to reduce unwanted same-sex attractions. *Id.* ¶ 4. He has been interviewed and featured on

15  numerous national news networks and other television programs discussing his methods of

16  counseling individuals with unwanted same sex attractions. *Id.*

17      Dr. Nicolosi has performed extensive research on the topic of homosexuality and SOCE

18  counseling and believes that individuals are capable of and do achieve success in reducing their

19  unwanted same-sex attractions and increasing their attractions towards members of the opposite

20  sex. *Id.* Dr. Nicolosi believes that if he and the client can develop the "therapeutic alliance," then

21  SOCE counseling can be as successful as any other counseling. *Id.* ¶ 12. This "therapeutic

22  alliance" is the term that Dr. Nicolosi uses to define the successful relationship that he develops

23  with his clients during the course of their treatment. *Id*. In addition to counseling clients in

4

Memorandum In Support of Preliminary Injunction

California, Dr. Nicolosi counsels clients outside of California using various telecommunication vehicles. *Id.* ¶ 26. He also produces videos regarding SOCE that are used by clients and others inside and outside of California. *Id.* ¶ 26.

Dr. Nicolosi is the current psychologist for Plaintiffs John Doe 1 and 2 and has been engaged by their parents to provide SOCE counseling to their children and families. *Id.* ¶ 9. Plaintiff John Doe 1 has been a patient of Dr. Nicolosi's for a year and a half. *Id.* ¶ 12. Plaintiff John Doe 2 has been a patient of Dr. Nicolosi's for about three and one half months. Declaration of Jack Doe 2 at ¶ 14. Prior to engaging in SOCE counseling with the Doe families,  Dr. Nicolosi provided a detailed consent form that reveals the nature of the treatment he provides, explicitly informs the client that he does not provide gay-affirming therapy, informs the client that he should seek an alternative psychotherapist if he seeks gay-affirming treatment or if he decides that is what he wants in the future, discusses the risks and benefits of SOCE, informs the client of the controversial nature of SOCE and the fact that some psychologists believe sexual orientation cannot or should not be changed, and explains that success in all psychotherapies is not guaranteed. Nicolosi Decl. ¶¶ 6-7. Dr. Nicolosi's SOCE counseling with the patients includes a number of various techniques and counseling sessions that are aimed at helping them reduce their unwanted same-sex attractions and to enable them to realize their heterosexual identity. *Id.* ¶ 9.

SOCE counseling includes discussing the root causes of same-sex attractions and the nature and extent of the same-sex attractions, and assisting clients in understanding traditionally gender-appropriate characteristics and behaviors and in affirming those characteristics. *Id.* Dr. Nicolosi believes that his course of treatment has obtained the "therapeutic alliance" with the clients and that they have a good chance of success in therapy. *Id.* ¶ 19. Dr. Nicolosi has

witnessed the success of SOCE counseling in the patients and has seen a marked increase in their realization of their heterosexual identity. *Id.* ¶¶ 13, 16, 17. Dr. Nicolosi also believes that implementation of SB 1172 would prevent that success from continuing and, in fact, that the clients would regress in their efforts to eliminate their unwanted same-sex attractions. *Id.* ¶ 18. Dr. Nicolosi's practice, which does not provide gay-affirming treatment, would be completely and irreparably injured if SB 1172 is allowed to stand.  *Id.* ¶ 6. Dr. Nicolosi's current clients, and his future clients who desire SOCE counseling, will be irreparably harmed if SB 1172 is allowed to stand because it would prohibit their desired counseling to deal with unwanted same-sex attractions.

Plaintiff, Robert Vazzo, is a California Licensed Marriage and Family Therapist, a member of the California Association of Marriage and Family Therapists, a member of NARTH, and is the Treasurer of the International Institute of Reorientation Therapies. Declaration of Robert Vazzo "Vazzo Decl." at ¶ 3. Mr. Vazzo is also a licensed Marriage and Family Therapist in Ohio and Florida, which creates substantial difficulty for him in understanding the scope of SB 1172. *Id.* ¶ 4. Mr. Vazzo engages in extensive informed consent with his clients prior to beginning therapy with them. *Id.* ¶ 5. Mr. Vazzo's current practice specializes in SOCE counseling and includes approximately fifteen to twenty clients per week. *Id.* Of those clients, Mr. Vazzo has about ten percent who are minors seeking SOCE counseling. *Id.* Many of Mr. Vazzo's clients profess to be Christians with sincerely-held religious beliefs that homosexuality is a harmful and destructive lifestyle and therefore seek SOCE counseling to live a lifestyle that is in congruence with their faith. *Id.* ¶ 6. Mr. Vazzo believes that SB 1172 will put him on an inevitable collision course with his ethical code's requirements, and that it will be harmful to his

Memorandum In Support of Preliminary Injunction

1    clients who have been successful in their efforts to reduce or eliminate their unwanted same-sex

2    attractions. *Id.* ¶¶ 11-18.

3       Plaintiff National Association of Research and Therapy for Homosexuals ("NARTH") is

4    a non-profit, professional, scientific organization organized under the laws of the state of Utah.

5    Declaration of David Pruden "Pruden Decl." at ¶ 3. NARTH's organizational mission is to

6    provide  hope  and  information  to  those  individuals  who  struggle  with  unwanted  same-sex

7    attractions.  *Id.*  As  an  organization,  NARTH  is  engaged  in  scientific  research  focusing  on

8    homosexuality  and  therapeutic  options  for  those  individuals  who  might  wish  to  eliminate  or

9    reduce  their  same-sex  attractions.  *Id.*  ¶ 4.  NARTH  provides  educational  information  to  those

10   individuals seeking treatment options for unwanted same-sex attractions, but respects the rights

11   and autonomy of all of its patients to choose their own destiny in treatment. *Id.* ¶¶ 4-6. As such,

12   NARTH supports the rights of individuals to seek treatment options such as SOCE, but it does

13   not impose any method of treatment on its clients. *Id.* ¶ 6.

14      NARTH offers a range of services to those clients with unwanted same sex attractions. It

15   provides an international referral service of licensed therapists offering SOCE treatments. *Id.* ¶ 3.

16   NARTH is engaged in extensive research concerning individuals who have successfully reduced

17   or eliminated their unwanted same-sex attractions and the psychological factors that are typically

18   associated  with  the  homosexual  lifestyle.  *Id.*  ¶ 4.  NARTH  offers  scholarly  publications  and

19   educational  information  to  the  general  public,  it  provides  various  presentations  across  the

20   country  hosted  by  mental  health  professionals  who  specialize  in  SOCE  counseling,  and

21   advocates for an open discussion of all views surrounding this area. *Id.*

22      NARTH maintains an office in Los Angeles, California and has many clients that receive

23   treatment in that location. *Id.* ¶¶ 3, 8. Some of these clients are minors who would lose the ability

7

Memorandum In Support of Preliminary Injunction

1    to continue receiving the SOCE counseling that they desire to receive from NARTH counselors

2    and who would inevitably regress in their course of treatment to eliminate their unwanted same-

3    sex attractions. *Id.* ¶ 8. As such, NARTH is bringing its claim on behalf of its California

4    members as well as on behalf all of their minor clients and all of the future minor clients that

5    would seek to receive the SOCE counseling prohibited by SB 1172.

6         Plaintiff American Association of Christian Counselors ("AACC") is an international

7    nonprofit professional scientific association of 50,000 members representing the full spectrum of

8    mental health professionals. Declaration of Eric T. Scalise "Scalise Decl." at ¶¶ 5-6. AACC

9    provides a wide range of educational and professional support to its members, with a particular

10   emphasis on integrating the Christian faith with professional counseling. *Id.* ¶ 7. AACC strongly

11   believes in the time-honored and foundational ethical value of client self-determination. *Id.* ¶ 11.

12   California Senate Bill 1172 directly and significantly undermines self-determination that AACC

13   and its members consider as a cornerstone principle in the treatment of clients. *Id.* That principle

14   is found in the language of the ethical codes of notable professional member organizations such

15   as the American Psychological Association ("APA"), the American Counseling Association

16   ("ACA"), and the American Association of Marriage and Family Therapists ("AAMFT").

17   AACC and its members believe that every client seeking mental health services has the inherent

18   right to participate in treatment that is in alignment with his religious beliefs and faith-based

19   values, and furthermore, to have this right vigorously protected. *Id.* ¶ 12. SB 1172 threatens that

20   right and the therapeutic relationship between professionals and their clients. *Id.* ¶¶ 8-15.

21        Plaintiff John Doe 1 is a minor under the age of eighteen who is currently receiving

22   SOCE therapy. Declaration of John Doe 1 "John Doe 1 Decl." at ¶ 14. John Doe 1 has been

23   receiving SOCE counseling for a year and a half. *Id.* John Doe 1 is a Christian and has a

Memorandum In Support of Preliminary Injunction

1  sincerely-held religious belief that he should seek to eliminate his unwanted same-sex

2  attractions; he wants his religious beliefs to predominate over his unwanted same-sex attractions.

3  *Id.* ¶ 9. John Doe 1 believes that his counseling with Dr. Nicolosi is helping him to bring his

4  unwanted impulses and behaviors into conformity with the religious values that he holds. *Id.*

5  Through counseling, John Doe 1 has learned the root causes of his unwanted same-sex

6  attractions.

7         When John Doe 1 was a younger child, he did not receive much male attention because

8  his father was constantly busy and overwhelmed with life. *Id.* ¶ 4. As a result of that, John Doe 1

9  began to seek to attention from the feminine presence in his home. *Id.* His sisters would dress

10  him up in girl's clothes, and he allowed it so that he could fit in with them. *Id.* Around the time

11  he was five years old, John Doe 1 began to experience confusion and to question his personal

12  identity. *Id.* ¶ 5. As his desire to fit in with the women in his home continued, John Doe 1 began

13  to develop certain habits and traits that reflected more traditional feminine characteristics, such

14  as talking and moving his hands like a little girl would. *Id.* ¶ 6. Because he exhibited these

15  characteristics, many of the students at school, and others who were around him, treated him

16  strangely and questioned why he behaved the way he did. *Id.* ¶ 7.

17         When he approached adolescence, John Doe 1's confusion about his personal identity led

18  to confusion over his sexual identity. *Id.* ¶ 8. John Doe 1 has a cousin and an uncle who are

19  involved in the homosexual lifestyle, which John Doe 1 believes made it easier for him to

20  question whether he also was experiencing same-sex attractions. *Id.* Those questions led John

21  Doe 1 to actually experience same-sex attractions. About a year and a half ago, John Doe 1

22  approached his parents and told them that he did not want to be gay and that he did not like

23  experiencing his same-sex attractions. *Id.* ¶ 10. At that time, John Doe 1 asked his parents

Memorandum In Support of Preliminary Injunction

1  whether they could find someone who would help him to eliminate his unwanted same-sex

2  attractions. *Id.* ¶ 10. Mr. and Mrs. Doe 1 then found out about Dr. Joseph Nicolosi, who

3  specializes in SOCE counseling. *Id.*

4      No one forced John Doe 1 into SOCE therapy, and he entered into it with full knowledge

5  of the potential benefits and harms. *Id.* ¶¶ 12-13. As a result of the SOCE counseling, John Doe 1

6  has experienced a substantial reduction in his unwanted same-sex attractions and an increase in

7  his security and identity as a male. *Id.* ¶¶ 14-15. John Doe 1 wishes to continue to receive SOCE

8  counseling because, while he has substantially reduced his unwanted same-sex attractions, he has

9  not completely eliminated them and believes without that therapy he may regress away from his

10  goal. *Id.* ¶ 16.

11      Plaintiffs Mr. and Mrs. Doe 1 are the parents of John Doe 1 and have entered into a

12  contract with Dr. Joseph Nicolosi to provide SOCE counseling to their son. Jack Doe 1 Decl. ¶ 3;

13  Jane Doe 1 Decl. ¶ 3. Mr. and Mrs. Doe 1 have sincerely-held religious beliefs that they are to

14  bring their children up in the nurture and admonition of the Lord. Jack Doe 1 Decl. ¶ 15; Jane

15  Doe 1 Decl. ¶ 15. Mr. and Mrs. Doe 1 chose Dr. Nicolosi because he is an expert on SOCE

16  counseling. Jack Doe 1 Decl. ¶ 6; Jane Doe 1 Decl. ¶ 7. Mr. and Mrs. Doe 1 both consented to

17  the treatment along with their son, John Doe 1, after having reviewed information concerning the

18  treatment and its potential benefits and effects. Jack Doe 1 Decl. ¶¶ 7-8; Jane Doe 1 Decl. ¶¶ 7-8.

19  Dr. Nicolosi provided Mr. and Mrs. Doe 1 and John Doe 1 with extensive information

20  concerning the nature of SOCE counseling, its potential effects and risks, and that some

21  therapists believe that sexual orientation should not or cannot be changed. Jack Doe 1 Decl. ¶¶ 7-

22  8; Jane Doe 1 Decl. ¶¶ 7-8. Mr. and Mrs. Doe 1 believe that the SOCE counseling that John Doe

23  1 has been receiving has substantially benefitted him and that it has improved the relationship

1    between them and their son. Jack Doe 1 Decl. ¶ 11; Jane Doe 1 Decl. ¶ 10. Mr. and Mrs. Doe 1

2    desire to have John Doe 1 continue to receive SOCE counseling, and they believe that John Doe

3    1 will regress from his progress if such treatment is not allowed to continue. Jack Doe 1 Decl.

4    ¶ 12; Jane Doe 1 Decl. ¶¶ 12-13. Additionally, John Doe 1 wants to continue his SOCE

5    counseling with Dr. Nicolosi because he likes the substantial improvements it has made on his

6    life. Jack Doe 1 Decl. ¶ 14; Jane Doe 1 Decl. ¶ 14.

7         Plaintiffs Jack and Jane Doe 2 and their 14-year-old son John Doe 2 have received SOCE

8    counseling from Dr. Nicolosi for about three and a half months. Declaration of Jack Doe 3 at

9    ¶ 14. John Doe 2 reported having unwanted confusion about sexual orientation, which conflicted

10   with the family's religious beliefs. *Id.* ¶ 5. The family met with Dr. Nicolosi and agreed to

11   participate in SOCE therapy. *Id.* ¶ 15.  Jack Doe 2 has seen a marked improvement in the family,

12   and has witnessed a closer bond between him and his children, as well as greater family unity. *Id.*

13   Mr. and Mrs. Doe 2 believe that if Dr. Nicolosi is prohibited from continuing to provide SOCE

14   counseling to their family that their son's progress in the relationship with his parents will be

15   thwarted. *Id.* ¶ 16. Mr. and Mrs. Doe 2 and their son wish to continue the SOCE counseling with

16   Dr. Nicolosi. *Id.* ¶ 15.


17                              **SB 1172 AND BACKGROUND**

18        SB 1172 was passed by the Legislature on August 30, 2012, and signed into law by

19   Governor Brown on or about September 29, 2012. **SB 1172**, which **goes into full effect on**

20   **January 1, 2013**, and adds Article 15, Sections 865-865.2 to Chapter 1 of Division 2 of the

21   Business and Professions Code. Section 865.1 states, "Under no circumstances shall a mental

22   health provider engage in sexual orientation change efforts with a patient under 18 years of age."

23   *See* Compl. ¶ 33. "Mental health providers" are defined as,

Memorandum In Support of Preliminary Injunction

a physician and surgeon specializing in the practice of psychiatry, a psychologist, a psychological assistant, intern, or trainee, a licensed marriage and family therapist, a registered marriage and family therapist, intern, or trainee, a licensed educational psychologist, a credentialed school psychologist, a licensed clinical social worker, an associate clinical social worker, a licensed professional clinical counselor, a registered clinical counselor, intern, or trainee, or any other person designated as a mental health professional under California law or regulation.

Section 865(a), Compl. ¶ 35.

"Sexual orientation change efforts" ("SOCE") are defined as "any practices by mental health providers that seek to change an individual's sexual orientation." *Id.* ¶ 34; (citing Cal. Bus. & Prof. Code § 865(b)(1)). "This includes efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals or the same sex." *Id.* Prohibited SOCE therapy **does not** include courses of treatment that "provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration or development" or efforts that "do not seek to change sexual orientation." *Id.* (citing Cal. Bus. & Prof. Code § 865(b)(2)). SB 1172 establishes a *per se* violation by stating that "[a]ny sexual orientation change efforts attempted on a patient under 18 years of age by a mental health provider *shall be unprofessional conduct* and shall subject a mental health provider to discipline by the licensing entity for that mental health provider." *Id.* ¶ 36 (citing Cal Bus. & Prof. Code § 865.2) (emphasis added).

In an attempt to justify the prohibition, the Legislature claims that SOCE is "harmful to minors," based upon opinions from various professional organizations. *See* SB 1172, Section 1. These include an APA position statement advising "parents, guardians, young people, and their families to avoid sexual orientation change efforts . . . ." SB 1172, Section 1(c). The American Psychiatric Association also issued a position statement stating that SOCE is "questionable" and that "anecdotal reports of 'cures' are counterbalanced by anecdotal claims of psychological

Memorandum In Support of Preliminary Injunction

1   harm." SB 1172, Section 1(d). In addition, the Legislature cited opinion statements from the

2   National Association of Social Workers, American Psychoanalytic Association, American

3   Academy of Child and Adolescent Psychiatry, and others, all of which state that the science in

4   inconclusive. *See* SB 1172, Sections 1(h), (j), (k). Based upon only these one-sided position

5   statements, the Legislature asserts that "California has a compelling interest . . . in protecting its

6   minors against exposure to serious harms caused by sexual orientation change efforts." SB 1172,

7   Section 1(n).

8        The sponsors and supporters of SB 1172 have publicly stated that the ban on SOCE is

9   necessary to protect children even when parents choose such treatment. Indeed, Senator Lieu,

10   who was the floor sponsor of the legislation, stated that "[t]he attack on parental rights is exactly

11   the whole point of the bill because we don't want to let parents harm their children." Compl. ¶ 70

12   (quoting Kim Reyes, *Controversy Follows Efforts to Ban Gay Conversion Therapy*, Orange

13   Cnty. Register (July 27, 2012)).[1]

**PROFESSIONAL ETHICAL CODES**

15        Conspicuously absent from the discussion of banning SOCE therapy is any reference to

16   the professional codes of conduct that govern mental health professionals and which directly

17   conflict with SB 1172. For example, General Principle E of the American Psychological

18   Association's "Ethical Principles of Psychologists and Code of Conduct" ("APA Code") states

19   that psychologists are to follow the wishes of their clients and respect their rights to self-

20   determination, take reasonable steps to avoid harming their clients/patients . . . and to minimize

---

[1]    Jim Crogan, *California Law Barring Parents from "Curing" Gay Children Moves through Legislature*, FoxNews.com (Aug. 18, 2012), www.foxnews.com/politics/2012/08/18/California-law-barring-parents-from-curing-gay-children-moves-through/).

Memorandum In Support of Preliminary Injunction

1  harm when foreseeable and unavoidable." *Id.* ¶ 37. SB 1172 prohibits mental health

2  professionals from respecting the client's autonomy when the client desires SOCE counseling.

3       Separately SB 1172 is redundant of existing ethical obligations. For example, Section

4  3.04 of the APA Code, "Avoiding Harm," requires that "Psychologists take reasonable steps to

5  avoid harming their clients/patients . . . and to minimize harm where it is foreseeable and

6  unavoidable." *Id.* ¶ 39. Given that the APA Code already prohibits harming patients, the stated

7  goal of SB 1172 to avoid harm is unnecessary.

8       The American Psychiatric Association Guidelines for Ethical Treatment ("APA

9  Guidelines") provide that "[a] psychiatrist shall not withhold information that the patient needs

10  or reasonably could use to make informed treatment decisions, including options for treatment

11  not provided by the psychiatrist." *Id.* ¶ 41 (citing Psychiatric Guidelines, Section 1(a)). The

12  Psychiatric Guidelines also require that a psychiatrist "strive to provide beneficial

13  treatment . . . ." *Id.* ¶ 44. SB 1172 prohibits discussion of a treatment option that has helped those

14  with unwanted same-sex attractions.

15       The American Medical Association Code of Ethics ("AMA Code") includes similar

16  language, while acknowledging and respecting the patient's right to choose his own treatment.

17  Opinion 10.01(2) of the AMA Code states that a "patient has the right to make decisions

18  regarding the health care that is recommended by his or her physician," and that "patients may

19  accept or refuse *any* recommended medical treatment." *Id.* ¶ 46 (emphasis added). The AMA

20  Code also requires that minor's rights be protected by providing that decisions concerning the

21  health care of a minor patient "should be based in the child's best interest." *Id.* ¶ 49.

22  Additionally, the AMA Code respects the right of parents to oversee their children's health care,

1  stating that in the event an agreement cannot be reached regarding the best course of treatment

2  for the minor patient, "the wishes of the parents should generally receive preference." *Id.*.

3      The American Counseling Association Code of Ethics ("ACA Code") requires its

4  members to respect the ability of a minor to consent to treatment if possible, and if not, to respect

5  the rights of the parents to make decisions concerning the well-being of their children. *Id.* ¶ 52

6  (citing ACA Code, Section A.2.d); *see also* Compl. ¶ 53 (citing ACA Code, Section B.5.b).

7  Section B.5.b of the ACA Code states, "Counselors are sensitive to the cultural diversity of

8  families and respect the inherent rights and responsibilities of parents/guardians over the welfare

9  of their children." Additionally, the ACA Code states: "Counselors act to avoid harming their

10  clients, trainees, and research participants and to minimize or to remedy unavoidable or

11  unanticipated harm." *Id.* ¶ 55 (citing APA Code, Section A.4.a).

12      Principle 1.2 of the American Association of Marriage and Family Therapists Code of

13  Ethics ("AAMFT Code") provides that all licensed Marriage and Family Therapists obtain

14  informed consent from their clients, which generally requires that the client "has been adequately

15  informed of significant information concerning treatment processes and procedures." Compl.

16  ¶ 58. SB 1172 prohibits Licensed Marriage and Family Therapists from informing their minor

17  clients about an entire course of treatment—SOCE counseling—that might benefit them and help

18  them achieve their goals of eliminating or reducing their unwanted same-sex attractions.

19      Principle 1.8 of the AAMFT Code provides that licensed marriage and family therapists

20  "respect the rights of clients to make decisions." Compl. ¶ 60. SB 1172 will prohibit California

21  Licensed Marriage and Family Therapists from respecting the rights of clients to make treatment

22  decisions because the State already made the decision for the client—i.e., no one under the age

23  of eighteen can receive SOCE counseling.

Memorandum In Support of Preliminary Injunction

15

Section 1.01 of Code of Ethics of the National Association of Social Workers ("NASW Code") states that it is a social worker's primary responsibility to promote the well-being of her clients. Compl. ¶ 63. Section 1.02 of NASW Code provides that the clients shall have the right to self-determination and that a social worker should only seek to assist the client in achieving the client's goals. Compl. ¶ 65. Section 1.03 of the NASW Code provides that social workers must provide sufficient information for the client to make an informed decision about the course of care and specifically states that such informed consent must include a discussion of reasonable *alternatives.*¶ 67.

None of the professional ethics codes imposes an outright ban on SOCE, and, in fact, could not impose such a ban without conflicting with the principle that the licensed professional is required to avoid harm and respect the wishes of a client's right to self-determination and the rights of parents with regard to the best course of treatment. Professionals cannot comply with these ethical standards if they refuse to offer or abruptly discontinue a course of treatment that a client has requested and is benefitting from. Yet that is precisely what the California Legislature requires under SB 1172.

***Effective January 1, 2013, SB 1172 will force the Therapist Plaintiffs who offer, or refer clients for, SOCE as a therapy option to address unwanted same-sex sexual attractions to violate the requirements of the ethical codes under which they are licensed. If therapists comply with SB 1172, they will violate their respective codes of ethics by overriding the client's right to self-determination to receive counseling that aligns with the client's religious and moral values; if therapists engage in SOCE counseling or refer to someone who does, then they violate SB 1172. The injury they face is immediate and irreparable. Moreover, the Minor Plaintiffs and the Parents/Guardians will no longer be able to receive counseling to minimize,***

Memorandum In Support of Preliminary Injunction

1   *reduce, resolve, or otherwise help the minor children conform their same-sex sexual*

2   *attractions to their religious and moral beliefs. These Plaintiffs will suffer immediate and*

3   *irreparable harm by being foreclosed from therapy they desire.*

### LEGAL ARGUMENT

6   Plaintiffs are entitled to injunctive relief if they can establish that they are likely to

7   succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary

8   relief, the balance of equities tips in their favor, and that the injunction is in the public interest.

9   *Associated Press v. Otter*, 682 F.3d 821, 823-24 (9th Cir. 2012) (quoting *Winter v. Nat. Res. Def.*

10   *Council, Inc*. 555 U.S. 7, 20 (2008)). The Ninth Circuit also follows a "sliding scale" approach to

11   preliminary injunctions, in which "the elements of the preliminary injunction test are balanced,

12   so that a stronger showing of one element may offset a weaker showing of another." *Alliance for*

13   *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Clear Channel Outdoor,*

14   *Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir.2003)). "[A]t an irreducible minimum,"

15   though, "the moving party must demonstrate a fair chance of success on the merits, or questions

16   serious enough to require litigation." *Pimentel v. Dreyfus* 670 F.3d 1096, 1105 -1106 (9th Cir.

17   2012) (citing *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009)). Plaintiffs easily satisfy this

18   sliding scale standard, and also satisfy the four requirements for injunctive relief. Therefore, this

19   Court should grant the requested injunctive relief.

20  **I.      PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF PREVAILING ON**
21  **         THE MERITS.**

23   SB 1172 presents a significant number of constitutional infirmities that provide Plaintiffs

24   with a substantial likelihood of succeeding on the underlying merits of their claims. SB 1172,

25   *inter alia*, discriminates on the basis of viewpoint, is hopelessly vague and overbroad, infringes

1  upon the fundamental rights of parents to direct the upbringing and education of their children,

2  and infringes upon the professionals' First Amendment rights to free speech and free exercise of

3  religion. Viewpoint discrimination is always unconstitutional and would entitle Plaintiffs to

4  injunctive relief regardless of the other infirmities, but these other infringements exacerbate the

5  State's inability to meet the burden of proof on the ultimate question of SB 1172's

6  constitutionality. Defendants cannot demonstrate that the legislation is narrowly tailored and

7  necessary to achieve a compelling state interest. Because SB 1172 discriminates on the basis of

8  viewpoint, this Court should grant the preliminary injunctive relief requested.

9  **A. SB 1172 UNCONSTITUTIONALLY DISCRIMINATES ON THE BASIS OF VIEWPOINT.**
10

11       SB 1172 represents a brazen attempt to silence a particular viewpoint with which the

12  State does not agree. SB 1172 permits licensed professionals to counsel minors about same-sex

13  attractions, but prohibits even the mention of the viewpoint that unwanted same-sex attractions

14  can be changed, reduced, or minimized in accordance with the self-determination of the client.

15  That is, mental health professionals are permitted to say that same-sex attractions exist, but

16  cannot say that a same-sex attraction that is unwanted may be changed. And where a client seeks

17  counseling to prioritize their religious and moral values over their same-sex attractions and

18  desires not to act on the unwanted attractions or to cease or manage these attractions in

19  accordance with their values, the counselor must not present the requested viewpoint to the

20  client. In fact, the counselor is required to present only one viewpoint, namely, that same-sex

21  sexual attractions are good, should not be resisted, and cannot be stopped, reduced or otherwise

22  managed. The counselor cannot even refer the client to someone who engages in SOCE. In other

23  words, mental health professionals' speech is censored when they wish to express the viewpoint

24  that there are treatments available that can change, reduce or minimize same-sex attractions

Memorandum In Support of Preliminary Injunction

1   when clients do not want to pursue those attractions. A mental health professional is threatened

2   with disciplinary action based on the expression of a particular viewpoint, which is the textbook

3   definition of impermissible viewpoint discrimination.

**1. Supreme Court And Ninth Circuit Precedent Establish That SB 1172's Prohibition On One Type Of Therapy Discriminates On The Basis Of Viewpoint.**

8   "It is axiomatic that the government may not regulate speech based on its substantive

9   content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S.

10   819, 828 (1995). "When the government targets not subject matter, but particular views taken by

11   speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. In

12   fact, viewpoint-based regulations are *always* unconstitutional. *See, e.g., Lamb's Chapel v. Ctr.*

13   *Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'the First Amendment forbids the

14   government to regulate speech in ways that favor some viewpoints or ideas at the expense of

15   others'" (quoting *City Council of Los Angeles v. Taxpayers for* Vincent, 466 U.S. 789, 804

16   (1984))). A regulation that affects expressive activity, such as SB 1172's restriction on what

17   mental health professionals can say to clients, is only permissible "*as long as the regulation is*

18   *not an effort to suppress the speaker's activity due to disagreement with the speaker's view.*"

19   *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). Much like the law

20   struck down in *R.A.V. v. St. Paul*, 505 U.S. 377 (1992), where the Court struck down an

21   ordinance that favored a particular point of view, SB 1172 impermissibly favors one side in a

22   debate on a very public issue, *i.e.,* therapeutic responses to same-sex attraction.

23   SB 1172's discriminatory treatment of the particular viewpoint of change therapy for

24   same-sex attractions also conflicts with prevailing Ninth Circuit precedent that has long

25   recognized the blanket prohibition on viewpoint-based discrimination. *See DiLoreto v. Downey*

19

Memorandum In Support of Preliminary Injunction

1   *Unified School District Board of Education*, 196 F.3d 958 (9th Cir. 1999). In *DiLoreto*, the court

2   observed that even in a nonpublic forum, the government may not limit expressive activity "if

3   the limitation is . . . based on the speaker's viewpoint." *Id.* at 965 (citing *ISKON v. Lee*, 505 U.S.

4   672, 679 (1992)). "Viewpoint discrimination is a form of content discrimination in which 'the

5   government targets not subject matter, but particular views taken by speakers on a subject.'"

6   *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 980 (9th Cir. 1998) (quoting

7   *Rosenberger* 515 U.S. at 829).

8           SB 1172 serves as a textbook example of this type of prohibited viewpoint

9   discrimination. The legislation explicitly states that a mental health professional cannot, "under

10   any circumstances," tell a client with unwanted same-sex attractions that same-sex sexual

11   orientation can be changed through therapy. On its face, SB 1172 allows counselors to discuss

12   the *subject* of sexual orientation, but precludes a *particular view on that subject*, namely that

13   sexual orientation *can change to the benefit of the client*. The perspective that sexual orientation

14   is fixed and immutable, however, is not so proscribed. In stark contrast to NARTH's desire "to

15   build an atmosphere which allows an honest debate" and to "open for public discussion all issues

16   relating to homosexuality,"[2] SB 1172 seeks to silence one side of the debate and essentially

17   curtail open and honest inquiry concerning homosexuality. While such discrimination is

18   sufficient to doom the legislation, the viewpoint discrimination goes even deeper.

19           SB 1172 specifically targets SOCE that seeks to "eliminate or reduce sexual or romantic

20   attractions or feelings *towards individuals of the same sex*." Compl. ¶ 34 (emphasis added). SB

21   1172 purportedly prevents such SOCE in order to "protect[] the physical and psychological well-

22   being of minors, including *lesbian, gay, bisexual, and transgender youth*." SB 1172 § 1(n)

---

[2]      *See* "What We Offer," available at http://narth.com/menus/goals.html (last visited Sept. 25, 2012).

1    (emphasis added). By explicitly mentioning same-sex attractions and LGBT youth, SB 1172

2    clearly aims to ban only therapy that seeks to change *non-heterosexual* sexual orientations. That

3    this is the actual meaning of SB 1172 cannot be seriously doubted, because it includes thirteen

4    legislative findings and/or declarations, eleven of which expressly decry efforts to change *non-*

5    *heterosexual* sexual orientations (i.e. homosexual or bisexual).[3] **Not one** legislative finding

6    explicitly opposes counsel seeking to change *heterosexual* sexual orientations. SB 1172's

7    definitions confirm that only non-heterosexual sexual orientation change efforts are precluded as

---

[3]      *See* SB 1172, Section 1(a)-(e), (h)-(k) ("Being lesbian, gay, or bisexual is not a disease…); ("The American Psychological Association Taskforce on Appropriate Therapeutic Responses to Sexual Orientation…concluded that sexual orientation change efforts can pose critical health risks *to lesbian, gay, and bisexual people*. . .); ("[T]he [American Psychological Association] advises parents, guardians, young people, and their families to avoid sexual orientation change efforts *that portray homosexuality as a mental illness*"); ("The American Psychiatric Association published a position statement [stating]: 'Psychotherapeutic modalities *to convert or 'repair' homosexuality* are based on developmental theories whose scientific validity is questionable.'"); ("The American School Counselor Association's position statement on professional school counselors *and lesbian, gay, bisexual, transgendered, and questioning (LGBTQ) youth* states: 'It is not the role of the professional school counselor to attempt to change a student's sexual orientation/gender identity but instead *to provide support to LGBTQ students*. . .'"); ("The American Medical Association Council on Scientific Affairs prepared a report in 1994 in which it stated: 'Aversion therapy (a behavioral or medical intervention which pairs unwanted behavior, *in this case, homosexual behavior*, with unpleasant sensations or aversive consequences) is no longer recommended *for gay men and lesbians*.'"); ("The National Association of Social Workers prepared a 1997 policy statement in which it stated: 'Social stigmatization *of lesbian, gay and bisexual people* is widespread and is a primary motivating factor in leading some people to seek sexual orientation changes.'"); ("The American Counseling Association Governing Council issued a position statement in April of 1999, and in it the council states: 'We oppose the promotion of reparative therapy as a cure *for individuals who are homosexual*.'"); ("The American Academy of Child and Adolescent Psychiatry in 2012 published an article in its journal, Journal of the American Academy of Child and Adolescent Psychiatry, stating: '[T]here is no medically valid basis *for attempting to prevent homosexuality*, which is not an illness.'"); ("Minors who experience family rejection based on their sexual orientation face especially serious health risks. In one study, *lesbian, gay, and bisexual young adults*. . .). Of the remaining two legislative findings in SB 1172, one references a policy statement that explicitly opposes efforts to change *non-heterosexual* sexual orientations, SB 1172, Section 1(l) (Pan American Health Organization statement that "[s]ervices that purport to 'cure' *people with non-heterosexual sexual orientation* lack medical justification"), while the other simply opposes generally" coercive interventions attempting to change sexual orientation." SB 1172, Section 1(f) (All emphases added).

Memorandum In Support of Preliminary Injunction

21

1  SOCE "does *not* include psychotherapies that: (A) provide *acceptance*, *support*, and
2  *understanding* of clients or facilitation of clients' coping, social support, and identity exploration
3  and development, including *sexual orientation-neutral intervention* . . . and (B) *do not seek to*
4  *change sexual orientation.*" *Id.* ¶ 34 (emphasis added).

5          Consequently, counselors are free to counsel their clients *toward* same-sex attractions, to
6  "provide acceptance, support, and understanding" of same-sex attractions, or to remain *neutral*
7  on such attractions. What they may *not* do, however, is discuss possibilities of *changing* same-
8  sex desires – even when the client and his parents desperately desire to eliminate same-sex
9  attractions. *See id.* The viewpoint of those counselors whose professional judgment leads them to
10 believe that homosexuality is destructive to some of their clients with unwanted same-sex
11 attractions, or that their clients might be better served by choosing SOCE, is silenced and
12 completely rejected as having no value in the counseling of minors.

13         The Supreme Court has not hesitated to facially invalidate laws like SB 1172 that seek to
14 regulate professions by censoring particular views. In *Legal Services Corporation v. Velazquez*,
15 531 U.S. 533 (2001), the Court addressed a federal limitation on the legal profession that
16 operated in materially the same viewpoint-based manner as does SB 1172.  In *Velazquez*, a
17 federal regulation prevented legal aid attorneys from receiving federal funds if they challenged
18 welfare laws. *Velazquez*, 531 U.S. at 537-38. The effect of this funding condition was to
19 "prohibit advice or argumentation that existing welfare laws are unconstitutional or unlawful,"
20 and thereby exclude certain "vital theories and ideas" from the lawyers' representation.
21 *Velazquez*, 531 U.S. at 547, 548. The Court invalidated the regulation on its face. *Id.* at 549. SB
22 1172 regulates mental health counselors in the same constitutionally-proscribed manner. In fact,
23 SB 1172's restrictions are even more egregious. The invalidated law at issue in *Velasquez* merely

Memorandum In Support of Preliminary Injunction

1  removed federal funding from lawyers who expressed the prohibited viewpoint. *Id.* Lawyers who

2  violated the provision could still practice law, but would just be deprived of a portion of their

3  income. However, under SB 1172, mental health professionals risk losing their licenses, and

4  thereby, their entire livelihood, if they express the prohibited viewpoint. If deprivation of one

5  source of income is sufficient to invalidate a regulation on the grounds of impermissible

6  viewpoint discrimination, then deprivation of an entire livelihood is even more so.

7        Ninth Circuit precedents that have enjoined efforts to censor particular medical and

8  psychological treatments provide even more compelling justification for the constitutional

9  invalidity of SB 1172. In *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), several physicians and

10  their patients brought a First Amendment challenge to a federal policy that punished physicians

11  for communicating with their patients about the benefits or options of marijuana as a potential

12  treatment. *Id.* at 633. The Ninth Circuit began its analysis by recognizing that the doctor-patient

13  relationship is entitled to robust First Amendment protection.

14  　　An integral component of the practice of medicine is the communication between
15  　　a doctor and a patient. Physicians must be able to speak frankly and openly to
16  　　patients. That need has been recognized by courts through the application of the
17  　　common law doctor-patient privilege.

18  *Id.* at 636. Far from being a First Amendment orphan, the court noted that such professional

19  speech "may be entitled to the strongest protection our Constitution has to offer." *Conant*, 309

20  F.3d at 637 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)). The court held

21  that the ban impermissibly regulated physician speech based on viewpoint:

22  　　The government's policy in this case seeks to punish physicians on the basis of
23  　　the content of doctor-patient communications. Only doctor-patient conversations
24  　　that include discussions of the medical use of marijuana trigger the policy.
25  　　Moreover, the *policy does not merely prohibit the discussion of marijuana; it*
26  　　*condemns expression of a particular viewpoint, i.e., that medical marijuana*
27  　　*would likely help a specific patient.* Such condemnation of particular views is
28  　　especially troubling in the First Amendment context.

23

Memorandum In Support of Preliminary Injunction

1    *Conant*, 309 F.3d 637-38 (emphasis added). The court rejected as inadequate the government's

2    justification that the policy prevented clients from engaging in illegal behavior, and permanently

3    enjoined enforcement of the policy. *Conant*, 309 F.3d at 638-39.

4         SB 1172 operates almost identically to the federal policy enjoined in *Conant*. Just as the

5    policy in *Conant* prohibited physicians from speaking about the benefits of marijuana to a

6    suffering patient, so SB 1172 prohibits counselors from speaking about the benefits of SOCE

7    with a client distressed about his non-heterosexual sexual attractions. Both policies favor one

8    government-preferred message over the private message of the health provider. Both should

9    suffer the same constitutional demise. *See R.A.V.*, 505 U.S. at 391 ("The First Amendment does

10   not permit [the government] to impose special prohibitions on those speakers who express views

11   on disfavored subjects.")

12        In *National Association for the Advancement of Psychoanalysis v. California Board of*

13   *Psychology*, 228 F.3d 1043 (9th Cir. 2000), the Ninth Circuit further clarified that the

14   government cannot engage in viewpoint discrimination, even in the context of mental health

15   professional licensing laws. In that case, a national association and individual psychoanalysts

16   brought a First Amendment challenge, *inter alia*, to the licensing scheme the California Board of

17   Psychology had enacted to govern the practice of psychology. *Nat'l Ass'n*, 228 F.3d at 1046. The

18   court noted that while the licensing scheme prescribed certain minimum qualifications to become

19   licensed, it did not "dictate what can be said between psychologists and patients during

20   treatment" nor did it "prevent licensed therapists from utilizing psychoanalytic methods," so it

21   did not constitute impermissible viewpoint discrimination. *Nat'l Ass'n*, 228 F.3d at 1055. By

22   contrast, SB 1172 *does* dictate what can be said between psychologists and patients during

23   treatment and *does* prevent licensed therapists from utilizing psychoanalytic methods. Therefore,

Memorandum In Support of Preliminary Injunction

1   unlike the licensing standards in *Nat'l Assn.*, the provisions in SB 1172 do constitute

2   impermissible viewpoint discrimination. Because SB 1172 was "adopted specifically because of

3   [California's] disagreement with a particular course of psychoanalytic theory," it cannot

4   withstand constitutional scrutiny. *Nat'l Ass'n*, 228 F.3d at 1056,

5   **2. SB 1172 Is Not Narrowly Tailored To Achieve A Compelling Government**

6   **Interest Even If It Were Only Content and Not Viewpoint-Based.**

7   A viewpoint-based restriction has never been upheld in any federal or Supreme Court

8   case. Thus, a balancing of the government's interest would not benefit SB 1172. If it fails

9   viewpoint neutrality, which it does, then it is unconstitutional no matter what interest the

10   government may allege.

11   But even if SB 1172 were merely content- and not viewpoint-based, the Defendants

12   cannot meet the burden of proving that SB 1172 survives strict scrutiny. *United States v. Playboy*

13   *Entm't Grp.*, 529 U.S. 803, 813 (2000). To survive strict scrutiny for a content-based restriction,

14   Defendants would have to show that SB 1172 is narrowly tailored to achieve a compelling

15   government interest and is the least restrictive means of achieving that interest. *Id.* As the

16   Supreme Court emphasized, the general rule is that the right of expression prevails, even where

17   no less restrictive alternative exists. *Id.*

18   The Legislature claims that SB 1172 is enacted to meet a compelling interest "in

19   protecting the physical and psychological well-being of minors." SB 1172(n). Under certain

20   circumstances, states may have a compelling interest in the well-being and protection of

21   children. *See Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S 115, 126 (1989).

22   "Notwithstanding this abstract compelling interest, when the government seeks to restrict speech

23   '[i]t must demonstrate that *the recited harms are real, not merely conjectural*, and that the

24   regulation will in fact alleviate these harms in a direct and material way.'" *Video Software*

25

Memorandum In Support of Preliminary Injunction

1   *Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009) (quoting *Turner*

2   *Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)) (emphasis added). So the reviewing

3   court must "assure that, in formulating its judgments, [the legislature] has drawn reasonable

4   inferences based on substantial evidence." *Video Software*, 556 F.3d at 962 (quoting *Turner*

5   *Broadcasting*, 512 U.S. at 664).   And further, the state must show that content discrimination is

6   "necessary to achieve [its compelling interests]." *R.A.V.*, 505 U.S. at 395-96.   Ultimately, even

7   "the objective of shielding children does not suffice to support a blanket ban if the protection can

8   be accomplished by a less restrictive alternative." *Playboy*, 529 U.S. at 813.

9                    **a.   The State Cannot Prove that SB 1172 Prevents any Actual Harm to Minors.**

10          The Legislature's *own sources* demonstrate an absence of proof that SOCE causes harm.

11   The legislative findings upon which the Legislature attempted to base a finding of compelling

12   interest consist of position statements from professional organizations that concede that scientific

13   evidence is inconclusive, and a sampling of three professional journal articles that, not

14   surprisingly, support the Legislature's viewpoint.

15          Defendants' primary evidence is a 2009 report issued by the American Psychological

16   Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation ("Task

17   Force"), which was charged with reporting on "the appropriate application of affirmative

18   therapeutic interventions *for adults* who present a desire to change their sexual orientation or

19   their behavioral expression of their sexual orientation."[4] Significantly, the Task Force report

20   states that "recent SOCE research cannot provide conclusions regarding efficacy or

21   effectiveness." *Id.* at ix. In fact, the Task Force report supports the fact that sexual orientation is

---

[4]   *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009) at 4 (emphasis added), available at http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf (last visited October 1, 2012).

Memorandum In Support of Preliminary Injunction

1   not immutable in that some have successfully changed their sexual orientation. *Task Force*

2   *Report.   Id. at 45.* (reporting "varying degrees of satisfaction and varying perceptions of

3   success"), 50 (some had "altered their sexual orientation;" "participants had multiple endpoints,

4   including LGB identity, ex-gay identity, no sexual orientation identity, and a unique self-

5   identity"), 53 ("individuals report a range of effects from their efforts to change their sexual

6   orientation, including both benefits and harm").

7        The Report exhibits the same bias as is apparent in SB 1172 by defining SOCE solely in

8   terms of seeking to change only *same-sex sexual orientation* without any basis to prohibit SOCE

9   counseling.[5] Most notably, the Task Force states that it "performed a systematic review of the

10   peer-reviewed literature" and found "some evidence**" of both harm *and* benefits** produced by

11   SOCE (for adults).[6] The Task Force also conceded that there were significant limitations in the

12   Report, including the following:

13         • "To date, the research has not fully addressed **age**, gender, gender identity, race,
14             ethnicity, culture, national origin, disability, language, and socioeconomic status
15             in the population of distressed individuals."[7]

16         • "[S]exual minority *adolescents are underrepresented* in research on evidence-
17             based approaches, and sexual orientation issues in *children* are **virtually**
18             **unexamined**."[8]

19         • "*None* of the recent research (1999-2007) meets methodological standards that
20             permit conclusions regarding efficacy or *safety.*" [9]

21         • "We conclude that **there is a dearth of scientifically sound research on the**
22             **safety of SOCE**. *Early and recent research studies provide no clear indication of*
23             *the prevalence of harmful outcomes* . . . because no study to date of scientific
24             rigor has been explicitly designed to do so." [10]

---

[5]    *Id.* at 12, n.5 (emphasis added)
[6]    *Id.* at 2-3, 42, 49-50 (emphasis added).
[7]    *Id.* at 120 (emphasis added).
[8]    *Id.* at 91 (emphasis added).
[9]    *Id.* at 2 (emphasis added).
[10]    *Id.* at 42 (emphasis added).

With respect to children and adolescents, the Task Force found the amount of research "limited, and stated unequivocally: "There is **no** research demonstrating that providing SOCE to children or adolescents has an impact on adult sexual orientation."[11] Given these limitations, the Task Force concluded that "research on SOCE (psychotherapy, mutual self-help groups, religious techniques) has ***not answered basic questions of whether it is safe or effective and for whom*** . . . . *[R]esearch into harm and safety is essential*."[12] Rather than demonstrating that SOCE is harmful, as the Legislature claims, the Task Force report serves to demonstrate that the effects of SOCE on children is inconclusive and that further study is necessary. The only "evidence" of harm the Task Force discovered was some anecdotal testimony of "some individuals [who] reported being harmed by SOCE."[13] But "the government must present more than anecdote and supposition" to support its burden of proof. *Video Software*, 556 F.3d at 962 (quoting *Playboy,* 529 U.S. at 822).[14] The only remaining factual support for the Legislature's action is a listing of policy statements from various organizations that oppose SOCE. *See* SB 1172, § 1(d), (e), (g), (h), (i), (j), and (l). At best, such statements are based upon the minimal scientific evidence available on the harms of SOCE, which, as the APA Task Force concluded, is both anecdotal and inconclusive. At worst, they represent nothing more than the unsupported political or ideological suppositions of the organizations. Either way, such positions do not prove that SOCE is harmful to minors, and the entire foundation upon which SB 1172 is based must fall.

---

[11]     *Id.* at 4 (emphasis added).
[12]     *Id.* at 90 (emphasis added).
[13]     *Id.* at 120.
[14]     Similarly, an article by the American Academy of Child and Adolescent Psychiatry cited in SB 1172 consists of mere supposition that SOCE "**may** be harmful."

Memorandum In Support of Preliminary Injunction

1    What is probative, however, is the standard of care of the various mental health

2   professions, as set forth in their codes of ethics. Those standards of care are designed to protect

3   patients from harm. The ethics codes prohibit practices that are generally regarded as violative of

4   the standard of care and therefore expose practitioners who engage in them to liability. Courts

5   have consistently looked to these codes of ethics to determine whether a psychologist has

6   [caused harm]."[15] In California, the Legislature has explicitly provided that APA's Ethics Code

7   is the accepted standard of care for all disciplinary proceedings in the field of psychology. Cal.

8   Bus. & Prof. Code § 2936 (West 2012). Consequently, if it were scientifically proven that SOCE

9   is harmful, then the relevant ethics codes would so indicate. However, they do not. In fact,

10   neither the American Psychological Association ("APA") nor the American Psychiatric

11   Association prohibits SOCE in their ethics code.[16] Even more revealing is the fact that those

12   organizations, on at least three different occasions, in 1994, 1995, and 2003, failed to amend

13   their ethics codes to make SOCE *per se* unethical when specifically considering the matter.[17]

14   Given that the mental health profession's standards of care do not condemn SOCE, and given the

15   additional safeguards against harm imposed by the ethics codes, there is no evidence to support

16   the Legislature's finding that SOCE is harmful.

17    It is Defendants' burden to show "substantial evidence" that SB 1172's prohibition on

18   SOCE is justified and necessary to advance the compelling government interest of protecting

19   children from "real" harm. *Video Software*, 556. F.3d at 962. This burden is especially difficult

20   in this context, for as the Supreme Court has recognized, "[n]o field of education is so

21   thoroughly comprehended by man that new discoveries cannot be made. *Particularly is this true*

---

[15]    Sean Young, Note, *Does "Reparative" Therapy Really Constitute Child Abuse?: A Closer Look*, 6 Yale J. Health Pol'y L. & Ethics 163, 202 (2006).
[16]    *Id.* at 204.
[17]    *Id.* at 208.

1   *in the social sciences, where few, if any, principles are accepted as absolutes.*" *Keyishian v. Bd.*

2   *of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (emphasis added). As discussed

3   above, neither the inconclusive APA Task Force Report, nor the unsupported position statements

4   of the various professional organizations constitute "substantial evidence" that SOCE causes

5   "real" harm. Because the very sources upon which the Legislature based its finding that SOCE is

6   harmful in fact do not support that finding, Defendants cannot establish any state interest, let

7   alone a compelling state interest in violating Plaintiffs' constitutional rights.

8   **b. *The State Cannot Prove that SB 1172 is Narrowly Tailored and Necessary***
9   ***to Prevent Harm to Minors.***
10
11   Defendants can establish neither that there is a compelling state interest to protect harm to

12   minors that justifies SB 1172, nor that the legislation is narrowly tailored. Even if the state could

13   ban an entire mode of therapy—such as SOCE—from the field of counseling, it could not do so

14   simply to suppress a particular idea. *R.A.V.*, 505 U.S. at 386 ("The government may not regulate

15   a ['mode of speech'] based on hostility—or favoritism—towards the underlying message

16   expressed."). Such a discriminatory motive is revealed where there are other content-neutral

17   substitutes to the regulation. *See id.* at 395 ("The existence of adequate content-neutral

18   alternatives thus 'undercut[s] significantly' any defense of such a statute, casting considerable

19   doubt on the government's protestations that the 'asserted justification is in fact an accurate

20   description of the purpose and effect of the law.'" (citations omitted)).

21   SB 1172 is not necessary to prevent harm because *all* the ethical codes of the professions

22   engaging in this treatment already prohibit engaging in practices that actually harm patients.

23   Specifically, Section 3.04 of the APA Code, "Avoiding Harm," requires that "[p]sychologists

24   take reasonable steps to avoid harming their clients/patients . . . and to minimize harm where it is

25   foreseeable and unavoidable." *See* Compl. ¶ 39. Section A.4.a of the ACA Code states:

Memorandum In Support of Preliminary Injunction

1    "Counselors act to avoid harming their clients . . . ." Compl.. Section 1(c) of the American

2    Psychiatric Association Guidelines states that "[a] psychiatrist shall strive to provide beneficial

3    treatment . . . ." *Id.* ¶ 44. Violations of these ethical codes are treated as unprofessional conduct

4    both by courts and in Business and Professions Code § 2936 and subject licensed professionals

5    to discipline by their respective licensing boards. Principle 1 of the American Association of

6    Marriage and Family Therapy's Ethics Code states that "[m]arriage and family therapists

7    advance the *welfare* of families and individuals." Certainly a principle mandating that marriage

8    and family therapists advance the welfare of their clients would be violated by engaging in a

9    course of treatment that is harmful to the client.

10        SB 1172, however, is not an attempt to prevent harm, but is a politically motivated

11   attempt to ascribe special treatment to a particular viewpoint regarding therapy, particularly

12   SOCE. The fact that children are already protected from harmful and dangerous therapies

13   exposes that the underlying goal of the legislation is not about protecting minors. Instead, the

14   asserted noble and compelling state interest is merely the mirage through which Defendants are

15   attempting to discriminate against, and silence, the viewpoint of those therapists who believe that

16   SOCE is helpful. Such legislative legerdemain should not be permitted.

17        Even if it could be shown that SOCE could cause potential harm to some minor patients,

18   the state would be required to utilize the *least* restrictive means available to address the interest.

19   For example, informed consent, which is the touchstone of counselors, and client-self-

20   determination, another touchstone, undercuts any alleged interest of the state because it is a least

21   restrictive means to achieve the state's goal in preventing harm to clients. A *complete ban* on

22   SOCE or a viewpoint regarding same-sex sexual attractions is certainly not the least restrictive

Memorandum In Support of Preliminary Injunction

31

1  means to achieve any purported governmental interest. Such extreme measures are

2  constitutionally impermissible and should be enjoined by this Court.

3  **B.  SB 1172 Is Unconstitutionally Vague and Overbroad.**

4  A law is unconstitutionally vague and overbroad if it "either forbids or requires the doing

5  of an act in terms so vague that [persons] of common intelligence must necessarily guess at its

6  meaning and differ as to its application." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926).

7  The State's policies "must be so clearly expressed that the ordinary person can intelligently

8  choose, in advance, what course it is lawful for him to take." *Id.* at 393. "Precision of regulation"

9  is the touchstone of the First Amendment. *NAACP v. Button*, 371 U.S. 415, 435 (1963). "It is a

10  basic principle of due process that an enactment is void for vagueness if its prohibitions are not

11  clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While all regulations

12  must be reasonably clear, "laws which threaten to inhibit the exercise of constitutionally

13  protected" expression must satisfy "a more stringent vagueness test." *Village of Hoffman Estates*

14  *v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). When considering challenges to

15  vague laws, "the crucial consideration is that no [individual subject to the law] can know just

16  where the line is drawn . . . ." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589,

17  599 (1967).  Thus, a law must give "adequate warning of what activities it proscribes" and must

18  "set out explicit standards for those who apply it." *See Broadrick v. Oklahoma*, 413 U.S. 601,

19  607 (1973) (citing *Grayned*, 408 U.S. at 108). SB 1172 fulfills neither requirement, and thus

20  forces therapists to guess at its meaning and differ as to its application both when diagnosing and

21  when treating a minor client.

22  **1.  Because SB 1172 Does Not Define "Sexual Orientation," Therapists Must**
23  **Guess About Whether They Have Triggered SB 1172's Prohibitions.**

Memorandum In Support of Preliminary Injunction

At the threshold diagnosis stage, SB 1172 leaves the therapist guessing because it does not define or provide any guidance regarding the fundamental operating term, "sexual orientation." Identifying a client's sexual orientation is critical for knowing when SB 1172's proscriptions are triggered. For without such guidance, a therapist cannot know when or if he has begun to engage in prohibited sexual orientation change efforts.

The vagueness created by this failure to define is exacerbated when combined with the complexities of human sexuality. The APA Task Force noted that therapists must consider sexual orientation along with "sexual orientation identity" and sexual attractions in multiple and changing combinations when counseling patients.

- "Same-sex sexual attractions and behavior occur in the context of a variety of sexual orientations and sexual orientation identities, and for some, sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) is fluid or has an indefinite outcome." [18]

- "The recent research on sexual orientation identity diversity illustrates that sexual behavior, sexual attraction, are labeled and expressed in many different ways, some of which are fluid."[19]

- "Individuals with sexual attractions may understand, define, and label their experiences differently than those with similar desires because of the unique historical constructs regarding ethnicity, gender, and sexuality." [20]

- "The available evidence … suggests that although sexual orientation is *unlikely* to change, *some individuals modified their sexual orientation identity* (i.e. individual or group membership and affiliation, self-labeling) and other aspects of sexuality (i.e. values and behavior). They did so in a variety of ways and in a variety of unpredictable outcomes." [21]

---

[18]  Task Force report at vii.
[19]  *Id.* at 14.
[20]  *Id.* at 30.
[21]  *Id.* at 3 (emphasis added).

1    Given the intricate and subjective interchange between these concepts, it is not surprising

2    that therapists conducting research on SOCE often misinterpreted sexual orientation entirely.[22]

3    Indeed, the concept is a moving target.

4

5    **2.    Because SB 1172 Does Not Adequately Define "Sexual Orientation**
6    **Change Efforts," Therapists Must Guess What Counsel Is Prohibited.**

7    Assuming a therapist can accurately diagnose a client's sexual orientation as understood

8    by SB 1172, it still fails to provide sufficient instruction for counselors concerning what they can

9    and cannot say during treatment to clients with non-heterosexual sexual attractions. The Supreme

10   Court struck down a similarly vague statute that regulated the teaching profession.

11   In *Keyishian*, the statute barred employment for any teacher who "advocates, advises, or

12   teaches the doctrine of forceful overthrow of government." The Court explained that the

13   proscription on "advocacy" could be interpreted to prohibit the employment of persons who

14   "merely advocate the doctrine in the abstract." *Keyishian*, 385 U.S. at 599-600. Moreover, the

15   Court considered whether the ban on "advising" prohibited "the mere advising of the existence

16   of the doctrine, advising another to support the doctrine," or "inform[ing one's] class about the

17   precepts of Marxism or the Declaration of Independence." *Id.* Finding no sufficient answers, the

18   Court declared the statute unconstitutionally vague. *Id.* at 604.

19   SB 1172 raises similarly unanswerable questions. Does a therapist violate SB 1172 when

20   the therapist simply raises the existence of SOCE with a minor client distressed with same-sex

21   sexual orientation or attractions? Does recommending a book that discusses SOCE to a minor

---

[22]    *Id.* at 31 ("Considered in the concept of the conceptual complexities of and debates over the assessment of sexual orientation, much of the SOCE research does not adequately define the construct of sexual orientation, does not differentiate it from sexual orientation identity, or has misleading definitions that do not accurately assess or acknowledge bisexual individuals.")

1   patient desiring to reduce or eliminate his same-sex attractions constitute "any practice" seeking

2   to change an individual's sexual orientation? Does mentioning that non-regulated, religious

3   counselors are available to provide such therapy and informing the patient of individuals who

4   will engage in the treatment? Do professional counselors unwilling to counsel in a manner

5   affirming homosexual practices have to effectively close their mouths at the mere mention that a

6   minor patient might have experienced some form of same-sex attractions?  SB 1172 does not

7   provide the answers to these questions, and it leaves professional counselors uncertain whether a

8   particular practice will cost them their professional license. SB 1172 thus puts therapists in the

9   same unconstitutional dilemma as that faced by the teachers in *Keyishian*. The vagueness

10  doctrine ensures that neither therapists nor teachers need choose between silence and

11  employment. Because SB 1172 forces therapists into this Morton's Fork without "adequate

12  warning of what activities it proscribes," it is impermissibly vague. *Broadrick*, 413 U.S. at 607.

13      SB 1172 also fails to address what counsel therapists may provide to minors who identify

14  themselves as bisexual. What is a professional counselor's obligation if a minor patient enters the

15  office on Monday discussing the *homosexual* feelings and relations he had over the weekend, but

16  returns on Thursday discussing *heterosexual* attractions and relations from the previous night? Is

17  the professional required to affirm the homosexual attractions the patient relayed during the

18  Monday session, but sit silently on Thursday when the patient is discussing heterosexual

19  attractions? Certainly, engaging in discussions that might encourage this hypothetical patient's

20  feelings during the Thursday session would involve some practice that might reduce the patient's

21  same-sex attractions or romantic feelings.

22      Additionally, what is a professional counselor's obligation when a "questioning" patient

23  enters the office? Is he only permitted to affirm the patient's homosexual feelings, but not the

Memorandum In Support of Preliminary Injunction

1    heterosexual feelings? If the patient is truly confused as to his sexual identity, SB 1172 appears

2    to compel him towards homosexuality, at least if the professional counselor does not want to risk

3    losing his license. If professional counselors are prohibited from engaging in "any practice" that

4    attempts to reduce same-sex attractions, then clients will only be able to receive homosexual-

5    affirming therapy. Yet even the APA acknowledges that "sexual orientation identity" "appears to

6    **shift** and **evolve** in some individuals' lives."[23] In short, there is simply no way to determine the

7    proper course of action when a questioning person enters the office.

8           Moreover, the APA also urges "support and respect" for self-determination,[24] even for

9    minors.[25] In fact, the APA recommends that services should "**maximize** self-determination." *Id.*

10   (emphasis added). But SB 1172 completely undermines this recommendation whenever the child

11   chooses SOCE. Further, the APA claims that the "clinical and research literature encourages the

12   provision of acceptance, support, and recognition of the importance of faith to individuals and

13   communities."[26]

14          Finally, the lack of any specified geographic boundaries further obscures the reach of the

15   bill. On its face, SB 1172 could presumably cover web videos, radio broadcasts or electronic

16   transmissions *into* California that provide SOCE or referrals to counselors who provide SOCE.

17   Specifically, Dr. Nicolosi and NARTH have numerous videos and instructional pamphlets on

18   their websites, which explicitly discuss and advocate for SOCE counseling. These videos are

19   available to potentially every minor in California, yet SB 1172 provides no guidance on whether

20   this would constitute a practice seeking to reduce or eliminate same-sex attractions. NARTH and

---

[23]    *Task Force Report* at 4 (emphasis added).
[24]    "Self-determination is the process by which a person controls or determines the course of his or her own life (according to the *Oxford English Dictionary*)." *Id.* at 5.
[25]    *Id.*
[26]    *Id.*

Memorandum In Support of Preliminary Injunction

36

1  Dr. Nicolosi are left to guess whether their videos could potentially subject them to sanctions for

2  an ethical violation. Similarly, SB 1172 could cover a California-licensed counselor who is

3  licensed in other jurisdictions and who offers SOCE in states outside of California. Mr. Vazzo is

4  a certified Marriage and Family Therapist in California, Ohio, and Florida. *See* Vazzo Decl. ¶¶ 3-

5  4. If he is providing SOCE counseling under his licenses in Florida or Ohio, states that do not

6  have prohibitions on SOCE counseling, is he committing an ethical violation in California? Mr.

7  Vazzo is left to guess at the answer and guessing wrong would cost him his license. The

8  Constitution simply does not permit such a quandary.

9      SB 1172 does not provide adequate protection to those counselors who engage in SOCE

10  counseling as they are left to guess at its meaning. Under SB 1172, counselors cannot

11  intelligently choose the proper course of action with certainty that they will be in compliance

12  with the law. Such a scenario renders SB 1172 unconstitutionally vague. For this reason,

13  Plaintiffs are likely to succeed on the merits of their case.

14  **C. SB 1172 Unconstitutionally Usurps The Fundamental Rights Of Parents To**
15  **Direct The Upbringing And Education Of Their Children.**
16
17      Parents are vested with the care, custody, and control of their children. That guarantee is

18  enforceable against the states through the Fourteenth Amendment. *See, e.g.*, *Troxel v. Granville*,

19  530 U.S. 57, 65 (2000); *Wisconsin v. Yoder*, 406 U.S. 205, 213-14 (1972); *Pierce v. Soc'y of*

20  *Sisters*, 268 U.S. 510, 534-35 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923). SB 1172

21  tramples upon this most basic right by preventing parents from caring for the mental health of

22  their children as they see fit. Indeed, SB 1172's sponsor, Senator Ted Lieu concedes as much:

23  "The attack on parental rights is exactly the whole point of the bill because we don't want to let

24  parents harm their children." *See* Compl. ¶ 70 (citing Kim Reyes, *Controversy Follows Effort to*

25  *Ban Gay Conversion Therapy*, Orange Cnty. Reg., July 27, 2012, at 2). Because the Bill intrudes

37

Memorandum In Support of Preliminary Injunction

1   upon a fundamental right, strict scrutiny applies. *See Reno v. Flores*, 507 U.S. 292, 301-02

2   (1993); *Fields v. Palmdale Sch. Dist*., 427 F.3d 1197, 1208 (9th Cir. 2005) ("Governmental

3   actions that infringe upon a fundamental right receive strict scrutiny.") Because Defendants

4   cannot satisfy this high burden, Plaintiffs are likely to succeed on the merits of their case.

5
6
        **1.**    **California's Parents Have A Fundamental Right To Make Mental Health Decisions For Their Children.**

7        The interest of parents in the care, custody, and control of their children "is perhaps the

8   oldest of the fundamental liberty interests recognized by this Court." *Troxel*, 530 U.S. at 65

9   (discussing nine seminal cases dealing with this parental liberty interest). "The history and

10   culture of Western civilization reflect a strong tradition of parental concern for the nurture and

11   upbringing of their children." *Yoder*, 406 U.S. at 232. American jurisprudence "historically has

12   reflected Western . . . concepts of the family as a unit with broad parental authority over minor

13   children." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). It cannot be questioned that parents enjoy a

14   fundamental discretion to bring up their children as they see fit. *Troxel*, 530 U.S. at 66. "This

15   primary role of the parents . . . is now established beyond debate as an enduring American

16   tradition." *Yoder*, 406 U.S. at 232.

17        The words "care, custody, and control" encompass decisions relating to the mental health

18   of the child, for parents have "a 'high duty' to recognize symptoms of illness and to seek and

19   follow medical advice." *Parham*, 442 U.S. at 602. Parents direct the destiny of their children and

20   inculcate moral standards in them. *Yoder*, 406 U.S. at 233; *Pierce*, 268 U.S. at 535. Certainly,

21   these responsibilities include selecting a course of therapy, for it is "parents . . . [who] choose

22   whether to expose their children to certain people or ideas." *In re Custody of Smith*, 969 P.2d 21,

23   31 (Wash. 1998) (*en banc*), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 63 (2000).

1    "Simply because the decision of a parent is not agreeable to a child *or because it involves*

2    *risks* does not automatically transfer the power to make that decision from the parents to some

3    agency or officer of the [S]tate." *Parham*, 442 U.S. at 603 (emphasis added). Rather, parents

4    have authority to select medical procedures and otherwise decide what is best for their child, and

5    "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* at

6    603-604. SB 1172 deliberately and explicitly infringes upon this right. There is no proof of any

7    harm befalling children engaging in SOCE therapy, and therefore not a modicum of reason to

8    support the constitutional violation the Legislature has intentionally visited upon parents.

9

10

11    **2.     SB 1172 Infringes Upon The Fundamental Right Of Parents To Make**
12    **Mental Health Decisions For Their Children.**

13    The Supreme Court has not hesitated to uphold the right to direct the upbringing of one's

14    child over state laws that would deprive parents of that right. This has been true even in the

15    context of public education, which is at "the very apex of the function of the State." *Yoder*, 406

16    U.S. at 213. In *Meyer v. Nebraska*, the Court upheld "the power of parents to control the

17    education of their own." *Meyer*, 262 U.S. at 401. At issue was a Nebraska statute that made it

18    illegal to teach "languages, other than the English language . . . [until] the pupil . . . passed the

19    Eighth grade." *Id.* at 397. The statute effectively prevented parents from hiring a teacher to

20    instruct their children in German and penalized teachers who did so. *Id.* at 396. The Court

21    facially voided the law, holding that the state's intrusion on parental rights could not be justified:

22        No emergency has arisen which renders knowledge by a child of some language
23        other than English so clearly harmful as to justify its inhibition with the
24        consequent infringement of rights long freely enjoyed. We are constrained to
25        conclude that the statute as applied is arbitrary and without reasonable relation to
26        any end within the competency of the state.

39

1    *Id.* at 403.

2         The Supreme Court similarly held that an Oregon law that required "every parent . . . of a

3    child between 8 and 16 years to send him to a public school" was an invalid effort to homogenize

4    the state's youth with a government-preferred form of education. *See Pierce v. Soc'y of the*

5    *Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 535 (1925).

6         [W]e think it entirely plain that the [law] unreasonably interferes with the liberty
7         of parents and guardians to direct the upbringing and education of children under
8         their control. As often heretofore pointed out, rights guaranteed by the
9         Constitution may not be abridged by legislation which has no reasonable relation
10        to some purpose within the competency of the state. *The fundamental theory of*
11        *liberty upon which all governments in this Union repose excludes any general*
12        *power of the state to standardize its children by forcing them to accept instruction*
13        *from public teachers only.*

14   *Pierce*, 268 U.S. at 535 (emphasis added).

15        As the Ninth Circuit recently explained, the unconstitutional actions proscribed in both

16   *Meyer* and *Pierce* were the same: the state's attempt to impose a comprehensive, government-

17   sanctioned mode of education upon children against the wishes of their parents.

18        [t]he *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot
19        prevent parents *from choosing a specific educational program* -- whether it be
20        religious instruction at a private school or instruction in a foreign language. *That*
21        *is, the state does not have the power to 'standardize its children' or 'foster a*
22        *homogenous people' by completely foreclosing the opportunity of individuals and*
23        *groups to choose a different path of education.*

24   *Fields*, 427 F.3d at 1205 (quoting *Brown v. Hot, Sexy & Safer Prods., Inc*., 68 F.3d 525, 533 (1st

25   Cir. 1995) (emphasis added)).

26        SB 1172 operates in the same unconstitutional manner because it prevents parents from

27   choosing a specific form of counseling—SOCE therapy—for their children by muzzling every

28   mental health professional in the state. Indeed, the prohibition is comprehensive, as it applies to

29   "physician[s] and surgeon[s] specializing in the practice of psychiatry," "psychologist[s],"

30   "licensed marriage and family therapist[s]," "registered marriage and family therapist[s],"

40

Memorandum In Support of Preliminary Injunction

"licensed educational psychologist[s]," "credentialed school psychologist[s]," "licensed clinical social worker[s]," "licensed professional clinical counselor[s]," "registered clinical counselor[s]," and their respective "interns and trainees" as well as "any other person designated as a mental health professional under California law or regulation." Cal. Bus. & Prof. Code § 2(a). The breadth of this Bill shows that California is attempting to "standardize its children," *Fields*, 427 F.3d at 1205, by ensuring that they may *only* receive professional help that affirms non-heterosexual sexual orientations. California does not have that power.

Just as Nebraska and Oregon "foreclosed the opportunity" of parents to choose professional foreign language training or private education for their children, so too has California foreclosed the opportunity of its parents—and in particular, Plaintiffs Jack and Jane Does 1 and 2 —to choose professional SOCE therapy for their children. If the former intrusions into parental rights are unconstitutional in the public school context, where the state's interest is at its apex, then the latter intrusions are certainly impermissible in the context of private counseling sessions chosen by parents to benefit their children.

### 3. The State Cannot Satisfy Strict Scrutiny Because SB 1172 Is Not Necessary To Achieve A Compelling State Interest.

Here, California has preempted parental discretion by interposing itself between therapist and child, limiting the therapeutic options from which a consenting parent, child, and therapist can select. Because SB 1172 arrogates the choice of therapies a minor may receive, and thus tramples the fundamental right of parents to care for the mental health of their children, Defendants must satisfy strict scrutiny. *See Troxel*, 530 U.S. at 80 (Thomas, J., concurring) (articulating that strict scrutiny is the appropriate standard of review for infringements upon the fundamental parental right). Defendants must therefore prove that California has a compelling

Memorandum In Support of Preliminary Injunction

1  interest to substitute for parents' judgments, and that SB 1172 is narrowly tailored to serve that

2  interest. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

3        At a minimum, Defendants must show that SOCE therapy "will jeopardize the health or

4  safety of the child." *Yoder*, 406 U.S. at 234. Defendants cannot make that showing because, as

5  discussed above, the sources cited in the legislative findings are either inadequate policy

6  statements or inconclusive studies. Without evidence, the claim that SB 1172 protects minors

7  rings constitutionally hollow. Therefore, Plaintiffs are likely to succeed on the merits, and this

8  Court should grant the preliminary injunction.

9      **D. SB 1172 Unconstitutionally Infringes Upon Minors' First Amendment Right To
10         Receive Information Regarding Available Treatment Methods.**
11

12        The First Amendment protects the right to receive information as a corollary of the right

13  to speak. The Fourteenth Amendment guarantees this right, too, against the states. *See, e.g.*, *Bd.*

14  *of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982); *Va. State*

15  *Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976); *Stanley v.*

16  *Georgia*, 394 U.S. 557, 564 (1969); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943); *Meyer*

17  *v. Nebraska*, 262 U.S. 390 (1923); *see also Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d

18  1022, 1027 n.5 (9th Cir. 1998). SB 1172 deprives minors—such as Plaintiffs John Does 1 and

19  2—of this right during counseling sessions because it prohibits therapists from offering SOCE

20  therapy to minors as treatment for unwanted same-sex attractions. While the government may

21  regulate the receipt of information for various legitimate reasons, it may not do so when its

22  purpose is to suppress certain ideas or viewpoints. *See Pico*, 457 U.S. at 871-72 (plurality) ("Our

23  Constitution does not permit the official suppression of ideas."); *id.* at 880 (Blackmun, J.,

24  concurring) ("[O]ur precedents command the conclusion that the State may not act to deny

25  access to an idea simply because state officials disapprove of that idea. . . .") As discussed above,

42

Memorandum In Support of Preliminary Injunction

1   SB 1172 suppresses the viewpoint that changing non-heterosexual attractions may be beneficial

2   to minors and expresses the Legislature's disapproval of SOCE therapy. Because both the

3   Supreme Court and Ninth Circuit have held that suppression of ideas from willing recipients in

4   the medical context is unconstitutional, Plaintiffs are likely to prevail on the merits.

5        Furthermore, in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer*

6   *Counsel, Inc.*, Virginia banned pharmacists from advertising the market prices of prescription

7   drugs. The stated rationale for the law was to uphold pharmaceutical professionalism against the

8   negative effects of price competition, but the Court dismissed that justification because

9   pharmacists' professional rules already imposed a high standard of care. *Id.* at 768-69. Instead,

10  the Court determined that the advertisement ban was designed to keep the public in ignorance of

11  drug prices, prevent them from "following the discount," and ultimately insulate ethical

12  pharmacists from unethical ones who could operate at lower cost. *Id.* at 769. In striking down the

13  law, the Court remarked that the First Amendment commands the assumption that "information

14  is not in itself harmful, that people will perceive their own best interests if only they are well

15  enough informed, and that the best means to that end is to open the channels of communication

16  rather than to close them." *Id.* at 770. The rule articulated in *Virginia State Board of Pharmacy*—

17  that the First Amendment commands more information, not less—is most pronounced for the

18  medical profession. Thus, the Ninth Circuit in *Conant v. Walters* upheld a permanent injunction

19  against a federal policy that threatened to punish physicians for communicating with their

20  patients about the medical use of marijuana. *See Conant,* 309 F.3d at 639. The Ninth Circuit

21  affirmed that the policy struck at "core First Amendment interests of doctors *and* patients" by

22  "creating barriers to full disclosure that would impair diagnosis and treatment." *Id.* at 636. The

23  federal policy at issue in *Conant*, like the state ban on certain SOCE therapy at issue here,

43

Memorandum In Support of Preliminary Injunction

1   prevented patients from making an informed decision as to their own health and self-

2   determination. As Judge Kozinski noted in *Conant*:

3   *Enforcement of the federal policy will cut such patients off from competent*
4   *medical advice and leave them to decide on their own whether to use marijuana*
5   *to alleviate excruciating pain, nausea, anorexia or similar symptoms.* But word-
6   of-mouth and the Internet are poor substitutes for a medical doctor; information
7   obtained from chat rooms and tabloids cannot make up for the loss of
8   individualized advice from a physician with many years of training and
9   experience.
10
11  *Conant*, 309 F.3d at 644 (Kozinski, J., concurring) (emphasis added).

12       Indeed, SB 1172 bears a striking resemblance to the speech restrictions at issue in

13  *Virginia State Board of Pharmacy* and *Walters*. Like the advertising ban on prescription drug

14  prices, SB 1172 assumes that SOCE therapy and related information are harmful and keeps the

15  public in ignorance by closing wholesale that channel of therapist-client communication. Like

16  the federal policy on medical marijuana at issue in *Conant*, SB 1172 diminishes patients'

17  understanding of their own symptoms, limits their personal choices toward self-determination,

18  and ultimately renders them less able to participate in public debate and influence public policy

19  regarding SOCE. In addition, SB 1172 could actually cause harm to minors: parents whose

20  children are distressed over their same-sex sexual attractions may thus seek out unlicensed and

21  untrained counselors who could inflict irreversible emotional damage. Like the laws in *Virginia*

22  *State Board of Pharmacy* and *Walters*, SB 1172 suppresses information that clients have a right

23  to hear. By so doing, SB 1172 also suppresses the particular idea that same-sex attractions felt by

24  a given individual may be harmful, may lead to unhappiness, or may not be the only way.

25  Because SB 1172 suppresses those ideas, it is unconstitutional.

26       In sum, the rule that the State cannot prescribe what shall be orthodox by suppressing

27  certain ideas or information applies not just to the medical profession, as in *Walters*, but also to

44

Memorandum In Support of Preliminary Injunction

psychologists, *Nat'l Ass'n for Advancement of Psychoanalysis v. Ca. Bd. of Psychology*, 228 F.3d 1043, 1054 (9th Cir. 2000), to attorneys, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001), and to a minor's voluntary acts, *Pico*, 457 U.S. at 869. Here, SB 1172 exemplifies the Legislature's desire to suppress a particular treatment for unwanted same-sex attractions and its unconstitutional means of doing so. SB 1172 states that "[u]nder no circumstances shall a mental health provider engage in [SOCE therapy] with a patient under 18 years of age," *see* Compl. ¶ 33. However, in 2009, the Legislature passed a law stating that "a minor who is 12 years of age or older may consent to mental health treatment or counseling services if, in the opinion of the attending professional person, the minor is mature enough to participate . . . ." Ca. Health & Safety Code § 124260(b) (West 2012). In other words, the Legislature is seeking to ban minors outright from consenting to SOCE therapy but at the same time deems those age 12-18 as competent enough to consent to mental health treatment. That inconsistency further discredits Defendants' argument that SB 1172 is designed to protect the health and safety of minors and indicates that Defendants' true motivation is to suppress any kind of therapy that seeks to reduce unwanted same-sex attractions. Such a law is simply unconstitutional.

For these reasons, Plaintiffs are likely to succeed on the merits, and this Court should grant the preliminary injunction.

## II.   PLAINTIFFS WILL CONTINUE SUFFERING IRREPARABLE HARM IF THE   INJUNCTION IS NOT ISSUED.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, ___ F.3d ___, 2012 WL 4358727 *9 (9th Cir. 2012) (preliminarily enjoining statute that violated plaintiffs' Fourth and Fourteenth Amendment rights) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This is especially true

Memorandum In Support of Preliminary Injunction

1  where the freedom of speech is at risk because the loss of such freedom "even for minimal

2  periods of time" constitutes irreparable harm. *Elrod*, 427 U.S. at 373; *see also New York Times*

3  *Co. v. United States*, 403 U.S. 713 (1971); *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir.

4  2012); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984). These

5  principles are so well-founded that "an alleged constitutional infringement will often alone

6  constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997)

7  (quoting *Associated Gen. Contractors v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir.

8  1991)). As discussed above, SB 1172 inflicts a host of irreparable constitutional injuries upon

9  California's therapists, parents, and minors.

10  **A. PLAINTIFFS-THERAPISTS WILL SUFFER IRREPARABLE HARM IF SB 1172 IS NOT**
11  **ENJOINED.**

12  Here, SB 1172 prohibits Plaintiff-therapists from engaging in certain discussions with

13  their clients, and this constitutes an indisputable First Amendment viewpoint-based violation.

14  SOCE therapy has been banned, and "any practice" that is aimed at reducing or eliminating

15  same-sex attractions is an ethical violation. SB 1172 silences counselors who wish to engage in a

16  course of therapy with consenting clients and that aligns with the clients' sincerely-held religious

17  beliefs. Such a prohibition constitutes a deprivation of First Amendment protection resulting in

18  immediate and irreparable harm. Indeed, Judge Kozinski recognized that "[b]y speaking candidly

19  to their patients about the potential benefits of medical marijuana, [doctors] risk losing their

20  license to write prescriptions, which would prevent them from functioning as doctors. In other

21  words, they may destroy their careers and lose their livelihoods." *Conant*, 309 F.3d at 639-40

22  (Kozinski, J., concurring). Plaintiffs are being denied the ability to speak to their patients and

23  clients about available treatments, which might assist the client in obtaining the desired

24  outcome—i.e., reducing or eliminating same-sex attractions. If they violate the prohibitions

Memorandum In Support of Preliminary Injunction

outlined in SB 1172, then Plaintiffs are subject to loss of their professional licenses. The imposition of punishment for discussing a course of treatment desired by the clients is certainly a deprivation of constitutional rights, and therefore *a priori* irreparable harm.

Not only does SB 1172 unconstitutionally proscribe discussion of SOCE therapy in the private office of a professional counselor, it also causes Plaintiffs and other counselors to live under the sword of Damocles. If any client comes into the counselor's office with intentions of discussing same-sex sexual attractions, then the counselor is almost certain to violate some provision of the ethical code of his respective profession. It is impossible to comply with both SB 1172 and all of the other provisions of the ethics codes. Specifically, SB 1172 prohibits professional counselors from "any practices that . . . eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex." Compl. ¶ 34. Nevertheless, to comply with SB 1172, Plaintiffs and all other counselors will be forced to violate their ethical codes that respect the client's right to self-determination and the right of the client to align their counseling with their religious and moral values when these clients voluntarily seek such counseling. But, if they do what they are otherwise ethically bound to do, namely to counsel or refer to counseling the client pursuant to the client's religious and moral values, then they violate SB 1172. Notwithstanding the fact that some counselors also have a sincerely-held religious belief to offer religious-based counsel, they will be unable to do so under SB 1172.

General Principle E of the American Psychological Association's "Ethical Principles of Psychologists and Code of Conduct" states that psychologists are to follow the wishes of their clients and respect their rights to self-determination, take reasonable steps to avoid harming their clients/patients . . . and to minimize harm when foreseeable and unavoidable." *Id.* ¶ 37. Yet, SB

Memorandum In Support of Preliminary Injunction

1172 interferes with this ethical obligation and will force counselors to violate this basic ethical principle.

Section 1(a) of the APA Guidelines for Ethical Treatment provide that "[a] psychiatrist shall not withhold information that the patient needs or reasonably could use to make informed treatment decisions . . . ." *Id.* ¶ 41. But, SB 1172 mandates that professional counselors refrain from "any practice" that attempts to reduce or eliminate same-sex attractions. Information on the availability of SOCE therapy would certainly be information that a patient desiring such therapy needs or reasonably could use in making a determination as to what therapy to begin and which counselor to select. Nevertheless, this would constitute a practice that could reduce or eliminate same-sex attractions, and hence fall within the broad ban of SB 1172.

Members of the American Counseling Association fare no better than the previous two professions. Section B.5.b of the ACA Code of Ethics states that "Counselors are sensitive to the cultural diversity of families and respect the inherent rights and responsibilities of parents/guardians over the welfare of their children." *Id.* ¶ 53. Section A.2.d of the ACA Code provides that counselors should seek the informed consent of the minor patient, but if not possible, then respect the rights of parents to make decisions on the child's behalf. *Id.* ¶ 52. SB 1172 prohibits members of the ACA from engaging in SOCE therapy with their minor clients, but this is specifically what many minor clients and their parents desire. An ACA counselor cannot respect the wishes of these clients without violating SB 1172, but she is also in violation of another provision of the ACA Code if she *complies* with SB 1172.

The American Medical Association members are also unable to comply with SB 1172 and all of the provisions of their ethical code. Opinion 10.01(2) of the AMA Code of Ethics provides that "the patient has the right to make decisions regarding the health care that is

Memorandum In Support of Preliminary Injunction

1    recommended by his or her physician." *Id.* ¶ 46. Opinion 10.016 of the AMA Code of Ethics

2    states that the decisions concerning a child's health care should be based on the best interest of

3    the child, but that "the wishes of the parent should generally receive preference" when

4    disagreement arises as to what is in the best interest of the child. *Id.* ¶ 49. Again, SB 1172 would

5    force physicians to select which provision of their ethical code they would rather violate, but it is

6    a Hobson's choice given that either will ultimately result in likely forfeiture of their license. A

7    counselor cannot respect the wishes of the client or the parent of a minor client if those

8    consenting parties desire to receive SOCE therapy: SB 1172 prohibits them from respecting that

9    choice, even if the minor desires the therapy and the parents believe that it is in the best interest

10   of the child.

11          Principle 1.2 of the American Association of Marriage and Family Therapists Code of

12   Ethics provides that all licensed Marriage and Family Therapists obtain informed consent from

13   their clients, meaning that the client "has been adequately informed of significant information

14   concerning treatment processes and procedures." SB 1172 prohibits Licensed Marriage and

15   Family Therapists from informing their minor clients about an entire course of treatment—SOCE

16   counseling—that might benefit them and help them. Principle 1.8 of the AAMFT Code provides

17   that licensed marriage and family therapists "respect the rights of clients to make decisions." SB

18   1172 will prohibit California Licensed Marriage and Family Therapists from respecting the

19   rights of clients to make the decisions because the State already made the decision for the

20   client—i.e., no one under the age of eighteen can receive SOCE counseling.

21          Section 1.01 of Code of Ethics of the National Association of Social Workers states that

22   it is a social worker's primary responsibility to promote the well-being of their clients. Section

23   1.02 of NASW Code provides that the clients shall have the right to self-determination and that a

Memorandum In Support of Preliminary Injunction

social worker should only seek to assist the client in achieving their goals. Section 1.03 of the NASW Code provides that social workers must provide sufficient information for the client to make an informed decision about their course of care and specifically states that such informed consent must include a discussion of reasonable *alternatives*.

Plaintiff AACC believes every client seeking mental health services has the inherent right to participate in treatment that is in alignment with his religious beliefs and faith-based values, and furthermore, to have this right vigorously protected. One of AACC's divisions, the Association for Spiritual, Ethical, and Religious Values in Counseling (ASERVIC), has developed written spiritual competencies to be incorporated into treatment protocols. In reviewing the proceedings at the 2007 AACC national conference in Detroit, Michigan, ASERVIC hosted a panel discussion of educators and clinicians. These individuals were intentionally identified as being nationally recognized for their expertise in teaching and research in the area of spirituality in counseling. The following are eight of the competencies that have particular relevance to counselors:

> Competency #2 – The professional counselor recognizes that the client's beliefs (or absence of beliefs) about spirituality and/or religion are central to his or her worldview and can influence psychosocial functioning.
>
> Competency #5 – The professional counselor can identify the limits of his or her understanding of the client's spiritual and/or religious perspective and is acquainted with religious and spiritual resources, including leaders, who can be avenues for consultation and to whom the counselor can refer.
>
> Competency #6 – The professional counselor can identify limits of her/his understanding of a client's religious or spiritual expression, and demonstrate appropriate referral skills and generate possible referral sources.
>
> Competency #7 – The professional counselor responds to client communications about spirituality and/or religion with acceptance and sensitivity.

Memorandum In Support of Preliminary Injunction

Competency #8 – The professional counselor uses spiritual and/or religious concepts that are consistent with the client's spiritual and/or religious perspectives and that are acceptable to the client.

Competency #9 – The professional counselor can recognize spiritual and/or religious themes in client communication and is able to address these with the client when they are therapeutically relevant.

Competency #12 – The professional counselor sets goals with the client that are consistent with the client's spiritual and/or religious perspectives.

Competency #13 – The professional counselor is able to a) modify therapeutic techniques to include a client's spiritual and/or religious perspectives, and b) utilize spiritual and/or religious practices as techniques when appropriate and acceptable to a client's viewpoint.

AACC believes, as evidenced in the language of the above listed Competencies—in particular Numbers 8 and 12—a client's spiritual and religious values are indeed valid and reasonable determinants for the focus and direction of treatment. AACC firmly believes that Senate Bill 1172 moves far beyond allegedly protecting minor clients and represents a reckless infringement on the religious liberties and mental health of anyone needing treatment.

ACCC believes when a client's faith values may be in conflict with other cultural values, especially as they may pertain to the language found in Senate Bill 1172, that ultimately the client—and in the case of a minor, his/her parent or legal guardian—has the moral and ethical right to participate in and determine the appropriate course of care, including alignment with his/her relevant religious beliefs. SB 1172 forces AACC's members to violate these principles.

Such Catch-22 legislation is irrational, illogical, and unconstitutional. It is irrational and illogical to force physicians, psychiatrists, psychologists, and counselors to choose between violating the ethical code of their respective professions and complying with SB 1172, or vice versa. This is especially true when the other provisions of each profession's ethical codes already offer protection for minors. Each code prohibits professionals from engaging in any course of

Memorandum In Support of Preliminary Injunction

1   therapy that would harm the patients. It is unconstitutional to draft a law that infringes on the

2   First Amendment liberties of professional counselors and to do so in such a manner that leaves

3   the members of the professions guessing as to what it means and differing as to how it applies.

4   These flaws are fatal to SB 1172 and result in irreparable harm to the Plaintiffs.

5
6   **B. PLAINTIFFS-PARENTS WILL SUFFER IRREPARABLE HARM IF SB 1172 IS NOT ENJOINED.**

7   If this court does not enjoin SB 1172, Plaintiffs-Parents will suffer the loss of their

8   constitutional right to direct the upbringing and education of their minor children. This

9   deprivation constitutes irreparable harm. *Melendres*, 2012 WL 4358727 at *9 ("the deprivation

10  of constitutional rights 'unquestionably constitutes irreparable injury.'")

11  As discussed above in section I.C., SB 1172 aims to homogenize all California children

12  by permitting counselors to provide *only* neutral or gay-affirming therapy. However, Plaintiff-

13  Parents, Jack and Jane Does 1 and 2 object to this government-approved therapy for their

14  respective male children, including John Doe 1 and John Doe 2, based on their sincerely-held

15  religious beliefs. *See* Jack Doe 1 Decl. ¶ 15; Jane Doe 1 Decl. ¶ 15; Jack Doe 2 Decl. ¶ 6; Jane

16  Doe 2 Decl. ¶ 6. Indeed, Mr. and Mrs. Doe 1 are Christians who believe in the authority of the

17  Bible, which states that homosexuality *harms* people. Mr. and Mrs. Doe 2 are a practicing

18  Muslim and a practicing Roman Catholic, respectively, whose shared religious beliefs include

19  the Biblical prohibition against homosexual conduct.  In accordance with these religious beliefs

20  and in direct contradiction to SB 1172, Plaintiff-Parents wish for their respective sons to

21  continue to receive therapy that decreases same-sex attractions and affirms the natural attractions

22  between men and women so that their sons can achieve their full, God-given heterosexual

23  potential. *See* Jack Doe 1 Decl. at ¶ 11; Jane Doe 1 Decl. ¶ 10; Jack Doe 2 Decl. ¶ 15; Jane Doe 2

24  Decl. ¶ 15. Through the SOCE therapy efforts of Dr. Nicolosi, John Doe 1 has experienced a

52

1   decrease in same-sex attractions and an increase in attractions for women while also

2   experiencing less personality disorder issues, less obsessive-compulsive behaviors, and improved

3   relationships with his parents. *See* Jack Doe 1 Decl. ¶ 11; Jane Doe 1 Decl. ¶ 10. Through the

4   SOCE therapy efforts of Dr. Nicolosi, John Doe 2 has experienced a stronger bond with his

5   parents and decreasing confusion about sexual orientation. Jack Doe 2 Decl. ¶ 15; Jane Doe 2

6   Decl. ¶ 15. In light of this progress, the Plaintiffs-Parents fear regression in their respective

7   child's healing if they cannot continue receiving SOCE therapy. *See* Jack Doe 1 Decl. ¶ 12; Jane

8   Doe 1 Decl. ¶ 11; Jack Doe 2 Decl. 16; Jane Doe 2 ¶ 16.

9        But, effective January 1, 2013, SB 1172 will cut off this avenue of therapy for the

10  Plaintiff-Parents and thereby sever their constitutionally-protected right to direct the upbringing

11  of their children. Only an injunction by this court can prevent this irreparable harm from

12  occurring.

13  **C. PLAINTIFFS-MINORS WILL SUFFER IRREPARABLE HARM IF SB 1172 IS NOT
14  ENJOINED.**

15       When SB 1172 becomes effective, Plaintiffs-Minors, John Does 1 and 2, will likewise

16  face the loss of their First Amendment right to receive medical information, which

17  "unquestionably constitutes irreparable harm." *Elrod,* 427 U.S. at 373; *see also New York Times*

18  *Co. v. United States*, 403 U.S. 713 (1971); *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir.

19  2012); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984). As discussed

20  above in section I.D., this constitutional right takes on special importance in the patient-client

21  context because patients cut off from professional advice are left to make critical medical

22  decisions on their own. *See Conant*, 309 F.3d at 622 ("Enforcement of the federal policy will cut

23  such patients off from competent medical advice and leave them to decide on their own whether

Memorandum In Support of Preliminary Injunction

1   to use marijuana to alleviate excruciating pain, nausea, anorexia or similar symptoms.")

2   (Kozinski, J., concurring).

3         Both John Doe 1 and John Doe 2 struggle with unwanted same-sex attractions. *See* John

4   Doe 1 Decl. ¶¶ 9-10 ; Jack Doe 2 Decl. ¶ 5. Both minors wish to minimize these same-sex

5   attractions and feminine behaviors and to increase their attractions to women so that they may

6   fully realize their potential as heterosexual men. *See* John Doe 1 Decl. ¶¶10, 14; Jack Doe 2

7   Decl. ¶ 16. In pursuit of these ends, the minor plaintiffs have voluntarily sought and received

8   SOCE therapy and indeed have been receiving such therapy. Forcing the counseling to stop will

9   result in immediate and irreparable harm.

10         Plaintiffs-Minors' allegations alone are sufficient to show a likelihood of irreparable

11   injury, *Monterey Mech. Co.,* 125 F.3d at 715 ("an alleged constitutional infringement will often

12   alone constitute irreparable harm.").

13   **III.**    **PLAINTIFFS' CONTINUING IRREPARABLE INJURY OUTWEIGHS ANY**
14            **HARM TO DEFENDANTS.**

15

16         Granting an injunction will preserve the status quo and protect the First Amendment

17   freedoms of professional counselors in California and allow them to engage in a course of

18   therapy voluntarily entered into with consenting counselors, patients, and parents. There is no

19   mandate that minors enter into SOCE therapy, and the ethical codes of all professional

20   counselors in California already prohibit imposing an ideology on patients and mandate that

21   counselors avoid causing any harm to patients. *See* Compl. ¶¶ 37-67. On the other hand, if an

22   injunction is not issued, professional counselors are subject to a hopelessly irreconcilable choice

23   of ethical violations, and minors will be unable to receive desired counseling that aligns with

24   their religious and moral values.

54

Memorandum In Support of Preliminary Injunction

An injunction in this case will protect the very rights that the Supreme Court has characterized as "lying at the foundation of free government of free men." *Schneider v. New Jersey*, 308 U.S. 147, 151 (1939). The loss of such fundamental freedoms outweighs any interest Defendants might have in halting SOCE therapy, especially given the fact that the basis for the ban is merely anecdotal evidence unsubstantiated by any significant and peer-reviewed studies. *See* SB 1172, § 1(d) (stating that "anecdotal reports of 'cures' are counterbalanced by anecdotal claims of psychological harm"). "The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights." *Elrod v. Burns*, 427 U.S. 347, 362 (1976).

The only potential injury that Defendants can assert is that an injunction will permit therapy to continue that legislators opine, but cannot establish, might be harmful to minors. Given that the ethical codes of all the relevant professions subject to the dictates of SB 1172 already prohibit imposing ideology or causing harm to a minor, the injunction will not cause any harm to minors. Because the injury caused to Plaintiffs is the total loss of First Amendment freedoms involving the doctor-patient relationship in SOCE therapy sessions, as well as the infringement of fundamental parental rights, and given that Plaintiffs cannot comply with SB 1172 without violating other provisions of their ethical codes, the balance of the equities strongly favors granting the injunction.

The Ninth Circuit has recognized that even if constitutional violations are not clearly established at the preliminary injunction phase, "the fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips sharply in [movant's] favor." *Sammartano v. First Judicial District, in & for Cnty. of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002). Certainly, SB 1172 raises serious constitutional questions concerning the First Amendment rights

Memorandum In Support of Preliminary Injunction

1   of professional counselors and the fundamental right of parents to direct the upbringing and

2   education of their children. As such, the balance of hardships tips strongly in favor of granting

3   Plaintiffs' requested relief.

4   **IV.      THE INJUNCTION WILL SERVE THE PUBLIC INTEREST.**

5           The public interest will be served by granting the injunction. The protection of

6   constitutional rights is of the highest public interest. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

7   "Here, the First Amendment rights of Plaintiffs are entirely eliminated from the field of SOCE

8   therapy with respect to minors. SB 1172 prohibits any practices that reduce or eliminate same-

9   sex attractions, which eliminates Plaintiffs' right to discuss available treatment with minor

10  patients desiring to obtain such treatment. Furthermore, "it is always in the public interest to

11  prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor

12  Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

13          The focus of the public interest inquiry is generally the challenged law's impact on non-

14  parties rather than parties. *Sammartano v. First Judicial District, in & for Cnty. of Carson City*,

15  303 F.3d 959, 974 (9th Cir. 2002). Here, the potential impact on non-parties is virtually

16  unlimited. No minor patient will ever be able to obtain SOCE therapy from a professional

17  counselor regardless of the patient's sincerely-held religious beliefs about same-sex attractions or

18  his desire to eliminate unwanted same-sex attractions. Additionally, it will forever muzzle

19  professional counselors from even mentioning the availability of SOCE therapy for minor

20  clients. Finally, allowing such an unconstitutional government infringement into the doctor-

21  patient relationship opens a potential Pandora's Box of regulations that will forever change the

22  relationship between patients and their doctors. Preventing such an unprecedented intrusion is

Memorandum In Support of Preliminary Injunction

1    unquestionably in the public interest. Therefore, this Court should grant Plaintiffs' requested

2    injunctive relief.

3

Memorandum In Support of Preliminary Injunction

# CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant the Preliminary Injunction.

/s/ _____

Mary E, McAlister
California Bar No. 148570
Mathew D. Staver*
Stephen M. Crampton*
Rena M. Lindevaldsen
LIBERTY COUNSEL
Attorneys for Plaintiffs
P.O. Box 11108
Lynchburg, VA 24502
Tel. 434-592-7000
Fax: 434-592-7700
court@LC.org

* Application to appear Pro Hac Vice pending

Memorandum In Support of Preliminary Injunction