1

2

3

4

5

6

7

8 IN THE UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10 DAVID H. PICKUP, et al.,

11         Plaintiffs,                    No. 2:12-CV-02497-KJM-EFB

12     vs.

13 EDMUND G. BROWN, et al.,               ORDER

14         Defendants.

15 _____/

16         Plaintiffs seek to enjoin Senate Bill (SB) 1172 from taking effect on January 1,

17 2013.  The bill prohibits licensed mental health professionals in California from engaging in

18 sexual orientation change efforts ("SOCE") with minors.  Plaintiffs, who are therapists, parents

19 and minors, contend SB 1172 violates their First and Fourteenth Amendment rights.  Their

20 motion came on for hearing on November 30, 2012.  Plaintiffs were represented by Matt Staver

21 in oral argument, and additionally in the courtroom by Daniel Schmid and Stephen Crampton.

22 Defendants were represented by Deputy Attorney General Alexandra Gordon.  Amicus Equality

23 California was represented by David Dinielli and Michelle Friedland in oral argument, and also

24 in the courtroom by Bram Alden, Christopher Stoll, Lika Miyake and Shannon Minter.  After

25 careful consideration of the arguments made in the briefs and at argument, and having reviewed

26 the relevant legal authority, the court finds plaintiffs are not likely to prevail on the merits so as

1   to prevail at this stage of the litigation.  For the reasons explained below, plaintiffs' motion is

2   DENIED.

3   I.      PROCEDURAL HISTORY

4           Plaintiffs in this case are David Pickup, Christopher Rosik, Ph.D., Joseph

5   Nicolosi, Ph.D., and Robert Vazzo, all licensed mental health professionals; the National

6   Association for Research and Therapy of Homosexuality (NARTH); the American Association

7   of Christian Counselors (AACC); Jack and Jane Doe 1, on behalf of minor John Doe 1; and Jack

8   and Jane Doe 2, on behalf of minor John Doe 2.  John Does 1 and 2 are patients of Dr. Nicolosi

9   (Decl. of Jack Doe 1 ¶ 10, ECF[1] 28-5; Decl. of Jack Doe 2 ¶¶ 13-14, ECF 28-5).  Plaintiffs name

10  the following defendants: Governor Edmund G. Brown, Jr.; Anna Caballero, Secretary of the

11  State and Consumer Services Agency of California; Kim Madsen, Executive Officer of the

12  California Board of Behavioral Sciences; Michael Erickson, Ph.D., President of the California

13  Board of Psychology; and Sharon Levine, President of the Medical Board of California.

14          Plaintiffs' complaint, filed on October 4, 2012, challenges SB 1172, which adds

15  three provisions to California's Business and Professions Code.  The new law provides that a

16  mental health provider, as defined by the statute, shall not "engage in sexual orientation change

17  efforts with a person under 18 years of age."   Sexual orientation change efforts are defined as

18  "any practices . . . that seek to change an individual's sexual orientation."  Plaintiffs assert six

19  constitutional claims, alleging SB 1172 violates: (1) the therapists' right to free speech and the

20  minors' right to receive information under the First Amendment; (2) the therapists' right to

21  liberty of speech and the minors' right to receive information under Article I § 2(a) of the

22  California Constitution; (3)  the parents' and minors' right to free exercise of religion; (4) the

23  parents' and minors' right to free exercise and enjoyment of religion under Article I, § 4 of the

24  California Constitution; (5) the Jack and Jane Does' parental rights under the First and

25  

26          [1]  ECF refers to "Electronic Case Filing," and the number following it is the docket
    number of the document referenced.

2

1  Fourteenth Amendment; and (6) the Jack and Jane Does' parental rights under Article I, § 7 of

2  the California Constitution. *(See generally* ECF 1.)

3       On October 19, 2012, Equality California filed a motion to intervene as a party

4  defendant.  (ECF 24.)  Plaintiffs have opposed the motion and Equality California has filed a

5  reply.  (ECF 56, 72.)  The motion to intervene is resolved by separate order.

6       On October 23, 2012, plaintiffs filed the pending amended motion for a

7  preliminary injunction.  (ECF 29.)  Defendants have opposed the motion and plaintiffs have filed

8  a reply.  (ECF 48, 60.)

9       On November 21, 2012, the court granted Equality California's request to file an

10  amicus brief and to participate in oral argument on the motion for a preliminary injunction.

11  (ECF 67.)  Equality California filed its amicus brief on November 21, 2012.  (ECF 70.)

12  II.    BACKGROUND ON SOCE[2]

13       As passed by the Legislature, SB 1172 seeks to regulate therapy known as "sexual

14  orientation change efforts," or SOCE (pronounced "sōsh").  "The phrase *sexual orientation*

15  *change efforts* (SOCE) encompasses a variety of methods, including techniques derived from

16  psychoanalysis, behavioral therapy, and religious and spiritual counseling.  These techniques

17  share the common goal of changing an individual's sexual orientation from homosexual to

18  heterosexual."  (ECF 52 ¶ 26 (emphasis in original).)

19

20       [2]  This background is drawn from the filings by both parties.  The parties have objected to
portions of the evidence submitted by their opponents.  (*See* ECF 50, 64, 76.)  Generally,

21  declarations and evidence supporting a preliminary injunction motion need not conform to the
standards for a summary judgment motion or to the Federal Rules of Evidence.  *Welker v.*

22  *Cicerone*, 174 F. Supp. 2d 1055, 1059 n. 2 (C.D. Cal. 2001), *abrogated on other grounds by*
*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007); *see also* CHARLES ALAN WRIGHT, ARTHUR R.

23  MILLER, MARY KAY KANE & RICHARD L. MARCUS, 11A FED. PRACTICE AND PROCEDURE § 2949
(2d ed. 1995) ("[I]nasmuch as the grant of a preliminary injunction is discretionary, the trial

24  court should be allowed to give even inadmissible evidence some weight when it is thought
advisable to do so in order to serve the primary purpose of preventing irreparable harm before a

25  trial can be had.").  Because the court's decision here would be the same whether all or none of
the contested evidence is admissible, the court does not rule on objections at this stage of the

26  litigation.

Modern SOCE traces its history to the mid-twentieth century, when homosexuality was considered a form of disease.[3]  At that time, "many mental health professionals sought to 'cure' [homosexuality] using a variety of techniques, including psychotherapy, hormone treatments, aversive conditioning with nausea-inducing drugs, lobotomy, electroshock, and castration." *Id.* ¶ 27.  Use of these practices has dropped significantly in light of the current position of many American psychological and psychiatric professionals that homosexuality is not a mental illness.  *Id.* ¶ 28.  "[M]ost practitioners [have] stopped attempting to change sexual orientation and some [have taken] strong public stands against such efforts."  *Id.*  Plaintiff NARTH's treatment guidelines recognize SOCE as "an increasingly controversial subject."  (ECF 63-2 at 6.)

Despite the documented decline of use in therapeutic practice, "the visibility of SOCE has increased in the last decade."[4]  (ECF 54-1 at 33.)  The American Psychological Association ("APA") has observed that "most SOCE currently seem[s] directed to those holding conservative religious and political beliefs, and recent research on SOCE includes almost exclusively individuals who have strong religious beliefs."  *Id.*  Plaintiff NARTH agrees that deeply religious people account for the bulk of patients now seeking SOCE.  (ECF 63-2 at 17.)  ("Research indicates that the majority of people who present to clinicians with unwanted same-sex attractions are motivated in part by deeply held religious values.").

Modern day SOCE can be categorized as either aversion or nonaversion treatments, with some practitioners utilizing techniques from both.  Aversion treatments include

---

[3] Homosexuality was listed as a mental disorder in the first edition of what came to be called the Diagnostic and Statistical Manual of Mental Disorders ("the DSM"), published in 1952.  (ECF 52 ¶ 11.)  Homosexuality was removed from the Manual in 1973.  *Id.* ¶ 12.  Two years later, in 1975, the American Psychological Association (APA) affirmed that homosexuality is not a mental illness and urged its membership to work towards dispelling the stigma of mental illness associated with homosexuality.  *Id.*

[4] The quoted report was published in 2009; "decade" presumably refers to the 10 years preceding.

1    practices "such as inducing nausea, vomiting, or paralysis; providing electric shocks; or having

2    the individual snap an elastic band around the wrist upon arousal by same-sex erotic images or

3    thoughts.  Other examples of aversive behavioral treatments include covert sensitization, shame

4    aversion, systematic desensitization, orgasmic recondition, and satiation therapy." (ECF 54-1 at

5    30.)  Plaintiff NARTH recognizes the controversy aversion treatment presents within the

6    psychological and medical fields, as well as the potential harms to patients presented by such

7    therapies.  *See* ECF 63-2 at 29.  NARTH's own treatment guidelines recommend avoiding some

8    aversion treatments.  *See id.*  (". . . in light of current research and professional ethics, some

9    interventions for unwanted same-sex attractions and behavior are not recommended. These

10   include shock therapy and other aversive techniques, so-called reparenting therapies, and

11   coercive forms of religious prayer.").

12           Nonaversive SOCE treatments center on "chang[ing] gay men's and lesbians'

13   thought patterns by reframing desires, redirecting thoughts, or using hypnosis, with the goal of

14   changing sexual arousal, behavior, and orientation."  (ECF 54-1 at 30.)  Such efforts often are

15   accomplished by an accompanying "educational process of dating skills, assertiveness, and

16   affection training with physical and social reinforcement to increase other-sex sexual behaviors."

17   *Id.*

18           Plaintiff NARTH's practice guidelines articulate the goal of SOCE as

19   "support[ing] the principle that individuals are capable of making their own choices in response

20   to same-sex attractions and [to] promote autonomy and self-determination."  (*Id.* at 21.)

21   NARTH advises clinicians to accomplish this goal by "(a) acknowledging a client's choice or

22   desire to seek intervention for unwanted same-sex attractions and behavior; (b) exploring why

23   these attractions and behaviors are distressing to the client...; © addressing the cultural and

24   political pressures surrounding choice in response to same-sex attractions; (d) discussing the

25   available range of professional therapies and resources...; (e) providing understandable

26   /////

1   information on outcome research related to change interventions...; and (f) obtaining informed

2   consent for treatment." *Id.* (citations omitted).

3   III.   SB 1172

4         A.     The Statute Enacted by SB 1172

5               SB 1172 enacts the following new sections of the California Business and

6   Professions Code:

7                    865.  For the purposes of this article, the following terms shall
                     have the following meanings:

8
                     (a) "Mental health provider" means a physician and surgeon
9                    specializing in the practice of psychiatry, a psychologist, a
                     psychological assistant, intern, or trainee, a licensed marriage and
10                   family therapist, a registered marriage and family therapist, intern,
                     or trainee, a licensed educational psychologist, a credentialed
11                   school psychologist, a licensed clinical social worker, an associate
                     clinical social worker, a licensed professional clinical counselor, a
12                   registered clinical counselor, intern, or trainee, or any other
                     person designated as a mental health professional under California
13                   law or regulation.

14                   (b) (1) "Sexual orientation change efforts" means any practices by
                     mental health providers that seek to change an individual's sexual
15                   orientation. This includes efforts to change behaviors or gender
                     expressions, or to eliminate or reduce sexual or romantic
16                   attractions or feelings toward individuals of the same sex.

17                   (2) "Sexual orientation change efforts" does not include
                     psychotherapies that: (A) provide acceptance, support, and
18                   understanding of clients or the facilitation of clients' coping,
                     social support, and identity exploration and development,
19                   including
                     sexual orientation-neutral interventions to prevent or address
20                   unlawful conduct or unsafe sexual practices; and (B) do not seek to
                     change sexual orientation.

21
                     865.1.  Under no circumstances shall a mental health provider
22                   engage in sexual orientation change efforts with a patient under 18
                     years of age.

23
                     865.2.  Any sexual orientation change efforts attempted on a
24                   patient under 18 years of age by a mental health provider shall be
                     considered unprofessional conduct and shall subject a mental
25                   health provider to discipline by the licensing entity for that mental
                     health provider.

26

                                        6

B.     Legislative History

A California State Senator introduced SB 1172 on February 22, 2012, with the stated intention of protecting California lesbian, gay, bisexual and transgender individuals from "sham therapies" that aim to change their sexual orientation.  *Senate Judiciary Committee, SB 1172*, 2011-2012 Sess. 5 (Cal. 2012); Complete Bill History of SB 1172 (Official California Legislative Information maintained electronically by Legislative Counsel of California).  Initially, the bill included provisions allowing former or current SOCE patients to sue a therapist engaging in SOCE and requiring therapists who provide SOCE to adult patients to obtain a patient's signature on an informed consent form.  *Senate Committee on Business, Professions and Economic Development*, *SB 1172*, 2011-2012 Sess. 8-9 (Cal. 2012).  Prior to final passage, the draft bill was changed to remove these two provisions, leaving the sections set forth above.  *Senate Rules Committee: Third Reading*, *SB 1172*, 2011-2012 Sess. 1 (Cal. 2012).   The full Senate passed a version of the bill on May 30, 2012, twenty-three votes to thirteen.  Complete Bill History of SB 1172.  SB 1172 was then referred to the Assembly, where it cleared committee to reach the floor.  *Id.*  After amending it several times, the Assembly passed the bill on August 28, 2012, fifty-two to twenty-two.  *Id.*  The Senate then adopted the Assembly amendments on August 30, on a vote of twenty-three to thirteen.  *Id.*  The Governor received the bill on September 10 and signed it into law on September 30, 2012.  Cal. Stats. 2012, ch. 835, p. 91.

Amicus Equality California was a primary sponsor of SB 1172, along with several other organizations, including Lambda Legal, Gaylesta, Mental Health America of Northern California and National Center for Lesbian Rights.  *Senate Rules Committee*: *Unfinished Business*, *SB 1172*, 2011-2012 Sess. 7-8 (Cal. 2012).  Initially, the California Psychological Association, California Association for Licensed Professional Clinic Counselors, California Psychiatric Association and California Association of Marriage and Family Therapists opposed the bill, on grounds that a statutory ban on a type of therapy was unprecedented, particularly the

complete ban on SOCE for minors, even those who freely consent to the treatment. *Senate Committee on Business, Professions and Economic Development*, *SB 1172*, 2011-2012 Sess. 9-10 (Cal. 2012). These organizations also expressed concern that the proposed definition of SOCE was too vague. *Assembly Committee on Business, Professions and Consumer Protection*, *SB 1172*, 2011-2012 Sess. 4 (Cal. 2012). Other organizations, including plaintiff NARTH, also opposed the bill. *Senate Rules Committee*: *Unfinished Business*, *SB 1172*, 2011-2012 Sess. 8 (Cal. 2012). The California Psychological Association and California Association of Marriage and Family Therapists eventually supported the bill.[5] *Senate Rules of Committee: Unfinished Business, SB 1172*, 2001-2012 Sess. 7 (Cal. 2012). At the time the bill was delivered to the Governor, it was opposed by the American College of Pediatricians, California Catholic Conference, Inc., Catholic Medical Association, Christian Medical and Dental Associations, Church State Council, Liberty Counsel Action, NARTH, Pacific Justice Institute and Parents and Friends of Ex-Gays and Gays. *Id.* The other professional organizations who had initially opposed the bill, listed above, had withdrawn their opposition. *See id.*

During committee hearings, the Legislature addressed a potential conflict with California Health & Safety Code § 124260, which allows minors who are twelve years of age or older to consent to mental health treatments without parental approval. *Senate Judiciary Committee, SB 1172*, 2011-2012 Sess. 6-8 (Cal. 2012). The Legislature ultimately concluded that Section 124260 was meant to allow minors to access only helpful treatment and thus that SB 1172's goal of protecting minors from harmful treatment was not in conflict. *Id.*

In adopting SB 1172, the Legislature expressly relied on mental health professional organizations' research into the safety and efficacy of SOCE, and in particular the report of the 2009 Task Force of the American Psychological Association (APA) titled

---

[5] At hearing, Equality California requested that the court take judicial notice of a letter from the California Psychological Association expressing its support in light of amendments to the bill. Plaintiffs' counsel objected because he had not previously seen the letter. The court declines to take notice of the letter or its contents.

*Appropriate Therapeutic Responses to Sexual Orientation*.  The Legislature also referenced the Ninth Circuit Court of Appeals' decision in *Pitcherskaia v. INS*, 118 F.3d 641 (9th Cir. 1997), holding that "sexual orientation treatment" of a Russian citizen including "sedative drugs and hypnosis" constituted mental and physical torture, although the Legislature did not suggest the treatment in *Pitcherskaia* was akin to current SOCE practices in California.  *Senate Rules Committee: Third Reading*, *SB 1172*, 2011-2012 Sess. 6 (Cal. 2012).  The Legislature briefly documented the history of treatment of homosexuality by mental health practitioners.  *Senate Rules Committee: Unfinished Business*, *SB 1172*, 2011-2012 Sess. 4-5 (Cal. 2012).  It noted the APA's removal of homosexuality from the Diagnostic and Statistical Manual of Mental Disorders (DSM) list of mental disorders in 1973, *id.* at 4; the further modification of the DSM in the mid-1980s to eliminate the definition of those "in conflict with" their sexual orientation as having a mental disorder, *id.* at 5; and the removal of the diagnosis of egodystonic[6] homosexuality from the DSM in 1987.  *Id.* The Legislature also noted the World Health Organization's removal of homosexuality from its International Classification of Disorders-10 in 1992, and shift to use of the term egodystonic homosexuality.  *Id.*

       The Legislature also reviewed the work of contemporary SOCE practitioners, including plaintiff Nicolosi's psychotherapeutic techniques, *Senate Rules Committee: Third Reading*, *SB 1172*, 2011-2012 Sess. 6 (Cal. 2012), as well as NARTH's view that homosexuals can and should be allowed to change their sexual orientation through therapy, *Assembly Committee on Business, Professions and Consumer Protection, SB 1172*, 2011-2012 Sess. 3 (Cal. 2012).

---

      [6] The International Classification of Disorders-10 defines "egodystonic sexual orientation" as: "The gender identity or sexual preference (heterosexual, homosexual, bisexual, or prepubertal) is not in doubt, but the individual wishes it were different because of associated psychological and behaviourial disorders, and may seek treatment in order to change it."  World Health Organization, ICD-10, § F66.1 (May 2010).

The final version of SB 1172 sets forth the Legislature's findings, summarized here:

• The major mental health professional organizations have recognized homosexuality is "not a disease, disorder, illness, deficiency, or shortcoming" for nearly 40 years.

• The 2009 APA Task Force report "concluded that sexual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people," including among many other effects "confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, suicidality, substance abuse, stress, disappointment, self-blame, decreased self-esteem and authenticity to others, . . ."

• The APA, in a 2009 resolution, advised persons to avoid SOCE.

• The APA has resolved that SOCE does not have proven effectiveness and that practitioners should refrain from engaging in the treatment.

• The American School Counselor Association, American Academy of Pediatrics, American Medical Association Council on Scientific Affairs, National Association of Social Workers, American Counseling Association Governing Council, American Psychoanalytic Association and Pan American Health Organization of the World Health Organization all have issued statements opposing SOCE.

• In a 2012 article, the American Academy of Child and Adolescent Psychiatry advised clinicians "there is no evidence that sexual orientation can be altered through therapy, and [] attempts to do so may be harmful."

• In a 2009 article in the journal *Pediatrics*, documentation supported the conclusion that "[m]inors who experience family rejection based on their sexual orientation face especially serious health risks."

The Legislature concluded that "California has a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and

1   transgender youth, and in protecting its minors against exposure to serious harms caused by

2   sexual orientation change efforts."

3   IV.   MOTION FOR PRELIMINARY INJUNCTION

4         A.   Standard

5             Injunctive relief is an extraordinary remedy that may only be awarded upon a

6   clear showing that the moving party is entitled to such relief.  *Winter v. Natural Res. Defense*

7   *Council, Inc.*, 555 U.S. 7, 22 (2008).  As provided by Federal Rule of Civil Procedure 65, a court

8   may issue a preliminary injunction to preserve the relative position of the parties pending a trial

9   on the merits.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The party seeking

10  injunctive relief must show it "is likely to succeed on the merits, . . . is likely to suffer irreparable

11  harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that

12  an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

13            Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or

14  "serious questions" test, which allowed a court to balance the elements of the test "so that a

15  stronger showing of one element may offset a weaker showing of another."  *Alliance for the Wild*

16  *Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Clear Channel Outdoor, Inc. v.*

17  *City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).  Recently, the Circuit has  found that its

18  "serious question" sliding scale test survived *Winter*: a court may issue a preliminary injunction

19  when the moving party raises serious questions going to the merits and demonstrates that the

20  balance of hardships tips sharply in its favor, so long as the court also considers the remaining

21  two prongs of the *Winter* test.  *Cottrell*, 632 F.3d at 1134-35.  However, a court need not reach

22  the other prongs if the moving party cannot as a threshold matter demonstrate a "fair chance of

23  success on the merits."  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (quoting

24  *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008); internal quotations omitted).

25  /////

26  /////

11

1    B.    Analysis

2        Plaintiffs' motion for preliminary injunctive relief is based only on their first and

3    fifth claims for relief: violation of the therapists' free speech and violation of parental rights

4    under the First and Fourteenth Amendments.[7] (ECF 28 at 2.) The free speech claim supports

5    three separate arguments: SB 1172 violates plaintiff therapists' rights by discriminating based on

6    viewpoint and/or content; SB 1172 violates plaintiff minors' rights to receive information; and

7    SB 1172 is unconstitutionally vague. The court addresses each of these free speech arguments

8    and then turns to plaintiffs' parental rights argument. Because the court determines plaintiffs do

9    not meet the threshold test of likelihood of prevailing on the merits on any claim, the court

10   addresses each of plaintiffs' arguments only in light of *Winter*'s first prong.

11          1.    Therapists' Free Speech Rights And Discrimination Based On Viewpoint
           Or Content

12

13       Plaintiffs argue that SB 1172 unconstitutionally discriminates on the basis of

14   viewpoint, by prohibiting licensed mental health providers from "even mentioning the viewpoint

15   that unwanted same-sex attractions can be changed"; they say the bill instead mandates that

16   counselors "espouse one viewpoint regarding same-sex sexual attractions, *i.e.*, that they . . .

17   cannot be stopped . . . ." Plaintiffs contend this discrimination against a particular viewpoint

18   cannot withstand strict scrutiny, even if the statute is interpreted as merely restricting content

19   rather than viewpoint. (ECF 28 at 8-9.) Defendants respond that SB 1172 is not viewpoint or

20   content discriminatory because the statute regulates conduct, not speech. They argue that SB

21   1172 does not prohibit licensed mental health professionals from mentioning SOCE to minors.

22   _____

23       [7] Plaintiffs assert parallel free speech, free exercise, and parental rights claims under the
United States Constitution (claims 1, 3, and 5) and the California Constitution (claims 2, 4, and

24   6). Defendants argue in their opposition that claims under the California Constitution are barred
by the Eleventh Amendment. (ECF 48 at 24 (citing *Pennhurst State Schs. & Hosp. v.*

25   *Halderman,* 465 U.S. 89, 106, 119 (1984) (Eleventh Amendment precludes federal courts from
hearing claims against state officials on the basis of state law)).) Because plaintiffs do not assert

26   a separate analytical basis for their claims under the California Constitution, this court treats the
two claims as identical for the purposes of this motion and does not reach the immunity issue.

Defendants also contend SB 1172 does not improperly single out a particular viewpoint because the Legislature did not exclude heterosexual minors from the statute's coverage.  (ECF 48 at 18-20.)  In reply, plaintiffs urge that defendants have not met their burden in justifying the statute's restrictions on their First Amendment rights.  They also argue the statute is not a content-neutral licensing scheme but rather "dictate[s] the content of what is said in therapy."   Because "psychotherapy is a series of conversations" and the "relationship between the psychotherapist and client is founded upon speech," they say, SB 1172 regulates speech, not conduct.  (ECF 60 at 8.)

a.      Content and Viewpoint Discrimination

"Content discrimination occurs when the government chooses the subjects that may be discussed, while viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001) (internal citations, quotation marks omitted). Viewpoint discrimination is a "subset or particular instance of the more general phenomenon of content discrimination . . . . [T]he distinction is not a precise one."  *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 830-31 (1995).  Whether a statute is content-based may be determined from the text of the statute itself: "if the statute describes speech by content, then it is content based."  *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1071 (9th Cir. 2006).  "Content-based regulations are presumptively invalid."  *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).

The Ninth Circuit considered content and viewpoint discrimination in *Conant v. Walters*, 309 F.3d 629, 634 (9th Cir. 2002), a case upon which plaintiffs rely.  In *Conant,* the Circuit addressed whether the government could investigate a physician or revoke a physician's license to prescribe controlled substances when the only basis for such action was the physician's professional recommendation for the use of marijuana.  The policy at issue in *Conant* was released by the Director of the Office of the National Drug Policy Council and was

13

formulated after two states decriminalized the use of marijuana for limited medical purposes.  *Id.*
at 632 n.1. The court described the policy as seeking "to punish physicians on the basis of [ ]
doctor-patient communications," because only those conversations that included a discussion of
the medicinal use of marijuana triggered the policy.  *Id.* at 637.   It found the policy was not only
content-based, but viewpoint discriminatory, because it precluded the discussion of marijuana
and also condemned the expression of any opinion that marijuana might help a particular patient.
*Id.*  The court recognized that the First Amendment protects physician speech because "an
integral component of the practice of medicine is the communication between a doctor and a
patient," something the law recognizes through the application of the physician-patient privilege.
The basis of the privilege, the court said, is that "'barriers to full disclosure would impair
diagnosis or treatment.'" *Id.* at 636 (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)).
The government's policy thus infringed the physician's First Amendment speech because it
prevented the doctor from exercising medical judgment in recommending a form of treatment he
or she believed might benefit a patient.  *Id.* at 638.  *Conant* did not consider whether the
government's restriction on prescribing medical marijuana or using medical marijuana as a
treatment would raise any First Amendment concerns.

   Similarly, in *Wollschlaeger v. Farmer*, No. 11–22026–Civ, 2012 WL 3064336
(S.D. Fla. June 29, 2012), a district court considered a Florida statute that prevented a medical
care provider from asking a patient about gun ownership and recording any information about
gun ownership in a patient's records, subject to a few exceptions.  The court described the act as
imposing "content-based restrictions on practitioners' speech" because it "regulate[s]
practitioners' inquiries [and] record-keeping . . ." on only one subject.  *Id.* at *7.   It observed
that the law was "different from so many other laws involving practitioners' speech" because "it
aims to restrict a practitioner's ability to provide truthful, non-misleading information to a
patient . . . .  The purpose of preventative medicine is to discuss with a patient topics that . . .
informs [*sic*] the patient about general concerns that may arise in the future." *Id.* at *9.  The

court in *Wollschlaeger* found that the law burdened the doctor-patient relationship by prohibiting speech necessary to the practice of preventative medicine and thereby preventing patients from receiving truthful, non-misleading information.  *Id*. at *12.[8]

Here, plaintiffs have not demonstrated a likelihood of success on the merits of their claim that SB 1172 will subject mental health professionals to discipline if they merely recommend SOCE to minor patients, or discuss it with them, or even present them with literature about SOCE.  This case is thus unlike *Conant*, where the government was unable "to articulate exactly what speech [was] proscribed, describing it only in terms of speech the patient believes to be a recommendation of marijuana."  *Id*. at 639.  Here, in contrast, the state's insistence that the statute bars treatment only, and not the mention of SOCE or a referral to a religious counselor or out-of-state practitioner, is consistent with a fair reading of the statute itself.  (ECF 48 at 18-19.)

According to the statute, SOCE is any "practices" aimed at changing a person's sexual orientation.  As the law itself does not define either "practices" or "change," the court construes the terms in accordance with their "ordinary or natural meaning."  *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994); *Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990, 1021 (9th Cir. 2010), *cert. denied,* ___ U.S. ___*,* 131 S.Ct. 1477 (2011).  A "practice" is "the application or use of an idea, belief, or method, as opposed to the theory or principles of it," and the transitive verb "to change" is to "make (a thing) other than it was; to render different."  CONCISE OXFORD ENGLISH DICTIONARY 1126, 236 (12th ed. 2011).[9]  As defined,

---

[8]  In an earlier order granting the physicians' motion for a preliminary injunction, the court said the statute restricted a practitioner's freedom to inquire about or discuss a certain subject.  *Wollschlaeger v. Farmer*, 814 F. Supp. 2d 1367, 1377 (S.D. Fla. 2011).

[9]  To define statutory terms in this order, the court examined several different dictionaries, including the one cited here and MERRIAM WEBSTER'S COLLEGIATE (10th ed. 1996), COMPACT OXFORD ENGLISH DICTIONARY (3rd ed. 2005), WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) and AMERICAN HERITAGE DICTIONARY ONLINE.  Because the court's survey yielded no material difference in definitions, the court cites to one leading dictionary.

then, what SB 1172 proscribes is actions designed to effect a difference, not recommendations or mere discussions of SOCE.  This fact distinguishes SB 1172 from the policy at issue in *Conant* or the law at issue in *Wollschlaeger*, as SB 1172 does not on its face penalize a mental health professional's exercise of judgment in simply informing a minor patient that he or she might benefit from SOCE; it also does not prohibit speech necessary to the therapist's practice. Moreover, the statute does not preclude a minor's taking information from a licensed mental health professional and then locating someone other than a licensed professional to provide SOCE.  *Cf. Sorrel v. IMS Health, Inc*., ___ U.S. ___, 131 S. Ct. 2653, 2665 (2011) ("[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used'") (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)).  The SOCE therapy regulated by SB 1172 is conduct.

The court also must determine, however, whether the statute's restriction on engaging in SOCE itself, distinct from discussion or recommendation of SOCE, violates a licensed professional's First Amendment rights as plaintiffs claim.

b.      First Amendment Rights

In making their conflicting arguments with respect to the First Amendment, both parties cite to the Ninth Circuit case of *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000) ("*NAAP*"). *NAAP* involved a challenge to provisions of California's licensing laws establishing certain educational requirements for a person to be licensed as a psychologist.  The individual plaintiffs, who had not completed all the required courses despite their other, substantial educational accomplishments, alleged that the licensing scheme violated their substantive due process and First Amendment rights.  The Circuit first considered the extent to which speech was implicated, noting that a course of conduct may be regulated even if it is "'in part initiated, evidenced, or carried out through means of language, either spoken, or written, or printed.'" *Id.* at 1053 (quoting *Giboney v. Empire Storage & Ice Co*. 336 U.S. 490, 502 (1949)).  It rejected NAAP's

1    claim that psychoanalysis is "pure speech," quoting the district court's determination that "'the

2    key component of psychoanalysis is the treatment of emotional suffering and depression, *not*

3    speech . . . .  That psychoanalysts employ speech to treat their clients does not entitle them, or

4    their profession, to special First Amendment protection.'"  *Id*. at 1054 (emphasis in original);[10]

5    *see also* STEDMAN'S MEDICAL DICTIONARY FOR THE HEALTH PROFESSIONS AND NURSING 1394,

6    1763 (7th ed. 2012) (defining "psychotherapy" as "[t]reatment of emotional, behavioral,

7    personality, and psychiatric disorders based primarily on verbal or nonverbal communication and

8    interventions with the patient, in contrast to treatments using chemical and physical measures"

9    and "therapy" as the "systematic treatment of a disease, dysfunction, or disorder," and in

10    psychiatry and clinical psychology, as "psychotherapy"); CONCISE OXFORD ENGLISH

11    DICTIONARY 1537 (12th ed. 2011) (defining "treatment" as "management in the application of

12    remedies; medical . . . application or service" and "action . . . towards a person"); CAL. BUS. &

13    PROF. CODE § 4996.9 ( defining psychotherapy as the use of "methods . . . to assist a person . . .

14    to achieve a better psychosocial adaptation . . . to modify internal and external conditions which

15    affect individuals, groups or communities in respect to behavior, emotions, and thinking).

16           At the same time, that therapy is conduct, as discussed above, does not

17    necessarily mean the First Amendment has no application: "conduct may be 'sufficiently imbued

18    with elements of communication to fall within the scope of the First and Fourteenth

19    Amendments.'"  *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. State of Wash.*,

20    418 U.S. 405, 409 (1974)); *Schneider v. Amador Cnty.*, No. CIV S-10-3242, 2011 WL 3876015,

21

22

23        [10]  Plaintiffs cite to that portion of *NAAP* finding the licensing scheme to be content-neutral in part because "[n]othing in the statutes prevents licensed therapists from utilizing

24    psychoanalytical methods . . . ," and that the licensing scheme "was not adopted because of any disagreement with psychoanalytical theory."  *NAAP*, 228 F.3d at 1055, 1056.  Plaintiffs argue that SB 1172 in contrast was adopted precisely because of the state's disagreement with a

25    particular analytical theory and that the law prevents them from using certain psychoanalytical methods.  While the cited discussion in *NAAP* gives the court pause, it is dicta and does not

26    control the resolution of the nature of SOCE therapy for First Amendment purposes in this case, given the other controlling precedent this court must apply.

at *3 (E.D. Cal. Sep. 1, 2011), *recommendation adopted in* 2011 WL 4766445 (E.D. Cal. Sep.

29, 2011).  The Supreme Court has rejected the idea that "an apparently limitless variety of

conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to

express an idea." *United States v. O'Brien*, 391 U.S 367, 376 (1968); *City of Dallas v. Stanglin*,

490 U.S. 19, 25 (1989) (rejecting the idea that every activity with "some kernel of expression" is

entitled to First Amendment protection).  Instead, it has extended First Amendment protection to

conduct only when "'[a]n intent to convey a particularized message [is] present, and . . . the

likelihood [is] great that the message w[ill] be understood by those who view it." *Anderson v.*

*City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010) (quoting *Spence*, 428 U.S. at 409-

11; process of tattooing entitled to First Amendment protection because the end product, the

tattoo, is pure speech); *Giebel*, 244 F.3d at 1187 (handbill entitled to First Amendment

protection because it was designed to convey information).  "If combining speech and conduct

were enough to create expressive conduct, a regulated party could always transform conduct into

'speech' simply by talking about it." *Rumsfield v. Forum for Academic and Inst. Rights, Inc.*,

547 U.S. 47, 66 (2006).

        Courts reaching the question have found that the provision of healthcare and

other forms of treatment is not expressive conduct. *O'Brien v. United States Dept. Of Health &*

*Human Servs.*, No. 4:12–CV–476 (CEJ), 2012 WL 4481208, at *12 (E.D. Mo. Sep. 28, 2012)

("Neither the doctor's conduct in prescribing nor the patient's conduct in receiving

contraceptives is inherently expressive.  Giving or receiving health care is not a statement in the

same sense as wearing a black armband or burning a flag." (internal citations omitted)); *see*

*Abigail Alliance For Better Access v. von Eschenbach*, 495 F.3d 695 (D. D.C. 2007) (collecting

cases finding no constitutional right of access to particular medical treatments reasonably

prohibited by the government); *Martin v. Campbell*, No. 09-4077, 2010 WL 1692074 (W.D. Ark.

Apr. 23, 2010) (rejecting a First Amendment challenge to a statute preventing acupuncturists

from prescribing, administering or dispensing certain drugs); *People v. Privitera*, 23 Cal. 3d 697,

1   703-04 (1979) ("the selection of a particular procedure is a medical matter" to which privacy

2   status does not attach); *Sharrer v. Zettel*, No. C 04-00042 SI, 2005 WL 885129, at *7 (N.D. Cal.

3   Mar. 7, 2005) (in rejecting claim that plaintiffs had a constitutional right to consult denturist,[11]

4   court found no fundamental right to choose type of medical treatment or particular health care

5   provider); *State Dept. of Health v. Hinze*, 441 N.W.2d 593, 597 (Neb. Jun. 16 1989) (practice of

6   medicine itself is not protected by the First Amendment).  Given the weight of the authority on

7   the question and the nature of the record before the court, plaintiff therapists have not shown

8   they are likely to succeed in bearing their burden of showing that the First Amendment applies to

9   SOCE treatment; they have not shown that the treatment, the end product of which is a change of

10   behavior, is expressive conduct entitled to First Amendment protection.  *See* ECF 54-2 at 12;

11   *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) (even though

12   government bears burden of justifying restrictions on First Amendment interests, "it is the

13   obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that

14   the First Amendment even applies").  Accordingly, because plaintiffs have not shown they will

15   be able to establish that SOCE therapy is expressive speech and thus within First Amendment

16   purview, the court need not reach the argument advanced by defendants and amicus Equality

17   California, that SB 1172's restrictions satisfy the intermediate test established in *United States v.*

18   *O'Brien*, 391 U.S. 367, 377 (1968) (requiring showing that incidental burden on First

19   Amendment freedoms is justified by neutral regulation promoting a substantial government

20   interest that would not be achieved as effectively without the regulation).

21         Plaintiffs also are not likely to succeed on the merits of the therapists' First

22   Amendment claims, given judicial recognition of the state's role in regulating the medical

23   profession.  *See, e.g., Watson v. Maryland*, 218 U.S. 173, 176 (1910) ("There is perhaps no

24   profession more properly open to such regulation than that which embraces the practitioners of

25

26       [11]  A denturist is a healthcare provider trained in the use of removable prosthetic
appliances to treat maladies of the human head and neck.  *Sharrer*, 2005 WL 885129, at *1.

1   medicine."); *see also Lambert v. Yellowley*, 272 U.S. 581 (1926) ("High medical authority being

2   in conflict as to the medicinal value of spirituous and vinous liquors taken as a beverage, it

3   would, indeed, be strange if Congress lacked the power to determine that the necessities of the

4   liquor problem require a limitation of permissible prescriptions.").  In *Planned Parenthood of*

5   *Southeastern Penn. v. Casey*, 505 U.S. 833, 884 (1992) (plurality opinion), the Supreme Court

6   rejected a number of challenges to the requirement that doctors provide certain information to

7   women seeking abortions.  In a short passage, the Court rejected the doctors' claim that the

8   regulations compelled speech, saying that a physician's First Amendment right to speak "as part

9   of the practice of medicine" is "subject to reasonable licensing and regulation by the State."  As

10  one Court of Appeals has observed, *Casey* means that strict scrutiny does not apply to a claim

11  that regulations compelled a physician to provide specified information to women seeking

12  abortions.  *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570 (5th

13  Cir. 2012) (stating "the three sentences with which the Court disposed of the First Amendment

14  claims are, if anything, the antithesis of strict scrutiny").  *See also Rust v. Sullivan*, 500 U.S. 173,

15  200 (1991) (upholding restrictions on funding for abortion counseling; "The doctor is always

16  free to make clear that advice regarding abortion is simply beyond the scope of the program.");

17  *NAAP*, 228 F.3d at 1054 (concluding that "[t]he communication that occurs during

18  psychoanalysis is entitled to constitutional protection, but it is not immune from regulation");

19  *Shultz v. Wells*, No. 2:09cv646-WKW, 2010 WL 1141452, at *9-10 (M.D. Ala. Mar. 3, 2010),

20  *recommendation adopted in* 2010 WL 1191444 (M.D. Ala. Mar. 22, 2010) (finding no

21  constitutional infirmity in disciplining a chiropractor for telling a patient to throw away medicine

22  prescribed by a physician, in light of fact that chiropractors could not prescribe).

23          Plaintiffs point to the case of *Legal Services Corporation v. Velazquez*, 531 U.S.

24  533 (2001).  But in that case, the Supreme Court rejected regulations that restricted legal services

25  lawyers from advising their clients and advocating that welfare laws were unconstitutional

26  because the government had not reasonably controlled the message in the limited public forum it

1   had created by subsidizing the legal services.  *Id.* at 543-44.   The instant case does not involve

2   speech in a limited public forum.

3         This case instead is more like *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447

4   (1978), in which the Court rejected a lawyer's challenge to professional discipline for his in-

5   person solicitation of clients.  In so doing it observed that a lawyer's solicitation is only

6   marginally related to First Amendment concerns and so falls within the state's "proper sphere of

7   economic and professional regulation," particularly in light of the state's "special responsibility"

8   for maintaining standards among members of the licensed professions.  *Id.* at 459, 460.

9         As SOCE therapy is subject to the state's legitimate control over the professions,

10  SB 1172's restrictions on therapy do not implicate fundamental rights and are not properly

11  evaluated under strict scrutiny review, but rather under the rational basis test.  *NAAP,* 228 F.3d at

12  1050 (applying rational basis test after deciding that challenged mental health professional

13  licensing scheme did not implicate a fundamental right).  Applying the rational basis test, the

14  reviewing court presumes the constitutionality of the state action by requiring those challenging

15  the legislative judgment to "convince the court that the legislative facts on which the

16  classification is apparently based could not reasonably be conceived to be true by the

17  governmental decisionmaker."  *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)).  The

18  state action need not even actually advance its stated purpose; the court instead inquires whether

19  "the government could have had a legitimate reason for acting as it did."  *Id.* (internal quotations

20  and citation omitted).  As examined below, SB 1172 passes the rational basis test.  *See* pages 42-

21  22 *infra*.  Plaintiff therapists are not likely to prevail on the merits on their First Amendment

22  claim.

23         2.      Minors' Free Speech Rights and Prevention of Receipt of Information
                   about SOCE
24

25         Plaintiffs argue that SB 1172 violates minors' First Amendment rights by

26  preventing them from being able to receive or hear about SOCE.  (ECF 28 at 28-29.)  The

government may burden children's right to free speech under the First Amendment, but "only in relatively narrow and well-defined circumstances." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975). "The state's authority over children's activities is broader than over like actions of adults. . . . A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens, with all that implies." *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944). The government's interest in the well-being of children exists apart from the government's interest in supporting parents' efforts to protect their children. *See Ginsberg v. State of New York*, 390 U.S. 629, 640 (1968). Thus, the Supreme Court "ha[s] sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757 (1982).

The First Amendment protects listeners' right to receive information. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866-67 (1982); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). Communication between doctors and patients can implicate patients' rights to free speech. *See Conant*, 309 F.3d at 636. The court has already concluded that SB 1172's restrictions on SOCE do not implicate the First Amendment right to free speech in analyzing plaintiff therapists' claim. The minors' claim is but the "flip side of that coin," *id.* at 643 (Kozinski, J., concurring), and subject to a similar, more exacting analysis, *see Pico*, 457 U.S. at 867. Plaintiffs have not shown a likelihood of success on the minor plaintiffs' claim.[12]

       3.     Vagueness

Plaintiffs make three primary vagueness arguments as part of their First Amendment due process challenge: First, plaintiffs maintain "SB 1172 leaves the therapist

---

[12]  The court is sympathetic to the fact that minor plaintiffs' courses of therapy will be disrupted once SB 1172 goes into effect. However, in the applicable legal framework, this concern is relevant to the question of irreparable harm, which the court does not reach here, as opposed to the merits of the minors' claims.

1   guessing since it does not define . . . the foundational concept of 'sexual orientation.'" (ECF 28

2   at 14.)  Second, plaintiffs maintain "SB 1172 also fails to address . . . what counsel therapists

3   may provide to minors who identify themselves as bisexual." (*Id.* at 16.)  Finally, plaintiffs

4   argue, "the lack of any specified geographic boundaries further obscures the reach of the bill"

5   because "SB 1172 could presumably cover [w]eb videos, radio broadcasts or electronic

6   transmissions *into* California that provide SOCE or referrals to counselors who provide SOCE."

7   (*Id.* at 17; emphasis in original.)[13]

8            Due process demands that any statutory proscription be sufficiently precise "to

9   provide people of ordinary intelligence a reasonable opportunity to understand what conduct it

10  prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Grayned v. City of Rockford*,

11  408 U.S. 104, 108 (1972).  A statute lacking the requisite precision must be struck down for

12  vagueness. *Id.*

13           However, "perfect clarity and precise guidance have never been required even of

14  regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794

15  (1989) (citing *Grayned*, 408 U.S. at 110.)  Indeed, voiding a democratically enacted statute on

16  grounds it is unduly vague is an extreme remedy.  The Ninth Circuit has explained that facial

17  invalidation for vagueness "is, manifestly, strong medicine that has been employed by the

18  [Supreme] Court sparingly and only as a last resort." *California Teachers Ass'n v. State Bd. of*

19  *Educ.*, 271 F.3d 1141, 1155 (9th Cir. 2001).  When addressing a facial vagueness challenge, as

20  here, the court "should uphold the challenge only if the enactment is impermissibly vague in all

21  of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489,

22  494-95 (1982); *accord  Humanitarian Law Project v. U.S. Treasury Dept.*, 578 F.3d 1133, 1146

23  _____

24       [13] Plaintiffs also argue that the statute acts as an unconstitutional prior restraint on
     expression.  The court already has found that SB 1172 does not proscribe expression, but rather
25   conduct.  Plaintiffs also contend SB 1172 improperly vests unbridled discretion in a public
     official.  Plaintiffs' argument in this regard is unavailing because, as described below, the statute
26   is sufficiently clear such that no public official is given limitless discretion.  Plaintiffs have not
     shown a likelihood of success on the merits based on these theories.

1   (2009) (a statute will survive a facial vagueness challenge so long as "it is clear what the statute

2   proscribes in the vast majority of its intended applications"); *Cal. Teachers Ass'n*, 271 F.3d at

3   1151 ("[U]ncertainty at a statute's margins will not warrant facial invalidation if it is clear what

4   the statute proscribes in the vast majority of its intended applications.").

5          An additional analytical nuance exists where the statutory proscription purports to

6   regulate a targeted industry or profession.  That is,

7          if the statutory prohibition involves conduct of a select group of
           persons having specialized knowledge, and the challenged
8          phraseology is indigenous to the idiom of that class, the standard is
           lowered and a court may uphold a statute which uses words or phrases
9          having a technical or other special meaning, well enough known to
           enable those within its reach to correctly apply them.

10

11  *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir.1993) (quoting *Precious Metals*

12  *Assocs., Inc. v. Commodity Futures Trading Comm'n*, 620 F.2d 900, 907 (1st Cir. 1980), in turn

13  quoting  *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926); internal quotations

14  omitted).

15                    a.       "Sexual Orientation"

16          Plaintiffs' argument attacking the term "sexual orientation" as undefined, as well

17  as the corresponding lack of guidance to a therapist regarding when or if he or she has begun to

18  engage in prohibited SOCE therapy, cites the APA Task Force, which noted that "[s]ame-sex

19  sexual attractions and behavior occur in the context of a variety of sexual orientations . . . and . . .

20  is fluid or has an indefinite outcome."  (ECF 28 at 14.)  In response, defendants argue that

21  plaintiffs, as practitioners of SOCE, cannot allege the term "sexual orientation" is vague;

22  moreover, they say, the term "sexual orientation" is well understood within the mental health

23  field generally.  "To practicing psychologists, it is a term of 'common understanding . . . to

24  which no [practitioner] is a stranger.'"  (*Id.* at 19.)  Defendants also argue the statute proscribes

25  only the discrete act of attempting, through sexual orientation change efforts, to alter the sexual

26  orientation of a minor.  (*Id.* at 20.)

1    SB 1172 does proscribe that which the named plaintiff therapists themselves

2 admit to practicing and therefore must understand: therapy the sole purpose of which is to alter

3 the sexual orientation of a patient, namely SOCE.[14]   The court is unpersuaded that the term

4 "sexual orientation" is unduly vague.  Plaintiffs rely on *Keyishian v. Board of Regents of*

5 *University of State of N. Y.,* 385 U.S. 589, 599 (1967), which held that a statute prohibiting

6 employing any teacher who "advocates, advises, or teaches the doctrine of forceful overthrow of

7 the government" was unconstitutionally vague because "[i]t w[ould] prohibit the employment of

8 one who merely advocates the doctrine in the abstract without any attempt to indoctrinate

9 others."  *Id.*  For example, the Court inquired whether "the teacher who carries a copy of the

10 Communist Manifesto on a public street" violates the statute.  *Id.  Keyishian* is not analogous to

11 this case: the term "sexual orientation" does not create uncertainty as to what a therapist can and

12 cannot do, as was the case for teachers in *Keyishian*; rather it is what the statute proscribes.[15]

13 Unlike in *Keyishian*, the statute expressly targets a specific form of therapy known to the

14 community in which it is practiced.

15    The court also finds the term "sexual orientation" is neither linguistically nor

16 semantically vague.  The definition of the term is clear: "[A] person's sexual identity in relation

17 to the gender to whom he or she is usually attracted; [ ] the fact of being heterosexual, bisexual,

18 or homosexual."  CONCISE OXFORD ENGLISH DICTIONARY 1321 (12th ed. 2011).  This definition

19

20    [14]  As noted at the hearing, some plaintiffs are organizations with nearly 50,000 members, such as AACC.  (See ECF 1 ¶ 26.)  This fact does not change the analysis.  The declarations
21 submitted by representatives of NARTH and AACC show those organizations are dedicated to "eliminat[ing] [a person's] unwanted same-sex attractions and the psychological factors that are
22 typically associated with a homosexual lifestyle."  (Pruden Decl., ECF 28-3 ¶ 4; *see also generally* Scalise Decl., ECF 28-4.)  The court is not persuaded that persons who have chosen to
23 join the plaintiff organizations may not be able to comprehend  SB 1172's definition of SOCE as "practices . . . that seek to change an individual's sexual orientation."

24    [15] Defendants' reliance on *Holder v. Humanitarian Law Project,* ___ U.S. ___, 130 S.Ct.
25 2705 (2010) for the proposition that the therapist plaintiffs cannot demonstrate a likelihood of success on the merits because they "engage[] in conduct that is 'clearly proscribed' by the
26 statute" is unpersuasive.  (ECF 48 at 17:11-13.)  *Holder* involved an "as applied" challenge, whereas plaintiffs here attack SB 1172 facially.  *Holder,* 130 S.Ct. at 2712.

1    is reinforced by a litany of California statutes.  *See, e.g.*, CAL. EDUC. CODE § 212.6 (defining

2    sexual orientation as "heterosexuality, homosexuality, or bisexuality"); CAL. CIV. CODE

3    § 51(e)(6) (referencing CAL. GOV'T CODE § 12926®)[16] (same); CAL. PENAL CODE § 422.56(h)

4    (same).[17]

5            One other federal court, after canvassing other decisions, determined the term

6    sexual orientation is not unconstitutionally vague.  *See Hyman v. City of Louisville*, 132 F. Supp.

7    2d 528, 545-47 (W.D. Ky. 2001) (relying on Black's dictionary definition, rejecting vagueness

8    challenge to statute banning discrimination on the basis of sexual orientation), *rev'd on other*

9    *grounds*, 53 Fed. Appx. 740 (6th Cir. 2002).  That court concluded, "[t]he definitions of 'sexual

10   orientation' . . . are consistent with the meanings attributed to those terms by common usage,"

11   namely heterosexuality, homosexuality, and bisexuality.  *Id.*

12           Because plaintiffs use the term themselves to describe the sexual orientation

13   change therapy they practice, the standard of review is lower.  The "statutory prohibition

14   involves conduct of a select group of persons having specialized knowledge, and the challenged

15   phraseology is indigenous to the idiom of that class . . . ."  *Weitzenhoff*, 35 F.3d at 1289.

16   Plaintiff therapists "well enough know" what the statute proscribes.  *Id.*

17                       b.      Treatment Allowed and Disallowed

18           In complaining that SB 1172 fails to clarify the forms of therapy covered by the

19   statute, plaintiffs point out the new law does not address what therapists may do when visited by

20   minors who identify themselves as bisexual.  They argue "there is simply no way to determine a

21   proper course of action when a [bisexual] questioning person enters [a therapist's] office."  (ECF

22   _____

23           [16] The California Legislature amended this Government Code section in 2012.  *See* 2012
     Cal. Legis. Serv. Ch. 287 (A.B. 1964) (WEST); 2012 Cal. Legis. Serv. Ch. 448 (A.B. 2370)

24   (WEST); 2012 Cal. Legis. Serv. Ch. 457 (S.B. 1381) (WEST); 2012 Cal. Legis. Serv. Ch. 701
     (A.B. 2386) (WEST).  These amendments, however, did not alter the statute's definition of

25   sexual orientation.

26           [17]  The common definition of the term sexual orientation does not, as plaintiffs' counsel
     suggested at hearing, include "pederasty."

28 at 17.)  In its amicus brief, EQCA notes the statute defines the term "sexual orientation change efforts" as "any practices by mental health providers that seek to change an individual's sexual orientation," such as efforts to "change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex."  (Amicus at 14, ECF 70.)  The statute also lists a number of psychotherapeutic techniques that do not fall within the statutory proscription.  (*Id.*)  Defendants point out the statute "does not prohibit mental health providers from counseling parties that homosexuality is morally wrong and should be changed, so long as they do not engage a minor in a course of treatment designed to change their sexual orientation."  (ECF 48 at 20.)  Such a course of treatment "requires a concerted application of psychological techniques and principles" in order to "chang[e] deeply rooted feelings and behaviors."  (*Id.*)

While the statute does not go into the level of detail plaintiffs suggest is needed, on its face the new law is clear enough: mental health providers, as defined by the statute, may not implement practices designed for the specific purpose of changing an individual's sexual orientation.  The record is replete with specific explanations and examples of what SOCE can entail, including from plaintiffs themselves.[18]  As explained above, such practices include both aversive and non-aversive techniques:  inducing nausea, vomiting, or paralysis; providing electric shocks; or having the individual snap an elastic band around the wrist when aroused by same-sex erotic images or thoughts, as well as attempting to alter thought patterns by reframing desires, redirecting thoughts, or using hypnosis.  It is these forms of therapy, implemented with the intent to alter the patient's sexual orientation, that the statute prohibits.

---

[18] The declaration submitted by plaintiff therapist Dr. Nicolosi expressly describes the types of therapeutic techniques SOCE practitioners employ in their efforts to alter a patient's sexual orientation.  (*See* Nicolosi Decl. ¶ 9) (discussing what his "SOCE counseling consists of . . .").  The declarations submitted by plaintiff therapists also demonstrate that they provide their minor patients with detailed informed consent of the nature of SOCE therapy.  (*See id.* ¶ 6 ("Prior to engaging in SOCE Counseling with patients, I provide them an extensive consent form that outlines the nature of the treatment.")); *see also* Rosik Decl. ¶ 9 (explaining that he provides patients "advanced informed consent," which "explains his therapeutic approach.")).

1    The simplicity of the statute also cuts against plaintiffs' argument. At bottom, the

2 proscription is discernable to a reasonable person, and particularly to a mental health

3 professional: any psychotherapeutic intent to change sexual orientation is not allowed by any

4 licensed professional.  *Cf. United States v. Kuffel*, 1 F.3d 1247 (9th Cir. 1993) (denying

5 vagueness challenge to sentencing statute, in part, because of the "simple wording of th[e]

6 statute.").  Nothing in SB 1172 prevents a therapist from mentioning the existence of SOCE,

7 recommending a book on SOCE or recommending SOCE treatment by another unlicensed

8 person such as a religious figure.[19]  (ECF 28 at 16.)  The statute does not require affirmation of a

9 patient's homosexuality.  *Id.*  Even if, "at the margins," there is some conjectural uncertainty as

10 to what the statute proscribes, such uncertainty is insufficient to void the statute for vagueness

11 because "it is clear what the statute proscribes in the vast majority of its intended applications,"

12 *Cal. Teachers Ass'n*, 271 F.3d at 1151, namely therapy intended to alter a patient's sexual

13 orientation.

14            c.        Geographic Reach

15    Plaintiffs' argument based on the lack of geographic boundaries notes that SB

16 1172 could cover a California-licensed counselor who also is licensed in other jurisdictions and

17 who offers SOCE in states outside of California.  (*Id.* at 18.)  Defendants respond that the statute

18 "does not prohibit, on its face or otherwise, web videos, radio broadcasts, or electronic

19 transmissions into California about SOCE."  (*Id.* at 20.)

20    Here, the statute does not subject a licensed mental health professional to

21 discipline for merely sending "[w]eb videos, radio broadcasts or electronic transmission[s] into

22 California."  (ECF 28 at 17.)  If a mental health professional licensed by California is engaging a

23

24        [19] Dr. Nicolosi has described SOCE therapy as a "long-term process, and one that is in
fact most probably lifelong."  (JOSEPH NICOLOSI, PH.D., REPARATIVE THERAPY OF MALE
25 HOMOSEXUALITY, 165-168 (1997), attached as Exhibit 2 to the Stein Declaration, ECF 54).  The
mere mention of SOCE's existence is inconsistent with the extensive and long-term efforts
26 plaintiffs indicate are necessary to effectuate SOCE.

1  patient in therapy intended to alter that patient's sexual orientation via video conference, or other

2  remote medium, only then is that therapist subject to discipline.

3       In sum, based on the record before the court, there is a general understanding of

4  what SOCE encompasses and the statute surpasses the bar set for minimal clarity.  Plaintiffs are

5  not likely to succeed on the merits of their claim that SB 1172 is unconstitutionally vague.

6       4.       Parents' Fundamental Rights

7       Plaintiffs assert that the parental right at issue in this case, of choosing a particular

8  mental health therapy for one's children, is a fundamental right that California cannot infringe

9  without satisfying strict scrutiny.  (ECF 28 at 22 (citing *Troxel v. Granville*, 530 U.S. 57, 80

10 (2000) (Thomas, J. concurring)).)  Plaintiffs contend SB 1172 "tramples" upon parents'

11 fundamental interest in the care, custody, and control of children by preventing parents from

12 caring for their children's mental health as the parents see fit.[20]  (*Id.* at 18.)  Analogizing to

13 *Meyer v. Nebraska*, 262 U.S. 390, 400-01 (1923) and *Pierce v. Soc'y of Sisters*, 268 U.S. 510,

14 534-35 (1925), plaintiffs aver SB 1172 operates in the same unconstitutional manner as the state-

15 imposed educational programs in those cases, which prevented parents from choosing German

16 language instruction and private school education for their children.  Plaintiffs say SB 1172 in

17 the same way prevents parents from choosing SOCE therapy for their children.  (ECF 28 at 20-

18 22.)

19       Plaintiffs further contend parents' right to make decisions regarding their

20 children's mental health is specifically protected, even when that decision is not agreeable to the

21 child or involves risks.  (*Id.* at 19 (citing *Parham v. J.R.*, 442 U.S. 584, 602-03 (1979).)  Neither

22 state officials nor federal courts, plaintiffs maintain, are equipped to review such parental

23

24       [20] Plaintiffs define the parental right at issue as choosing mental health treatment for
25 one's children.  (ECF 28 at 18, 22).  In their moving papers, plaintiffs do not attempt to argue
   parental rights based upon freedom of religion, although free exercise arguments are contained in
26 their fourth and fifth claims for relief.  (ECF 1 at 43-45.)  Therefore, the court does not address
   the Free Exercise Clause in deciding this motion.

1   decisions.  (*Id.* (citing *Parham*, 442 U.S. at 603-04).)  Finally, plaintiffs claim defendants have

2   no proof that SOCE therapy is harmful, but rather rely upon "mere[ ] policy statements by

3   organizations politically opposed to SOCE therapy" that are "anecdotal [and] speculative."

4   (ECF 28 at 22; ECF 60 at 11.)  Because SOCE therapy is harmless, children are not protected by

5   proscribing it; therefore, plaintiffs conclude, California has no compelling interest in SB 1172

6   that justifies its encroachment on fundamental parental rights.  (ECF 60 at 11.)

7           Defendants argue SB 1172 does not infringe any fundamental rights and should

8   be upheld because it is "rationally related to a legitimate state interest."  (ECF 48 at 24 (citing

9   *NAAP,* 228 F.3d at 1047).)  Defendants contend there is no fundamental or privacy right in

10  choosing a particular type of medical treatment, whether on behalf of oneself or one's children.

11  (*Id.* at 21.)  Defendants cite Ninth and Tenth Circuit cases in which the courts held cancer

12  patients did not have a privacy interest in choosing a treatment the FDA had not deemed safe and

13  effective.  *Carnohan v. United States*, 616 F.2d 1120, 1122 (9th Cir. 1980) (per curiam);

14  *Rutherford v. United States*, 616 F.2d 455, 457 (10th Cir. 1980).

15          Parents do of course have a fundamental interest in the general care, custody, and

16  control of their children.  *Troxel*, 530 U.S. at 65; *Wisconsin v. Yoder*, 406 U.S. 205, 213-14

17  (1972); *Pierce*, 268 U.S. at 534-35; *Meyer*, 262 U.S. at 400-01.  This interest is "perhaps the

18  oldest of the fundamental liberty interests" recognized by the Supreme Court.  *Troxel*, 530 U.S.

19  at 65.  State action that infringes upon this fundamental right is subject to strict scrutiny.  *Fields

20  v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1208 (9th Cir. 2005), *aff'd*, 447 F.3d 1187 (2006) (per

21  curiam), *cert. denied*, 549 U.S. 1089 (2006) ; *see also Yoder*, 406 U.S. at 221 ("Where

22  fundamental claims of religious freedom are at stake . . . we must searchingly examine the

23  interests that the State seeks to promote . . . .").  In addition, the Supreme Court has found there

24  is a "traditional presumption that a fit parent will act in the best interest of his or her child."

25  *Troxel*, 530 U.S. at 69 (citing *Parham*, 442 U.S. at 602).

26  /////

1    This fundamental parental interest is not without limitation, however. *Prince,* 321

2    U.S. at 166; *Fields*, 427 F.3d at 1204.  "[T]he state has a wide range of power for limiting

3    parental freedom and authority in things affecting the child's welfare; and [ ] this includes, to

4    some extent, matters of conscience and religious conviction." *Prince*, 321 U.S. at 167.  State

5    action that does not affect a fundamental right is reviewed under the rational basis test. *Fields*,

6    427 F.3d at 1208.  State actions that have prevailed over conflicting parental rights in the face of

7    rational basis review include requiring school attendance, regulating or prohibiting child labor,

8    and compelling school vaccinations. *Prince*, 321 U.S. at 166.  Moreover, the Supreme Court has

9    declared states have a compelling interest in "safeguarding the physical and psychological well-

10   being of a minor." *New York v. Ferber*, 458 U.S. 747, 756 (1982) (internal quotations and

11   citation omitted).  In short, limitations to parental rights may exist where "harm to the physical

12   or mental health of the child or to the public safety, peace, order, or welfare has been

13   demonstrated or may be properly inferred." *Yoder*, 406 U.S. at 230; *see also Runyon v.*

14   *McCrary*, 427 U.S. 160, 177 (1976) (no fundamental parental right to educate children in private

15   segregated schools); *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905) (upholding a

16   compulsory inoculation statute); *Fields*, 427 F.3d at 1206 (parental rights do not encompass the

17   right to direct how a public school teaches children, even when the curriculum includes graphic

18   sexual content); *Hooks v. Clark Cnty. Sch. Dist.*, 228 F.3d 1036, 1041-42 (9th Cir. 2000)

19   (parental rights did not encompass the right to have state-funded speech therapy for home-

20   schooled children); *Carnohan*, 616 F.2d at 1122) (no fundamental right to access drugs the FDA

21   has not deemed safe and effective); *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 538 (D.C. Cir.

22   1999) (upholding a municipality's curfew for minors).

23   Here, as discussed below, the court finds there is no fundamental or privacy right

24   to choose a specific mental health treatment the state has reasonably deemed harmful to minors.

25   No such right follows from the line of cases beginning with *Meyer*, nor is it specifically

26   enumerated in other substantive due process cases.

1                            a.  Definition of Right

2         The Supreme Court instructs that substantive due process analysis "must begin

3 with a careful description of the asserted right[,] for the more general is the right's description,

4 *i.e.*, the free movement of people, the easier is the extension of substantive due process."

5 *Hutchins*, 188 F.3d at 538 (citing *Reno v. Flores*, 507 U.S. 292, 302 (1993)); *see also Michael H.*

6 *v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989 ) (Scalia, J., for the court but joined in footnote only

7 by Rehnquist, C.J.) (proper level of generality at which to describe the right is "the most specific

8 level at which a relevant tradition protecting, or denying protection to, the asserted right can be

9 identified").  "And the 'doctrine of judicial self-restraint requires us to exercise the utmost care

10 whenever we are asked to break new ground in this field.'"  *Hutchins*, 188 F.3d at 538 (quoting

11 *Flores,* 507 U.S. at 302).

12         Here, plaintiffs frame the contested right as encompassing:  parents' interest in

13 the care, custody, and control of their children; parents' right to care for the mental health of

14 their children as the parents see fit; and parents' right to choose a specific form of counseling for

15 their children.  (ECF 28 at 18, 21.)  Defendants, in contrast, frame the contested right as the

16 privacy interest or fundamental right in choosing a particular type of medical treatment or

17 medical provider, either on one's own or one's children's behalf.  (ECF 48 at 21.)

18         The court defines the right at issue in this case as the right to choose a specific

19 mental health treatment that the state has deemed harmful to minors.  This definition is

20 consistent with plaintiffs' description of the contested right in similar terms.  (*See* ECF 28 at 18,

21 21.)  It also is the most specific level at which the court has been able to identify precedent

22 addressing the  protection accorded analogous asserted rights.  *Cf. Fields*, 427 F.3d at 1206

23 (parental rights do not encompass the right to direct how a public school teaches children, even

24 when the curriculum includes graphic sexual content); *Carnohan*, 616 F.2d at 1122 (no

25 fundamental interest in choosing a drug the FDA has not found safe or effective).

26 /////

1    Although parental rights and other substantive due process rights, such as privacy,

2  have traditionally been developed through distinct frameworks, the Supreme Court has intimated

3  the two types of right may be "no more than verbal variations of a single constitutional right."

4  *Runyon v. McCrary*, 427 U.S. 160, 178 n.15 (1976) (citing *Roe v. Wade*, 410 U.S. 113, 152-53

5  (1973)).  Nevertheless, the *Runyon* Court addressed parental and privacy rights separately.  This

6  court follows the *Runyon* Court's blueprint and examines each type of right in turn.

7              b.     Parental Rights

8                     i.     *Meyer* Line of Cases

9            The line of cases beginning with *Meyer* "evince[s] the principle that the state

10 cannot prevent parents from choosing a specific educational program . . . that is, the state does

11 not have the power to 'standardize its children' or 'foster a homogenous people.'" *Fields*, 427

12 F.3d at 1205 (quoting *Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 529 (1st Cir.

13 1995), *abrogated on other grounds by Martinez v. Cui*, 608 F.3d 54, 63-64 (1st Cir. 2010)).

14 *Meyer* and its progeny are distinguishable from the instant case in three important ways.  First,

15 the contested state actions in the *Meyer* cases constituted comprehensive and total interference

16 with a parental right.  Thus, the Court broadly defined the fundamental right at issue in each case

17 as parents' interest in the care, custody, and control of their children.  Second, as the Court in

18 *Yoder* noted, none of the *Meyer* cases dealt with an instance in which "any harm to the physical

19 or mental health of the child or to the public safety, peace, order, or welfare has been

20 demonstrated or may be properly inferred."  *Yoder*, 406 U.S. at 230.  Third, plaintiffs in the

21 *Meyer* cases, with the exception of *Pierce*, brought as-applied challenges after being criminally

22 convicted of violating the challenged statutes (*Meyers* and *Yoder*) or after being negatively

23 affected by the implemented statute (*Troxel*).  Such as-applied challenges require plaintiffs to

24 meet a lower burden to demonstrate unconstitutionality than does the facial challenge mounted

25 here.  *See Patel v. City of Los Angeles*, 686 F.3d 1085, 1086 (9th Cir. 2012) (facial challenge is

26 "the most difficult challenge to mount successfully, since the challenger must establish that no

33

1  set of circumstances exist under which the Act would be valid") (quoting *United States v.*

2  *Salerno*, 481 U.S. 739, 745 (1987)).

3        In *Meyer*, the Nebraska statute at issue prohibited any person, "individually or as

4  a teacher," from teaching modern foreign languages in any "private, denominational, parochial,

5  or public school" to children below the Eighth Grade.  262 U.S. at 396.  The Court scrutinized

6  the statute under something akin to the rational basis test, concluding the statute was "arbitrary

7  and without reasonable relation to any end within the competency of the state."  *Id.* at 403.  The

8  statute also prescribed criminal punishment for violators; the plaintiff had already been tried and

9  convicted.  *Id.* at 396.  In effect, the statute enacted a total ban on the teaching of modern

10 languages to children below the Eighth Grade, as it prohibited any person, not just state-licensed

11 or professional teachers, from teaching in these languages, even in religious schools.  The Court

12 also found no evidence that such language instruction would harm children; the laudable goal of

13 encouraging civic participation through monolingualism was insufficient justification.  *Id.* at

14 403.

15       In contrast, SB 1172 bars parents only from seeking SOCE through state-licensed

16 mental health professionals.  SB 1172 § 2(865)(a) (restricting prohibition to state-licensed

17 "mental health providers").  It does not enact a comprehensive and total ban; parents can still

18 seek SOCE or its equivalent through religious institutions or other unlicensed providers.  SB

19 1172 also does not impose criminal punishment.  And the California Legislature relied upon the

20 expertise of ten different mental health professional organizations who have discouraged or

21 opposed SOCE as a "cure" for homosexuality, SB 1172 § 1(a)-(l), some of which deem SOCE a

22 violation of ethical principles.  SB 1172 § 1(l) (noting statement of Pan American Health

23 Organization).  The Legislature also relied on studies indicating minors who face family

24 rejection based on their sexual orientation face especially serious health risks.  SB 1172 § 1(m).

25 No such indication of harm was before the Court in *Meyer*.  *See* 262 U.S. at 403.

26 /////

1    *Pierce* is even more readily distinguishable from this case.  There, an Oregon

2    statute required every eight- to sixteen-year-old child to attend public school, 268 U.S. at 530,

3    effectively foreclosing all other education options, including private religious schooling and

4    home schooling.  The Court determined the prohibited activity in which the plaintiff educational

5    corporations engaged, private and religious primary education, was not inherently harmful to

6    children, but rather was "long regarded as useful and meritorious."  *Id.* at 534.  In contrast, SB

7    1172 does not foreclose all parents' options to seek SOCE.  On the record before it, the court is

8    not prepared to second-guess the Legislature's determination that SOCE therapy cannot at this

9    point be considered "long regarded as useful and meritorious."

10    *Yoder*, in which Amish parents successfully contested a Wisconsin statute

11    requiring formal public or private school attendance until age sixteen, is similarly

12    distinguishable.  406 U.S. at 207.  Plaintiffs in that case relied largely upon the Free Exercise

13    Clause, a claim plaintiffs do not rely on in this motion.  *See id.* at 213.  The *Yoder* plaintiffs

14    contended it was fundamental to the Amish faith that their children not be educated outside the

15    Amish community, and the Amish Community did not provide formal schooling that satisfied

16    the statute.  *Id.*  The Wisconsin statute acted as a comprehensive and total bar to plaintiffs'

17    religious practices, and plaintiffs had been criminally charged, tried, and convicted of violating

18    the statute by refusing to send their children to school.  *Id.* at 208.  The Court in *Yoder* found no

19    evidence the Wisconsin statute prevented harm.  *Id.* at 230-32.  Here, in contrast, SB 1172 does

20    not impede parents' religious or moral convictions because it proscribes SOCE only as

21    performed by state-licensed mental health professionals, and the California Legislature relied on

22    more than hypothetical information.

23    Plaintiffs also rely on the parental rights case of *Troxel*.  There, the Court

24    invalidated a Washington statute that interfered with parents' decisions on visitation rights.  530

25    U.S. at 67.  The statute was "breathtakingly broad": the Court found it effectively allowed a state

26    court to "disregard and overturn *any* decision by a fit custodial parent concerning visitation

whenever a third party affected by the decision file[d] a visitation petition, based solely on the judge's determination of the child's best interests." *Id.* (emphasis in original).  When the plaintiff in *Troxel* brought her challenge, Washington had already implemented the statute, and the plaintiff's children's grandparents had been awarded visitation rights over her objection. *Id.* at 62.  The serious nature of the parental right at issue in *Troxel*, coupled with the unbounded judicial discretion vested by the "best interests" standard, distinguish the statute in *Troxel* from SB 1172.  Preventing state-licensed mental health professionals from providing SOCE to minors is not equivalent to empowering state officers to override parents' decisions on who should be allowed have to familial visits with their children.  Also in *Troxel*, the visitation statute required no showing of harm, and the state of Washington made no showing to counter the plaintiff's as-applied challenge. *Id.* at 68.

ii.    *Prince* and *Fields*

*Prince*, in which the Supreme Court identified limitations to the parental right at issue in *Meyer*, is more similar to the instant case than any of the *Meyer* cases.  In *Prince*, the Court upheld a Massachusetts statute prohibiting twelve to eighteen year olds from selling magazines, newspapers, and periodicals on city streets or in any public place. *Prince*, 321 U.S. at 160-61.  Whoever furnished such items to minors could be criminally sanctioned. *Id.* at 161.  The plaintiff was cited under this statute when she took her minor niece with her to preach about their Jehovah's Witness faith and to sell related magazines on a public street. *Id.* at 161-63.  The plaintiff argued the Massachusetts statute was unconstitutional because it did not target activity that poses a "clear and present danger" to a child; the child was in no danger when she was simply preaching the Gospel and selling church magazines on a public street in the company of her legal guardian. *Id.* at 167.

The Court in *Prince* upheld the statute as applied, noting the state's greater authority over children's activities than adults'. *Id.* at 168.  While recognizing the fundamental right of parents to the care, custody, and control of their children as determined in *Pierce*, the

1   Court found that the "family itself is not beyond regulation in the public interest." *Id.* at 166-67.

2   It observed that a democratic state depends on children developing into healthy maturity as

3   citizens, and states can secure this goal "against impeding restraints and dangers, within a broad

4   range of selection." *Id.* Child labor, the Court found, is crippling, and time on the streets carries

5   with it many "possible harms." *Id.* Even if a child is not engaged in child labor per se, but is

6   evangelizing in the company of a parent, harmful possibilities still attach, such as "emotional

7   excitement and psychological or physical injury." *Id.* at 170. Parents may choose to martyr

8   themselves, but they may not "make martyrs of their children before they have reached the age

9   of full and legal discretion when they can make that choice for themselves." *Id.*

10        As did the state of Massachusetts in *Prince*, California here has determined to

11   protect minors from particular conduct in the interest of preventing possible harm. Parents'

12   interest in choosing a mental health therapy for their children is not beyond state regulation; if

13   the state determines a therapy is potentially harmful to minors, it may prohibit minors from

14   receiving that therapy from state-licensed therapists. *Cf. id.* at 166-67. In other words, parents

15   may not conscript the state-regulated mental health profession into treating their children with a

16   potentially harmful therapy before those children have reached the age of majority. *Cf. id.* at

17   168-70.

18        The differences between *Prince* and this case serve only to strengthen the

19   conclusion that this case should be decided as *Prince* was. First, SB 1172 is a more limited

20   regulation than that in *Prince,* in that it is not an "absolute prohibition" of the regulated conduct.

21   *See id.* at 168. Minors can still receive SOCE treatment from non-licensed providers. Second,

22   SB 1172 does not impose criminal penalties; instead, mental health professionals who violate the

23   statute are subject to professional disciplinary action. Third, the plaintiff in *Prince* faced a lower

24   threshold in proving the statute unconstitutional because she brought an as-applied challenge, *id.*

25   at 159, whereas here plaintiffs bring a facial challenge. *See Patel*, 686 F.3d at 1086.

26   /////

Additionally, the Ninth Circuit, in company with the First and Sixth Circuits, has held that parental rights do not encompass the analogous right to direct how a public school teaches children, even when the curriculum includes graphic sexual content.  *Fields*, 427 F.3d at 1206; *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (parents do not have a fundamental right to direct how a public school teaches their children); *Brown*, 68 F.3d at 529 ("We think it is fundamentally different for the state to say to a parent, 'You can't teach your child German or send him to a parochial school,' than for the parent to say to the state, 'You can't teach my child subjects that are morally offensive to me.'").

In *Fields*, parents contended a survey the school administered to their children violated parents' fundamental rights because the survey contained sexually-explicit questions. 427 F.3d at 1200.  The school administered the survey to discover whether some children suffered psychological impediments to learning.  *Id.*  Parents argued they had a fundamental right to introduce their children to sexual matters as they saw fit.  *Id.*  The court rejected this argument, holding that parents have the "right to inform their children when and as they wish on the subject of sex; they have no constitutional right, however, to prevent a public school from providing its students with whatever information it wishes to provide, sexual or otherwise, when and as the school determines that it is appropriate to do so."  *Id.* at 1206.  Parents did not have the right to compel public schools to follow their "idiosyncratic views" about what information schools can dispense.  *Id.*  "'While parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child.'"  *Id.* (quoting *Blau*, 401 F.3d at 395-96; emphases in original).

The analogy to *Fields* in this case is strong.  Parents have the right to teach their children whatever they wish regarding sexual orientation, and retain the right to obtain SOCE from unlicensed providers, including religious figures.  Parents do not, however, have the right to prevent a state from proscribing the practice of a particular therapy when the state reasonably determines such proscription is appropriate.  In the face of California's legislative determination

38

1    that homosexuality is not an illness to be treated with SOCE, based upon identified medical and

2    scientific information, some parents' desire to obtain SOCE from licensed professionals is

3    equivalent to parents seeking to compel schools to deliver messages conforming to parents' own

4    moral views.  While parents have a fundamental right to decide whether to avail themselves of

5    state-regulated mental health professionals, they do not have a fundamental right to direct the

6    state's regulation of those professionals.  *Cf. Blau*, 401 F.3d at 395-96.

7         The court in *Fields* also considered the practicalities of expanding parents'

8    fundamental rights to include the right to prevent public schools from delivering information

9    some parents find morally objectionable.  427 F.3d at 1207.  The court could find no

10    constitutional reason to distinguish the concern in *Fields* from "any of the countless moral,

11    religious, or philosophical objections that parents might have to other decisions of the School

12    District — whether those objections regard information concerning guns, violence, the military,

13    gay marriage, racial equality, slavery, the dissection of animals, or the teaching of scientifically-

14    validated theories of the origins of life."  *Id.*  The court reasoned that schools cannot be expected

15    to accommodate the moral or religious concerns of every parent, as such an obligation would be

16    impossible to satisfy.  *Id.*  Plaintiffs here wish to prevent California from regulating mental

17    health professionals in a manner that contravenes plaintiffs' personal views.

18         The court finds that the parental rights question in this case is resolved by the

19    Supreme Court's decision in *Prince* and the Ninth Circuit's decision in *Fields*.  *Prince*, 321 U.S.

20    158; *Fields*, 427 F.3d 1197.

21               c.      Privacy Rights

22         Plaintiffs' contention that parents have a protected privacy right in making

23    decisions regarding their children's mental health also fails.  (ECF 28 at 19.)  As discussed

24    below, the Supreme Court's *Parham* case does not stand for plaintiffs' proposition, and neither

25    does the Ninth Circuit's decision in *Carnohan*, which accords with the Tenth Circuit's

26    *Rutherford* decision.  (*See* ECF 48 at 21-23.)

i.      *Parham*

In *Parham v. J.R,*, minor children sought a declaratory judgment that a Georgia statute enabling parents to voluntarily institutionalize their minor children violated the minors' substantive due process rights.  442 U.S. at 587.  The minor plaintiffs contended the statute severely deprived them of liberty, as they could be institutionalized against their will if their parents so elected.  *Id.* at 597.  Mental health professionals were required to review each proposed patient to ensure institutionalization was warranted.  *Id.*  Plaintiffs asserted that due process demanded a formal or quasi-formal hearing before institutionalization could occur.  *Id.* at 603.  The primary constitutional interests in tension were those of the parents against those of the children.  *Id.*  The Court examined the *Meyer* line of cases to determine its illumination of parents' rights in the face of minors asserting contrary interests.  *Id.* at 603.  The Court in *Parham* upheld the statute, finding that the mental health professionals' independent prior determination of necessity for each institutionalization was sufficient to prevent commitment in violation of the minors' interests.  *Id.* at 602.

In *Parham,* unlike here, parents and the state were on the same side; the Court was not deciding a contest between parents' and states' interests, but confirmed parents' right to make mental health decisions on behalf of their minor children but against the children.[21]  In *Parham*, the Court relied on the interests of the state to reach its holding that favored parents' rights.  *Id.* at 605-08 (intimating the parents' interests and the state's *parens patriae* interests were aligned).  At the same time, the Court recognized "a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."  *Id.* at 603 (citing *Yoder*, 406 U.S. at 230 and *Prince*, 321 U.S. at 366).  However, /////

---

[21]  Here, there is no indication the interests of the plaintiff parents and children are not aligned.  *See* ECF 71 (court's order granting parents guardian ad litem status).  Plaintiff's argument at hearing that *Parham* requires a showing of more than mere risk is inapposite; such a rule applies when parents' interests are in tension with their children's interests.  *Id* at 603.

1   the Court distinguished *Yoder* and *Prince* as it did *Meyer* and *Pierce*, as they were not applicable

2   to a conflict between parents and children.  *Id.*

3                                ii.       *Carnohan* and *Rutherford*

4                   The cases of *Carnohan* and *Rutherford* are closer than *Parham* to the case at bar.

5   In both cases, terminally-ill cancer patients sought equitable determinations that the federal

6   government could not inhibit them from utilizing a cancer drug the FDA had not approved.

7   *Carnohan*, 616 F.2d at 1121*; Rutherford*, 616 F.2d at 456.  The plaintiffs based their claims upon

8   individual privacy interests established in *Roe* and other substantive due process cases.

9   *Carnohan*, 616 F.2d at 1122; *Rutherford*, 616 F.2d at 457.  Both courts held that the plaintiffs'

10  protected fundamental right is a patient's decision whether to seek treatment or not; but a

11  patient's "selection of a particular treatment, or at least a medication, is within the area of

12  governmental interest in protecting health."  *See Carnohan*, 616 F.2d at 1122 ("Constitutional

13  rights of privacy and personal liberty do not give individuals the right to obtain laetrile free of

14  the lawful exercise of government police power."); *Rutherford*, 616 F.2d at 457.  Both cases

15  support the proposition that no privacy right exists to access pharmaceutical treatments the

16  government reasonably has deemed harmful, or has not deemed safe.[22]

17                  By analogy, plaintiffs in this case do not have a fundamental right to receive a

18  therapy that California has deemed harmful and ineffective.  *Carnohan*, 616 F.2d at 1122;

19  *Rutherford*, 616 F.2d at 457; *see also NAAP*, 228 F.3d at 1050 ("substantive due process rights

20  do not extend to the choice of type of treatment"; noting Seventh Circuit's conclusion that

21  "'most federal courts have held that a patient does not have a constitutional right to obtain a

22  particular type of treatment . . . if the government has reasonably prohibited that type of

23  treatment . . . .'" (quoting *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1994)).  California's

24

25          [22] Contrary to plaintiffs' assertions at hearing, laetrile was not a controlled substance.  It
26  was subject to regulation under the Federal Food, Drug, and Cosmetic Act.  *Carnohan*, 616 F.2d
    at 1121.

1  governmental interest in protecting public health, deriving from its police power, enables it to

2  prohibit certain treatments without infringing on plaintiffs' fundamental privacy rights.  The

3  plaintiffs in *Carnohan* and *Rutherford* did not prevail despite having been diagnosed with

4  terminal cancer.  Plaintiffs in this action are seeking treatment in the face of the Legislature's

5  reasonable determination that there is no illness to treat.  Although plaintiffs here base their

6  claim upon the *Meyer* line of parental rights cases, and not upon the individual privacy and

7  liberty rights addressed in *Rutherford* and *Carnohan*, the Supreme Court as noted has intimated

8  that these rights are simple variations of a single constitutional right.  *Runyon*, 427 U.S. at 179

9  n.15.  This court finds no meaningful distinction to make a difference here.  SB 1172 thus is

10  subject to rational basis review.

11              c.       The Rational Basis Test

12              While plaintiffs' briefing focuses on strict scrutiny, ECF 28 at 22, plaintiffs'

13  counsel clarified his position at argument that SB 1172 also fails the rational basis test.  Plaintiffs

14  argue that California's legislative findings provide no concrete evidence that SOCE harms

15  minors, taking aim in particular at the APA Task Force report and asserting it concedes there

16  have been no studies of SOCE's harmfulness to children or adolescents.  (*Id.* at 22; ECF 60 at 3-

17  5, 11.)  Plaintiffs provide declarations in support of their contention that the APA report is

18  "scientifically flawed, biased," based upon anecdotal and speculative policy statements, and

19  presents no consensus on SOCE's efficacy, even on adults.  (ECF 60 at 4, 11.)

20              Defendants argue that SB 1172 does satisfy the rational basis standard.  They

21  assert that states have a compelling, not just legitimate, interest in regulating access to mental

22  health treatments and providers and that the California Legislature rationally determined that SB

23  1172 would promote this important interest.  (ECF 48 at 22, 24-25.)  Defendants claim this

24  legislative determination was based on "hard data and expert opinion," that at a minimum:

25  1) SOCE therapy is unproven and potentially harmful; and 2) homosexuality is not a disease or

26  condition that warrants treatment.  (*Id.* at 25.)

1    The APA report on which the Legislature relied includes the following:

2    [T]here is a dearth of scientifically sound research on the safety of
     SOCE.  Early and recent research studies provide no clear
3    indication of the prevalence of harmful outcomes among people
     who have undergone efforts to change their sexual orientation or
4    the frequency of occurrence of harm because no study to date of
     adequate scientific rigor has been explicitly designed to do so.
5    Thus, we cannot conclude how likely it is that harm will occur
     from SOCE. However, studies . . . indicate that attempts to change
6    sexual orientation may cause or exacerbate distress and poor
     mental health in some individuals, including depression and
7    suicidal thoughts.

8    (ECF 54-1 at 50.)  The APA report also "found no empirical evidence that providing any type of

9    therapy in childhood can alter adult same-sex orientation."  *Id.* at 87.)

10         As noted above, the California Legislature also relied upon the expertise of nine

11   other mental health professional organizations who have discouraged or opposed SOCE as a

12   "cure" for homosexuality.  SB 1172 § 1(a)-(l).  Some of these organizations deem SOCE a

13   violation of ethical principles.  SB 1172 § 1(l).  The Legislature also cited to studies indicating

14   minors who face family rejection based on their sexual orientation face especially serious health

15   risks.  SB 1172 § 1(m).

16         On the record before it, the court concludes that SB 1172 is "rationally related to

17   a legitimate state interest."  *See Fields*, 427 F.3d at 1208.[23]  SB 1172's stated purpose is the

18   protection of the "physical and psychological well-being of minors."  SB 1172 § 1(n).  This is

19   more than a "legitimate" interest: it is a significant, if not compelling, interest according to

20   Supreme Court precedent.  *Ferber*, 458 U.S. at 756; *Yoder*, 406 U.S. at 230; *Prince*, 321 U.S. at

21   166.  SB 1172 is rationally related to this interest because it prohibits a therapeutic practice

22   deemed unproven and potentially harmful to minors by ten professional associations of mental

23   health experts.  Even assuming plaintiffs' criticisms of the APA report are true, plaintiffs still

24   have not carried their burden of demonstrating that the facts on which the Legislature says SB

25   _____

26       [23]  Because rational basis review applies here, plaintiffs' reliance on *Video Software
     Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950 (2009), is misplaced.

1172 is based cannot "reasonably be conceived to be true by the governmental decisionmaker." *NAAP*, 228 F.3d at 1050.  The findings, recommended practices, and opinions of ten professional associations of mental health experts is no small quantum of information.  Even if all of the studies and reports upon which the California Legislature relied were inconclusive or flawed, SB 1172 still would be a valid legislative enactment.  A legislative choice such as this "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.* 508 U.S. 307, 315 (1993); *see also Ginsberg*, 390 U.S. at 642-43 (finding a statute prohibiting the sale of obscene materials to minors had a rational basis even though studies about its harmfulness were inconclusive); *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352, 370-71 (6th Cir. 2002) (upholding state law as rational even though legislature relied upon "anecdotes collected from newspapers" rather than studies).

SB 1172 need not "actually advance its stated purpose"; it is enough that "the government could have had a legitimate reason for acting as it did." *NAAP*, 228 F.3d at 1050. The court need not engage in an exercise of legislative mind reading to find the California Legislature and the state's Governor could have had a legitimate reason for enacting SB 1172.

V.     <u>CONCLUSION</u>

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

DATED:  December 4, 2012.

_____
UNITED STATES DISTRICT JUDGE