**FOR PUBLICATION**

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**FILED**

**1/29/2014**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID H. PICKUP; CHRISTOPHER H. ROSICK; JOSEPH NICOLOSI; ROBERT VAZZO; NATIONAL ASSOCIATION FOR RESEARCH AND THERAPY OF HOMOSEXUALITY, a Utah non-profit organization; AMERICAN ASSOCIATION OF CHRISTIAN COUNSELORS, a Virginia non-profit association; JACK DOE 1, Parent of John Doe 1; JANE DOE 1, Parent of John Doe 1; JOHN DOE 1, a minor, guardian ad litem Jane Doe, guardian ad litem Jack Doe; JACK DOE 2, Parent of John Doe 2; JANE DOE 2, Parent of John Doe 2; JOHN DOE 2, a minor, guardian ad litem Jack Doe, guardian ad litem Jane Doe, *Plaintiffs-Appellants*, <br><br> v. <br><br> EDMUND G. BROWN, JR., Governor of the State of California, in his official capacity; ANNA M. CABALLERO, Secretary of the California State and Consumer Services Agency, in her official capacity; SHARON LEVINE, President of the Medical Board of California, in her official capacity; KIM | No. 12-17681 <br><br> D.C. No. 2:12-CV-02497-KJM-EFB |

MADSEN, Executive Officer of the
California Board of Behavioral
Sciences, in her official capacity;
MICHAEL ERICKSON, President of the
California Board of Psychology, in
his official capacity,
                    *Defendants-Appellees*,


                    and


EQUALITY CALIFORNIA,
        *Intervenor-Defendant-Appellee.*


Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding


DONALD WELCH; ANTHONY DUK;          No. 13-15023
AARON BITZER,
            *Plaintiffs-Appellees*,      D.C. No.
                                  2:12-CV-02484-
                v.                    WBS-KJN

EDMUND G. BROWN, JR., Governor
of the State of California, in his        ORDER AND
official capacity; ANNA M.                AMENDED
CABALLERO, Secretary of California        OPINION
State and Consumer Services
Agency, in her official capacity;
DENISE BROWN, Case Manager,
Director of Consumer Affairs, in her
official capacity; CHRISTINE
WIETLISBACH, PATRICIA LOCK-

DAWSON, SAMARA ASHLEY, HARRY
DOUGLAS, JULIA JOHNSON, SARITA
KOHLI, RENEE LONNER, KAREN
PINES, CHRISTINA WONG, in their
official capacities as members of the
California Board of Behavioral
Sciences; SHARON LEVINE, MICHAEL
BISHOP, SILVIA DIEGO, DEV
GNANADEV, REGINALD LOW, DENISE
PINES, JANET SALOMONSON, GERRIE
SCHIPSKE, DAVID SERRANO SEWELL,
BARBARA YAROSLAVSKY, in their
official capacities as members of the
Medical Board of California,
                    *Defendants-Appellants*.

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, Senior District Judge, Presiding

Argued and Submitted
April 17, 2013—San Francisco, California

Filed August 29, 2013
Amended January 29, 2014

Before: Alex Kozinski, Chief Judge, and Susan P. Graber,
and Morgan Christen, Circuit Judges.

Order;
Dissent to Order by Judge O'Scannlain;
Opinion by Judge Graber

# SUMMARY[*]

## Civil Rights

The panel replaced its prior opinion, filed on August 29, 2013, and published at 728 F.3d 1042, with an amended opinion, denied a petition for panel rehearing, denied a petition for rehearing en banc on behalf of the court, and ordered that no further petitions shall be entertained.

Reversing an order granting preliminary injunctive relief in *Welch v. Brown*, 13-15023, and affirming the denial of preliminary injunctive relief in *Pickup v. Brown*, 12-17681, the panel held that California Senate Bill 1172, which bans state-licensed mental health providers from engaging in "sexual orientation change efforts" with patients under 18 years of age, does not violate the free speech rights of practitioners or minor patients, is neither vague nor overbroad, and does not violate parents' fundamental rights. The panel held that Senate Bill 1172 regulates professional conduct, not speech and therefore was subject only to a rational basis review.

Dissenting from the denial of rehearing en banc, Judge O'Scannlain, joined by Judges Bea and Ikuta stated that by defining disfavored speech as "conduct," the panel's opinion entirely exempted California's regulation from the First Amendment. Judge O'Scannlain stated that in so doing, the panel contravened recent Supreme Court precedent, ignored established free speech doctrine, misread Ninth Circuit cases,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and thus insulated from First Amendment scrutiny California's prohibition—in the guise of a professional regulation—of politically unpopular expression.

## COUNSEL

No. 12-17681

Mathew D. Staver (argued) and Anita L. Staver, Liberty Counsel, Maitland, Florida; Mary E. McAlister, Stephen M. Crampton, and Daniel J. Schmid, Liberty Counsel, Lynchburg, Virginia, for Plaintiffs-Appellants David H. Pickup et al.

Alexandra Robert Gordon (argued), Deputy Attorney General, Kamala D. Harris, Attorney General of California, Douglas J. Woods, Senior Assistant Attorney General, Tamar Pachter, Supervising Deputy Attorney General, and Daniel J. Powell and Rei R. Onishi, Deputy Attorneys General, San Francisco, California, for Defendants-Appellees Edmund G. Brown, Jr., et al.

Shannon P. Minter (argued), National Center for Lesbian Rights, San Francisco, California; David C. Dinielli, Munger, Tolles & Olson LLP, Los Angeles, California, for Intervenor/Defendant-Appellee.

Robert P. Taylor, Arnold & Porter LLP, San Francisco, California, for Amici Curiae American Association for Marriage and Family Therapy-California Division, et al.; Elizabeth O. Gill, ACLU Foundation of Northern California, Inc., San Francisco, California, for Amicus Curiae American Civil Liberties Union Foundation of Northern California; Eric

Alan Isaacson, San Diego, California, and Stacey M. Kaplan, San Francisco, California, for Amici Curiae California Faith for Equality, et al.; Brad W. Seiling, Benjamin G. Shatz, and Justin Jones Rodriquez, Manatt, Phelps & Phillips, LLP, Los Angeles, California, and Hayley Gorenberg, Lambda Legal Defense and Education Fund, Inc., New York, New York, and Shelbi D. Day, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California, for Amici Curiae Children's Law Center of California, et al.; Jay Rapaport, Covington & Burling LLP, San Francisco, California, for Amicus Curiae Dr. Jack Drescher, M.D.; Jon B. Eisenberg and Barry R. Levy, Encino, California, for Amicus Curiae First Amendment Scholars; Eileen R. Ridley, Thomas F. Carlucci, Patrick T. Wong, and Kristy K. Marino, Foley & Lardner LLP, San Francisco, California, for Amicus Curiae Health Law Scholars; Adam L. Gray and James Maxwell Cooper, Kirkland & Ellis LLP, San Francisco, California, for Amici Curiae Medical Professionals Tonya Chaffee, MD, MPH, et al.; Tara M. Steeley, Deputy City Attorney, and Dennis J. Herrera, City Attorney, and Therese Stewart, Mollie Lee, and Sara Eisenberg, Deputy City Attorneys, San Francisco, California, for Amicus Curiae The City and County of San Francisco; and Sanford Jay Rosen, Rosen Bien Galvan & Grunfeld LLP, San Francisco, California, for Amicus Curiae Survivors of Sexual Orientation Change Efforts.

No. 13-15023

Alexandra Robert Gordon (argued), Deputy Attorney General, Kamala D. Harris, Attorney General of California, Douglas J. Woods, Senior Assistant Attorney General, Tamar Pachter, Supervising Deputy Attorney General, and Daniel J. Powell and Rei R. Onishi, Deputy Attorneys General, and

Craig J. Konnoth, Deputy Solicitor General, San Francisco, California, for Defendants-Appellants Edmund G. Brown, Jr., et al.

Kevin T. Snider (argued), Matthew B. McReynolds, and Michael J. Peffer, Pacific Justice Institute, Sacramento, California, for Plaintiffs-Appellees Donald Welch et al.

Elizabeth O. Gill, ACLU Foundation of Northern California, Inc., San Francisco, California, for Amicus Curiae American Civil Liberties Union Foundation of Northern California; Peter D. Lepiscopo, William P. Morrow, James M. Griffiths, and Michael W. Healy, Lepiscopo & Associates Law Firm, San Diego, California, for Amicus Curiae American College of Pediatricians; Eric Alan Isaacson, San Diego, California, and Stacey M. Kaplan, San Francisco, California, for Amici Curiae California Faith for Equality, et al.; Brad W. Seiling and Benjamin G. Shatz, Manatt, Phelps & Phillips, LLP, Los Angeles, California, and Hayley Gorenberg, Lambda Legal Defense and Education Fund, Inc, New York, New York, and Shelbi D. Day, Lambda Legal Defense and Education Fund, Inc., Los Angeles, California, for Amici Curiae Children's Law Center of California, et al.; Shannon P. Minter, National Center for Lesbian Rights, San Francisco, California, and David C. Dinielli, Munger, Tolles & Olson LLP, Los Angeles, California, for Amicus Curiae Equality California; Jon B. Eisenberg and Barry R. Levy, Encino, California, for Amicus Curiae First Amendment Scholars; John A. Eidsmoe and Joshua M. Pendergrass, Foundation for Moral Law, Montgomery, Alabama, for Amicus Curiae Foundation for Moral Law; Eileen R. Ridley, Thomas F. Carlucci, Patrick T. Wong, and Kristy K. Marino, Foley & Lardner LLP, San Francisco, California, for Amicus Curiae Health Law Scholars; Dean R. Broyles, The National Center for Law &

Policy, Escondido, California, for Amicus Curiae Parents and Friends of Ex-Gays & Gays; and Sanford Jay Rosen, Rosen Bien Galvan & Grunfeld LLP, San Francisco, California, for Amicus Curiae Survivors of Sexual Orientation Change Efforts.

## ORDER

The opinion filed on August 29, 2013, and published at 728 F.3d 1042, is replaced by the amended opinion filed concurrently with this order.  With these amendments, the panel has voted to deny the petitions for panel rehearing and petitions for rehearing en banc.

The full court has been advised of the petitions for rehearing en banc.  A judge of the court called for a vote on whether to rehear the matter en banc.  On such vote, a majority of the nonrecused active judges failed to vote in favor of en banc rehearing.

The petitions for panel rehearing and petitions for rehearing en banc are **DENIED**.  No further petitions for panel rehearing or petitions for rehearing en banc shall be entertained.

O'SCANNLAIN, Circuit Judge, joined by BEA and IKUTA, Circuit Judges, dissenting from the denial of rehearing en banc:

May the legislature avoid First Amendment judicial scrutiny by defining disfavored talk as "conduct"? That is what these cases are really about.

The State of California, in the statute at issue here, has prohibited licensed professionals from saying certain words to their clients. By labeling such speech as "conduct," the panel's opinion has entirely exempted such regulation from the First Amendment. In so doing, the panel contravenes recent Supreme Court precedent, ignores established free speech doctrine, misreads our cases, and thus insulates from First Amendment scrutiny California's prohibition—in the guise of a professional regulation—of politically unpopular expression.

I respectfully dissent from our court's regrettable failure to rehear these cases en banc.

I

California enacted Senate Bill 1172 ("SB 1172"), which subjects state-licensed "mental health providers"[1] to professional discipline for engaging in "sexual orientation

---

[1] According to the statute, "mental health providers" consist not only of the medical doctor and trained psychologist, but also "psychological assistant, intern, or trainee, a licensed marriage and family therapist, a registered marriage and family therapist, intern, or trainee, . . . a licensed clinical social worker, an associate clinical social worker, a licensed professional clinical counselor, a registered clinical counselor, intern, or trainee." Cal. Bus. & Prof. Code § 865(a).

change efforts" with clients who are minors.  Cal. Bus. & Prof. Code §§ 865.1, 865.2.  The statute defines such change efforts to include "any practices . . . that seek to change an individual's sexual orientation." *Id.* § 865(b)(1).  Explicitly exempted from the regulation are "psychotherapies that provide acceptance, support, and understanding of clients' coping, social support, and identity exploration and development." *Id.* § 865(b)(2).  The law does not expressly prohibit professionals from discussing change efforts with patients, from referring patients to unlicensed practitioners of change efforts, or otherwise from offering opinions on the subject of homosexuality.  Amended op. at 26.

In *Welch*, the district court granted plaintiffs an injunction against SB 1172, but a different judge in *Pickup* denied a similar request.  Plaintiffs in these cases include licensed professionals who provide change efforts exclusively through speech—i.e., methods such as counseling and prayer.[2] *Cf. id.* at 39 n.5.

According to the panel the words proscribed by SB 1172 consist entirely of medical "treatment," which although effected by verbal communication nevertheless constitutes "professional *conduct*" entirely unprotected by the First Amendment.  *See* amended op. at 37–39.  Unlike a professional's opinions, theories, recommendations, or advocacy, such "conduct" effected through speech would receive no constitutional safeguards against state suppression.  *Id.*  The panel provides no principled doctrinal basis for its

---

[2] In surveying the history of "sexual orientation change efforts," the panel also catalogues various "aversive" treatments, some barbaric and many archaic, employed by psychologists of a bygone era.  *See* amended op. at 23–24.  Such anachronisms are not at issue here.

dichotomy: by what criteria do we distinguish between utterances that are truly "speech," on the one hand, and those that are, on the other hand, somehow "treatment" or "conduct"? The panel, contrary to common sense and without legal authority, simply asserts that some spoken words—those prohibited by SB 1172—are not speech.

Empowered by this ruling of our court, government will have a new and powerful tool to silence expression based on a political or moral judgment about the content and purpose of the communications. The First Amendment precisely forbids government from punishing speech on such grounds.

II

Our precedents do not suggest that laws prohibiting "conduct" effected exclusively by means of speech escape First Amendment scrutiny. In fact, the Supreme Court, in its most recent relevant case, flatly refused to countenance the government's purported distinction between "conduct" and "speech" for constitutional purposes when the activity at issue consisted of talking and writing.

The plaintiffs in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), had challenged a Federal statute forbidding "material support" to terrorist organizations for criminalizing protected verbal communications. *Id.* at 2716–17. The Supreme Court upheld the statute, but only after applying First Amendment scrutiny. Specifically, the Court rejected the government's argument that the statute only punished "conduct": for, in this situation, the "conduct triggering coverage under the statute consists of communicating a message." *Id.* at 2724. In other words, the

government's *ipse dixit* cannot transform "speech" into "conduct" that it may more freely regulate.[3]

The panel attempts, vainly, to distinguish *Humanitarian Law Project* from the facts of this case by emphasizing that the change efforts prohibited by SB 1172 are "therapeutic treatment, not expressive speech" and that the practitioners to whom the law applies are "licensed mental health professionals acting within the confines of the counselor-client relationship." Amended op. at 39. In purported contrast is the issue in *Humanitarian Law Project*, which according to the panel dealt with "political speech . . . by ordinary citizens." *Id.* at 40. These supposedly distinguishing characteristics find no support in the Supreme Court's holding and do not even fairly characterize the facts of the case.

In the first place, the panel's vague invocation of "ordinary citizens" misses the mark. What exactly the panel means by this locution—more redolent of campaign sound bites or generic political press releases than the customarily more precise language of judicial opinions—is unclear. To the extent that "ordinary citizens" encompass non-professionals, this dichotomy is self-evidently irrelevant on the facts of *Humanitarian Law Project*. The plaintiffs in that case included a nonprofit human-rights organization with consultative status to the United Nations, 130 S. Ct. at

---

[3] Undoubtedly the State possesses an important interest in regulating the professions in the interest of public health, safety, and morals; but presumably the governmental interest in proscribing criminal activity, and especially support of terrorism, is similarly substantial—if not more so. Yet the Supreme Court declined to declare speech uttered in just such a context as categorically outside of the First Amendment's protections.

2713–14; the activities in which they had contemplated engaging included offering their professional expertise and advice on various international and humanitarian issues, *id.* at 2716–17. Such plaintiffs may not have been doctors or psychoanalysts, but certainly purported to be offering professional services of another sort; the Supreme Court, at least, did not treat them as mere lay people. If that is the distinction the panel perceives in the "ordinary citizens" of *Humanitarian Law Project*, it is illusory.

Furthermore, the Supreme Court in *Humanitarian Law Project* explicitly rejected the plaintiffs' argument that the expression in question consisted of "pure political speech." *Id.* at 2722; *see also id.* at 2724 ("The First Amendment issue before us is . . . not whether the Government may prohibit pure political speech."). In explanation, the Court proceeded to enumerate various sorts of political expression that the statute did not abridge—just as the panel's opinion does with respect to SB 1172. The material support statute permitted "plaintiffs . . . to say anything they wish on any topic[; t]hey may speak and write freely[;] . . . . [t]hey may advocate before the United Nations." *Id.* at 2722–23; *cf.* amended op. at 26 ("SB 1172 does *not* . . . [p]revent mental health providers from communicating with the public about SOCE[; p]revent mental health providers from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic[; p]revent mental health providers from recommending SOCE to patients, whether children or adults . . . ."). Such classical "political speech," Chief Justice Roberts concluded, did not fall within the statute's strictures; nevertheless, the Court ruled that the First Amendment still applied to the sort of speech in which the plaintiffs contemplated engaging and which they claimed the statute forbade. *See id.* at 2724–27. The reasoning of

*Humanitarian Law Project* specifically forecloses courts from approving a statutory restriction on speech simply because it still permits various and extensive political expression.

The cases here present an analogous situation: professionals—including but not limited to doctors and psychologists—desire to "communicate a message" that the law in question does not permit. This court accordingly should subject SB 1172 to *some level of scrutiny* under the First Amendment.

It bears noting, further, that the Court in *Humanitarian Law Project* did not examine the content or purpose of the "message" the plaintiffs desired to communicate. Thus the panel's attempt to validate SB 1172, on the basis that the speech—the communicated "message"—it proscribes is not "expressive" or "symbolic," amended op. at 39, finds no support in *Humanitarian Law Project* itself. Whether the prohibited communications in any given situation qualify as pure political speech or, for example, commercial speech will affect only the level of scrutiny, not whether the First Amendment applies at all. The Supreme Court has not required that speech, as a threshold matter, be "expressive" or "symbolic" before deigning to extend to it constitutional protection.[4]

---

[4] The panel's reliance on the Supreme Court's opinion in *Rumsfeld v. Forum for Academic & Institutional Rights ("FAIR II")*, 547 U.S. 47 (2006), consequently, begs the question. *See* amended op. at 40. That case "extended First Amendment protection only to conduct that is inherently expressive," *id.* at 66; but the panel's insufficiently grounded assertion that change efforts constitute "conduct" is precisely what is at issue. *FAIR II* would only control if the panel first correctly determined that change efforts comprise not speech but conduct for the purposes of

The Supreme Court's implication in *Humanitarian Law Project* is clear:  legislatures cannot nullify the First Amendment's protections for speech by playing this labeling game.  SB 1172 prohibits certain "practices," just as the statute in *Humanitarian Law Project* prohibited "material support"; but with regard to those plaintiffs as well as the plaintiffs here, those laws targeted speech.  Thus, the First Amendment still applies.

### III

The Federal courts have never recognized a freestanding exception to the First Amendment for state professional regulations.[5]  Indeed authoritative precedents have established that neither professional regulations generally, nor even a more limited subclass of such rules, remain categorically outside of the First Amendment's reach.[6]  To justify its

---

the First Amendment—a determination that, on these facts, *Humanitarian Law Project* forecloses.

[5] The panel places professionals' free-speech rights along a "continuum," on one end of which, "where a professional is engaged in a public dialogue," he enjoys extensive protections under the First Amendment.  And, "[a]t the midpoint of the continuum, . . . First Amendment protection . . . is somewhat diminished" but apparently not obliterated.  *See* amended op. at 34–37.

[6] *See, e.g.*, *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 622–24 (1995) (applying the First Amendment to state bar rules forbidding certain direct attorney advertising); *Edenfield v. Fane*, 507 U.S. 761, 765–67 (1993) (applying the First Amendment to state professional regulation of accountants); *Ohralik v. Ohio St. Bar Ass'n*, 436 U.S. 447, 454–59 (1978) (applying a balancing test under the First Amendment to state professional regulation that prohibited attorney in-person solicitation); *Bates v. St. Bar of Ariz.*, 433 U.S. 350, 363–66 (1977) (applying First Amendment to state

purported speech/conduct dichotomy in the context of the professions, the panel instead invokes our decisions in *National Association for the Advancement of Psychoanalysis v. California Board of Psychology ("NAAP")*, 228 F.3d 1043 (9th Cir. 2000), and *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), as well as scattered citations of non-authoritative cases.  Supreme Court precedent, however, as well as *NAAP* and *Conant* themselves, do not dictate such conclusion—rather, they counsel against it.

### A

*NAAP* confronted the question whether California may regulate the psychoanalytical professions at all.  We concluded, indeed, that psychoanalysts, simply by dint of theirs being the "talking cure," do not receive "*special* First Amendment protection."  *See NAAP*, 228 F.3d at 1054

---

professional regulation that prohibited attorney advertising); *Va. St. Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 758–61 (1975) (applying First Amendment to state professional regulation that prohibited pharmacists from advertising prices).

Most precedents addressing the application of the First Amendment to professional regulations have occurred in the context of rules against advertising.  The Supreme Court has subjected such "commercial speech" to a lower degree of scrutiny under the First Amendment than classical political expression, respecting the state's traditional "power to regulate commercial activity deemed harmful."  *Ohralik*, 436 U.S. at 456.  Unlike advertising—or the "exchange of information about securities, corporate proxy statements, the exchange of price and production information, and employers' threats of retaliation for the labor activities of employees," *id.*—change efforts do not have a necessarily commercial focus.  Indeed, SB 1172 does not simply prohibit licensed practitioners from engaging in change efforts for a fee, but subjects them to professional discipline for doing so even absent any commercial relationship—such as, for example, in connection with a church's ministry.

(emphasis added).  But such statement does not in any way support the novel principle, discerned by the panel, that such "talk therapy" receives *no First Amendment protection at all.* In fact *NAAP* explicitly affirmed that the "communication that occurs during psychoanalysis is entitled to constitutional protection," even if it "is not immune from regulation." *Id.* Although the panel implies otherwise, *NAAP* did not hold that psychotherapy administered solely through the spoken word constitutes wholly unprotected speech.[7]  Rather we stated in *NAAP* that mental health professionals do not lose all of their First Amendment immunities once their counseling sessions begin.[8]

## B

*Conant* likewise offers no *terra firma* for the panel's unprecedented distinction.  In that case, the Ninth Circuit invalidated a Federal regulation that prohibited physicians from recommending medicinal marijuana to their patients.  In so doing, we affirmed that  doctors' speech to their patients "may be entitled to the strongest protection our Constitution has to offer." *Conant*, 309 F.3d at 637 (internal quotation

---

[7] Plaintiffs in that case had challenged California's general licensing scheme for certain mental health professionals, which required practitioners to possess certain educational credentials but otherwise did not "dictate what can be said between psychologists and patients during treatment." *NAAP*, 228 F.3d at 1055.  Unlike *NAAP*, this case does not involve simply a general licensing scheme or educational requirements, but rather the substantive regulation of the speech uttered between practitioners and patients.

[8] It merits repeating here that SB 1172's reach extends much more broadly than the psychoanalytical professions: it also regulates marriage therapists, social workers, and clinical counselors.  *See supra* note 4.

marks omitted).  *Conant* furthermore explained that *NAAP*
stated that "communication that occurs during psychoanalysis
is entitled to First Amendment protection" and summarized
its holding that the regulation at issue in that case passed
muster because the "content-neutral" law "did not attempt to
dictate the content of what is said in therapy and did not
prevent licensed therapists from utilizing particular psycho-
analytical methods." *Id.* (internal quotation marks omitted).
On its face, this language from *Conant* seems to apply more
directly and more strongly to SB 1172 than to the Federal
restriction considered in that case.  Indeed, SB 1172 explicitly
bans speech with a certain content or uttered with a certain
intent, and unequivocally prohibits not only "particular
psycho-analytical methods" but also particular purposes that
both doctor and patient may have for preferring such
methods.

    The panel, however, claims to find support for its
conduct/speech distinction in *Conant*'s contrast of
*recommending* medicinal marijuana with actually *prescribing*
the controlled substance.  *See id.* at 635.  Because SB 1172
purportedly permits professionals freely to discuss change
efforts with—and even recommend change efforts to—their
patients, but simply forbids them from engaging in change
efforts themselves, the panel asserts that the regulation does
not fail under *Conant*'s logic.  *See* amended op. at 38–39.
Such a conclusion depends on an analogy between change
efforts and "speak[ing] the words necessary to provide or
administer the banned drug." *Id.* at 37–38.  But by writing a
prescription, a physician's words have an independent legal
effect: ordinarily, it entitles the patient to a controlled
chemical substance he otherwise would have no right to
possess.  When the State prohibits a doctor from prescribing
a drug, it simply refuses to accord his written words this

additional legal significance.[9]   Rather, like the regulation challenged and invalidated in *Conant*, SB 1172 prohibits the doctor from speaking to his patient with certain words and in a certain way.[10]

---

[9] For a similar reason, the State may also punish a doctor for purporting to prescribe an illegal drug or otherwise writing a prescription he is not qualified or permitted to write.   In such a situation, the doctor is attempting fraudulently to arrogate to his writing a legal significance to which it is not entitled.  A psychologist or a social worker who undertakes change efforts on his patient, on the other hand, is not investing, or attempting to invest, his words with any legal effect.

[10] Although it quotes, word for word, the statutory definition of "mental health provider," amended op. at 25 n.1, the panel finds no problem characterizing as "medical treatment" the services provided by non-medical professionals such as marriage therapists, social workers, and clinical counselors—all of whom SB 1172 forbids from engaging in change efforts.

The panel emphasizes the "medical" nature of the regulation at issue. It describes change efforts as "therapeutic treatment" and "activities [that] are therapeutic," and classifies change efforts as analogous for relevant purposes alongside medical procedures. *Id* at 39–40.  Although the panel expressly invokes the statutory language when arguing that SB 1172 regulates conduct, it does not attend as closely to the legislative text in attempting to characterize change efforts as "medicine."   Indeed, as emphasized above, SB 1172 extends much more broadly than just to the medical or even the psychoanalytical professions.  SB 1172 likewise forbids licensed marriage and family therapists as well as social workers, among others, from engaging in change efforts.  *See* Cal. Bus. & Prof. Code § 865(a).   It strains credulity to depict the counseling services—socially invaluable as they are—provided by marriage counselors and social workers  as "medicine" or "treatment."  If the panel's presumption that all change efforts, whether administered by doctors and psychologists, or by social workers and marriage counselors, are necessarily "medicine" is based on scientific or other objective technical expertise, they do not say so.  For certainly the text of the statute does not suggest, let alone compel, such a broad proclamation.

C

Perhaps what really shapes the panel's reasoning in these cases is not the principles supposedly distilled from the case law, but rather problematic and potentially unavoidable implications of an alternative conclusion. By subjecting SB 1172 to any First Amendment scrutiny at all, the panel may fear it will open Pandora's box: heretofore uncontroversial professional regulations proscribing negligent, incompetent, or harmful advice will now attract meritless challenges merely on the basis that such provisions prohibit speech.

Alluding to these concerns, the panel notes that "doctors are routinely held liable for giving negligent medical advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care." Amended op. at 36. But the panel nevertheless fails to develop this argument, and cites no authoritative precedent that protects such regulations from First Amendment scrutiny. In the first place, *Humanitarian Law Project* has effectively neutralized this ground of reasoning. The material-support statute in that case attempted, with respect to those plaintiffs, just what SB 1172 proposes to do to Drs. Welch and Pickup: prohibit the provision of certain professional services delivered solely through speech. The statute in *Humanitarian Law Project* survived—but it did not escape—First Amendment scrutiny.

Subjecting regulations of professionals' speech to *some* degree of scrutiny under the First Amendment indeed does not necessarily call their legitimacy into question. But perhaps the panel's common sense would afford more deferential treatment to such traditional regulations as, for example, the ethical rules forbidding attorneys from

divulging client confidences.    Accordingly, the panel intimates a potentially broad exception to the First Amendment for certain categories of speech.  The Supreme Court, however, has clearly warned us inferior courts against arrogating to ourselves "any 'freewheeling authority to declare new categories of speech outside the scope of the First Amendment.'"  *United States v. Alvarez*, 132 S. Ct. 2537, 2547 (2012) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).[11]  The panel cites no case holding that speech, uttered by professionals to their clients, does not actually constitute "speech" for purposes of the First Amendment.  And that should not surprise us—for the Supreme Court has not recognized such a category.[12]

### III

The Supreme Court has chastened us lower courts for creating, out of whole cloth, new categories of speech to which the First Amendment does not apply.  But, that is exactly what the panel's opinion accomplishes in this case, concealing its achievement by casually characterizing the communications prohibited by SB 1172 as nonexpressive

---

[11] Notwithstanding my vigorous dissent from our court's denial of en banc rehearing, the Supreme Court ratified the *Alvarez* panel's "novel theory that 'we presumptively protect all speech . . . .'" *United States v. Alvarez*, 638 F.3d 666, 679 (9th Cir. 2011) (O'Scannlain, J., dissenting from denial of rehearing).  We may not reopen now this settled question.

[12] Although the panel fears the implications of *overprotecting* professional speech, it does not consider the potential effects of *underprotection*.  If a state may freely regulate speech uttered by professionals in the course of their practice without implicating the First Amendment, then targeting disfavored moral and political expression may only be a matter of creative legislative draftsmanship.

conduct.  Of course, this begs the question.  The panel provides no authority to support its broad intimations that the words spoken by therapists and social workers, if they fall within the statutory language of SB 1172, should receive no protection at all from the First Amendment.

The regulation at issue may very well constitute a valid exercise of California's police power: I take no view as to the merits of SB 1172, either as a matter of policy or on the question whether it would withstand strict or some intermediate level of scrutiny.  But as to the threshold issue—may California remove from the First Amendment's ambit the speech of certain professionals when the State disfavors its content or its purpose?—the Supreme Court has definitively and unquestionably said "No."  It is no longer within our discretion to disagree.

For the foregoing reasons I respectfully dissent from the court's decision not to rehear these cases en banc.

## OPINION

GRABER, Circuit Judge:

The California legislature enacted Senate Bill 1172 to ban state-licensed mental health providers from engaging in "sexual orientation change efforts" ("SOCE") with patients under 18 years of age.  Two groups of plaintiffs sought to enjoin enforcement of the law, arguing that SB 1172 violates the First Amendment and infringes on several other constitutional rights.

In *Welch v. Brown*, No. 13-15023, the district court ruled that Plaintiffs were likely to succeed on the merits of their First Amendment claim and that the balance of the other preliminary-injunction factors tipped in their favor; thus, the court granted a preliminary injunction. In *Pickup v. Brown*, No. 12-17681, the district court ruled that Plaintiffs were unlikely to succeed on the merits of any of their claims and denied preliminary relief. The losing parties timely appealed. We address both appeals in this opinion.

Although we generally review for abuse of discretion a district court's decision to grant or deny a preliminary injunction, we may undertake plenary review of the issues if a district court's ruling "'rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance.'" *Gorbach v. Reno*, 219 F.3d 1087, 1091 (9th Cir. 2000) (en banc) (quoting *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 755–57 (1986)). Because those conditions are met here, we undertake plenary review and hold that SB 1172, as a regulation of professional conduct, does not violate the free speech rights of SOCE practitioners or minor patients, is neither vague nor overbroad, and does not violate parents' fundamental rights. Accordingly, we reverse the order granting preliminary relief in *Welch* and affirm the denial of preliminary relief in *Pickup*.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Sexual Orientation Change Efforts ("SOCE")*

SOCE, sometimes called reparative or conversion therapy, began at a time when the medical and psychological community considered homosexuality an illness. SOCE

encompasses a variety of methods, including both aversive and non-aversive treatments, that share the goal of changing an individual's sexual orientation from homosexual to heterosexual. In the past, aversive treatments included inducing nausea, vomiting, or paralysis; providing electric shocks; or having an individual snap an elastic band around the wrist when aroused by same-sex erotic images or thoughts. Even more drastic methods, such as castration, have been used. Today, some non-aversive treatments use assertiveness and affection training with physical and social reinforcement to increase other-sex sexual behaviors. Other non-aversive treatments attempt "to change gay men's and lesbians' thought patterns by reframing desires, redirecting thoughts, or using hypnosis, with the goal of changing sexual arousal, behavior, and orientation." American Psychological Association, *Appropriate Therapeutic Responses to Sexual Orientation* 22 (2009). The plaintiff mental health providers in these cases use only non-aversive treatments.

In 1973, homosexuality was removed from the Diagnostic and Statistical Manual of Mental Disorders. Shortly thereafter the American Psychological Association declared that homosexuality is not an illness. Other major mental health associations followed suit. Subsequently, many mental health providers began questioning and rejecting the efficacy and appropriateness of SOCE therapy. Currently, mainstream mental health professional associations support affirmative therapeutic approaches to sexual orientation that focus on coping with the effects of stress and stigma. But a small number of mental health providers continue to practice, and advocate for, SOCE therapy.

B.  *Senate Bill 1172*

Senate Bill 1172 defines SOCE as "any practices by mental health providers[1] that seek to change an individual's sexual orientation[,] . . . includ[ing] efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex."  Cal. Bus. & Prof. Code § 865(b)(1). SOCE, however,

> does not include psychotherapies that:  (A) provide acceptance, support, and understanding of clients or the facilitation of clients' coping, social support, and identity exploration and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and (B) do not seek to change sexual orientation.

---

[1] California Business and Professions Code section 865(a) defines "mental health provider" as

> a physician and surgeon specializing in the practice of psychiatry, a psychologist, a psychological assistant, intern, or trainee, a licensed marriage and family therapist, a registered marriage and family therapist, intern, or trainee, a licensed educational psychologist, a credentialed school psychologist, a licensed clinical social worker, an associate clinical social worker, a licensed professional clinical counselor, a registered clinical counselor, intern, or trainee, or any other person designated as a mental health professional under California law or regulation.

*Id.* § 865(b)(2).  A licensed mental health provider's use of SOCE on a patient under 18 years of age is "considered unprofessional conduct," which will subject that provider to "discipline by the licensing entity for that mental health provider."  *Id.* § 865.2.

Importantly, SB 1172 does *not* do any of the following:

- Prevent mental health providers from communicating with the public about SOCE

- Prevent mental health providers from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic

- Prevent mental health providers from recommending SOCE to patients, whether children or adults

- Prevent mental health providers from administering SOCE to any person who is 18 years of age or older

- Prevent mental health providers from referring minors to unlicensed counselors, such as religious leaders

- Prevent unlicensed providers, such as religious leaders, from administering SOCE to children or adults

- Prevent minors from seeking SOCE from mental health providers in other states

Instead, SB 1172 does just one thing: it requires licensed mental health providers in California who wish to engage in "practices . . . that seek to change a [minor's] sexual

orientation" either to wait until the minor turns 18 or be subject to professional discipline. Thus, SB 1172 regulates the provision of mental treatment, but leaves mental health providers free to discuss or recommend treatment and to express their views on any topic.

The legislature's stated purpose in enacting SB 1172 was to "protect[] the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and [to] protect[] its minors against exposure to serious harms caused by sexual orientation change efforts." 2012 Cal. Legis. Serv. ch. 835, § 1(n). The legislature relied on the well-documented, prevailing opinion of the medical and psychological community that SOCE has not been shown to be effective and that it creates a potential risk of serious harm to those who experience it. Specifically, the legislature relied on position statements, articles, and reports published by the following organizations: the American Psychological Association, the American Psychiatric Association, the American School Counselor Association, the American Academy of Pediatrics, the American Medical Association, the National Association of Social Workers, the American Counseling Association, the American Psychoanalytic Association, the American Academy of Child and Adolescent Psychiatry, and the Pan American Health Organization.

In particular, the legislature relied on a report created by a Task Force of the American Psychological Association. That report resulted from a systematic review of the scientific literature on SOCE. Methodological problems with some of the reviewed studies limited the conclusions that the Task Force could draw. Nevertheless, the report concluded that SOCE practitioners have not demonstrated the efficacy of

SOCE and that anecdotal reports of harm raise serious concerns about the safety of SOCE.

## C. *Procedural History*

Plaintiffs in *Welch* include two SOCE practitioners and an aspiring SOCE practitioner. Plaintiffs in *Pickup* include SOCE practitioners, organizations that advocate SOCE, children undergoing SOCE, and their parents. All sought a declaratory judgment that SB 1172 is unconstitutional and asked for injunctive relief to prohibit enforcement of the law.[2]

In *Welch*, Plaintiffs moved for preliminary injunctive relief, arguing that SB 1172 violates their free speech and privacy rights. They also argued that the law violates the religion clauses and is unconstitutionally vague and overbroad under the First Amendment.

The *Welch* court held that SB 1172 is subject to strict scrutiny because it would restrict the content of speech and suppress the expression of particular viewpoints. It reasoned that the fact that the law is a professional regulation does not change the level of scrutiny. The court granted preliminary relief because it determined that the state was unlikely to satisfy strict scrutiny, Plaintiffs would suffer irreparable harm

---

[2] In *Pickup*, Equality California, an advocacy group for gay rights, sought and received intervenor status to defend SB 1172. *Pickup* Plaintiffs argue that the Supreme Court's recent decision in *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013), means that Equality California does not have standing to defend the statute. We need not resolve that question, however, because the State of California undoubtedly has standing to defend its statute, and "the presence in a suit of even one party with standing suffices to make a claim justiciable." *Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) (per curiam).

in the absence of an injunction, the balance of the equities tipped in their favor, and the injunction was in the public interest. Because the district court granted relief on their free speech claim, it did not reach Plaintiffs' other constitutional challenges.[3]

In *Pickup*, Plaintiffs moved for preliminary injunctive relief, arguing that SB 1172 violates the First and Fourteenth Amendments by infringing on SOCE practitioners' right to free speech, minors' right to receive information, and parents' right to direct the upbringing of their children. They also argued that SB 1172 is unconstitutionally vague.

The *Pickup* court denied Plaintiffs' motion because it determined that they were unlikely to prevail on the merits of any of their claims. It reasoned that, because the plain text of SB 1172 bars only treatment, but not discussions about treatment, the law regulates primarily conduct rather than speech. Applying the rational basis test, the court ruled that

---

[3] The *Welch* Plaintiffs' response brief contains a single paragraph asserting that SB 1172 violates the religion clauses of the First Amendment. That paragraph, which cites neither the record nor any case, is part of Plaintiffs' argument that SB 1172 is not narrowly tailored to achieve a compelling government purpose, as required by the Free Speech Clause, because it contains no clergy exemption. The religion claim, however, is not "specifically and distinctly argued," as ordinarily required for us to consider an issue on appeal. *Thompson v. Runnels*, 705 F.3d 1089, 1099–1100 (9th Cir.) (internal quotation marks omitted), *cert. denied*, 134 S. Ct. 234 (2013); *see also Maldonado v. Morales*, 556 F.3d 1037, 1048 n.4 (9th Cir. 2009) ("Arguments made in passing and inadequately briefed are waived."). Moreover, although the *Welch* Plaintiffs raised the claim in the district court, the court did not rule on it because it granted relief on their free speech claim. In these circumstances, we decline to address the religion claim. The district court may do so in the first instance.

Plaintiffs were unlikely to show a violation of the SOCE practitioners' free speech rights or the minors' right to receive information. As for vagueness, the court ruled that the text of the statute is clear enough to put mental health providers on notice of what is prohibited. Finally, the court ruled that SB 1172 does not implicate parents' right to control the upbringing of their children because that right does not encompass the right to choose a specific mental health treatment that the state has reasonably deemed harmful to minors.

## DISCUSSION

### A. *Free Speech Rights*

At the outset, we must decide whether the First Amendment requires heightened scrutiny of SB 1172. As explained below, we hold that it does not.

The first step in our analysis is to determine whether SB 1172 is a regulation of conduct or speech. "[W]ords can in some circumstances violate laws directed not against speech but against conduct . . . ." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992). "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. ("FAIR II")*, 547 U.S. 47, 62 (2006). The Supreme Court has made clear that First Amendment protection does not apply to conduct that is not "inherently expressive." *Id.* at 66. In identifying whether SB 1172 regulates conduct or speech, two of our cases guide our

decision: *National Association for the Advancement of Psychoanalysis v. California Board of Psychology ("NAAP")*, 228 F.3d 1043 (9th Cir. 2000), and *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).

In *NAAP*, 228 F.3d at 1053, psychoanalysts who were not licensed in California brought a First Amendment challenge to California's licensing scheme for mental health providers. The licensing scheme required that persons who provide psychological services to the public for a fee obtain a license, which in turn required particular educational and experiential credentials. *Id.* at 1047. The plaintiffs alleged that the licensing scheme violated their First Amendment right to freedom of speech because the license examination tested only certain psychological theories and required certain training; plaintiffs had studied and trained under different psychoanalytic theories. *Id.* at 1055. We were equivocal about whether, and to what extent, the licensing scheme in *NAAP* implicated any free speech concerns. *Id.* at 1053 ("We conclude that, *even if* a speech interest is implicated, California's licensing scheme passes First Amendment scrutiny." (emphasis added)); *id.* at 1056 ("Although some speech interest *may be* implicated, California's content-neutral mental health licensing scheme is a valid exercise of its police power . . . ." (emphasis added)). We reasoned that prohibitions of conduct have "'never been deemed an abridgment of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language.'" *See id.* at 1053 (ellipsis in original) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). And, importantly, we specifically rejected the argument that "because psychoanalysis is the 'talking cure,' it deserves special First Amendment protection because it is 'pure speech.'" *Id.* at 1054. We reasoned: "[T]he key

component of psychoanalysis is the treatment of emotional suffering and depression, *not* speech.  That psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amendment protection." *Id.* (internal quotation marks and ellipsis omitted).

Nevertheless, we concluded that the "communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation." *Id.*  But we neither decided how *much* protection that communication should receive nor considered whether the level of protection might vary depending on the function of the communication. Given California's strong interest in regulating mental health, we held that the licensing scheme at issue in *NAAP* was a valid exercise of its police power. *Id.* at 1054–55.

We went on to conclude that, even if the licensing scheme in *NAAP* regulated speech, it did not trigger strict scrutiny because it was both content neutral and viewpoint neutral. *Id.* at 1055.  We reasoned that the licensing laws did not "dictate what can be said between psychologists and patients during treatment." *Id.*  Further, we observed that those laws were "not adopted because of any disagreement with psychoanalytical theories" but for "the important purpose of protecting public health, safety, and welfare." *Id.* at 1056 (internal quotation marks omitted).  We again concluded that the laws were a valid exercise of California's police power. *Id.*

In *Conant*, 309 F.3d at 633–34, we affirmed a district court's order granting a permanent injunction that prevented the federal government from revoking a doctor's DEA registration or initiating an investigation if he or she recommended medical marijuana.  The federal government

had adopted a policy that a doctor's "recommendation" of marijuana would lead to revocation of his or her license. *Id.* at 632. But the government was "unable to articulate exactly what speech [the policy] proscribed, describing it only in terms of speech the patient believes to be a recommendation of marijuana." *Id.* at 639. Nevertheless, the demarcation between conduct and speech in *Conant* was clear. The policy prohibited doctors from *prescribing* or *distributing* marijuana, and neither we nor the parties disputed the government's authority to prohibit doctors from *treating* patients with marijuana. *Id.* at 632, 635–36. Further, the parties agreed that "revocation of a license was not authorized where a doctor *merely discussed* the pros and cons of marijuana use." *Id.* at 634 (emphasis added).

We ruled that the policy against merely "recommending" marijuana was both content- and viewpoint-based. *Id.* at 637. It was content-based because it covered only doctor-patient speech "that include[d] discussions of the medical use of marijuana," and it was viewpoint-based because it "condemn[ed] expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient." *Id.* We held that the policy did not withstand heightened First Amendment scrutiny because it lacked "the requisite narrow specificity" and left "doctors and patients no security for free discussion." *Id.* at 639 (internal quotation marks omitted).

We distill the following relevant principles from *NAAP* and *Conant*: (1) doctor-patient communications *about* medical treatment receive substantial First Amendment protection, but the government has more leeway to regulate the conduct necessary to administering treatment itself; (2) psychotherapists are not entitled to special First Amendment protection merely because the mechanism used to deliver

mental health treatment is the spoken word; and (3) nevertheless, communication that occurs during psychotherapy does receive *some* constitutional protection, but it is not immune from regulation.

Because those principles, standing alone, do not tell us whether or how the First Amendment applies to the regulation of specific mental health treatments, we must go on to consider more generally the First Amendment rights of professionals, such as doctors and mental health providers. In determining whether SB 1172 is a regulation of speech or conduct, we find it helpful to view this issue along a continuum.

At one end of the continuum, where a professional is engaged in a public dialogue, First Amendment protection is at its greatest. Thus, for example, a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream, or even dangerous, is entitled to robust protection under the First Amendment—just as any person is—even though the state has the power to regulate medicine. *See Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring) ("Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that 'Congress shall make no law . . . abridging the freedom of speech, or of the press.'"); Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*,

2007 U. Ill. L. Rev. 939, 949 (2007) ("When a physician
speaks to the public, his opinions cannot be censored and
suppressed, even if they are at odds with preponderant
opinion within the medical establishment."); *cf. Bailey v.
Huggins Diagnostic & Rehab. Ctr., Inc.*, 952 P.2d 768, 773
(Colo. Ct. App. 1997) (holding that the First Amendment
does not permit a court to hold a dentist liable for statements
published in a book or made during a news program, even
when those statements are contrary to the opinion of the
medical establishment).  That principle makes sense because
communicating to the *public* on matters of *public concern* lies
at the core of First Amendment values.  *See, e.g.*, *Snyder v.
Phelps*, 131 S. Ct. 1207, 1215 (2011) ("Speech on matters of
public concern is at the heart of the First Amendment's
protection." (internal quotation markets, brackets, and ellipsis
omitted)).    Thus, outside the doctor-patient relationship,
doctors are constitutionally equivalent to soapbox orators and
pamphleteers, and their speech receives robust protection
under the First Amendment.

At the midpoint of the continuum, within the confines of
a professional relationship, First Amendment protection of a
professional's speech is somewhat diminished.  For example,
in *Planned Parenthood of Southeastern Pennsylvania v.
Casey*, 505 U.S. 833, 884 (1992), the plurality upheld a
requirement that doctors disclose truthful, nonmisleading
information to patients about certain risks of abortion:

> All that is left of petitioners' argument is
> an asserted First Amendment right of a
> physician not to provide information about the
> risks of abortion, and childbirth, in a manner
> mandated by the State.    To be sure, the
> physician's First Amendment rights not to

speak are implicated, but only as part of the
practice of medicine, *subject to reasonable
licensing and regulation by the State*.  We see
no constitutional infirmity in the requirement
that the physician provide the information
mandated by the State here.[**4**]

(Citations omitted; emphasis added.)    Outside the
professional relationship, such a requirement would almost
certainly be considered impermissible compelled speech. *Cf.
Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (holding that
a state could not require a person to display the state motto on
his or her license plate).

Moreover, doctors are routinely held liable for giving
negligent medical advice to their patients, without serious
suggestion that the First Amendment protects their right to
give advice that is not consistent with the accepted standard
of care.  A doctor "may not counsel a patient to rely on quack
medicine.  The First Amendment would not prohibit the
doctor's loss of license for doing so." *Conant v. McCaffrey*,
No. C 97-00139 WHA, 2000 WL 1281174, at *13 (N.D. Cal.
Sept. 7, 2000) (order) (unpublished); *see also Shea v. Bd. of
Med. Exam'rs*, 146 Cal. Rptr. 653, 662 (Ct. App. 1978) ("The
state's obligation and power to protect its citizens by
regulation of the professional conduct of its health
practitioners is well settled. . . .  [T]he First Amendment . . .
does not insulate the verbal charlatan from responsibility for

---

    **4** Although the plurality opinion garnered only three votes, four
additional justices would have upheld the challenged law in its entirety.
*Casey*, 505 U.S. at 944 (Rehnquist, C.J., concurring in the judgment in
part and dissenting in part).  Thus, there were seven votes to uphold the
disclosure requirement.

his conduct; nor does it impede the State in the proper exercise of its regulatory functions." (citations omitted)); *cf.* Post, 2007 U. Ill. L. Rev. at 949 ("[W]hen a physician speaks to a patient in the course of medical treatment, his opinions are normally regulated on the theory that they are inseparable from the practice of medicine."). And a lawyer may be disciplined for divulging confidences of his client, even though such disclosure is pure speech. *See, e.g.*, *In re Isaacson*, State Bar Court of California, Case No. 08-O-10684, 2012 WL 6589666, at *4–5 (Dec. 6, 2012) (unpublished) (noting prior suspension of bar license for failure to preserve client confidences). Thus, the First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it. And that toleration makes sense: When professionals, by means of their state-issued licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate. *Cf. Lowe*, 472 U.S. at 232 (White, J., concurring) ("One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession.").

At the other end of the continuum, and where we conclude that SB 1172 lands, is the regulation of professional *conduct*, where the state's power is great, even though such regulation may have an incidental effect on speech. *See id.* ("Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession."). Most, if not all, medical and mental health treatments require speech, but that fact does not give rise to

a First Amendment claim when the state bans a particular treatment. When a drug is banned, for example, a doctor who treats patients with that drug does not have a First Amendment right to speak the words necessary to provide or administer the banned drug. *Cf. Conant*, 309 F.3d at 634–35 (noting the government's authority to ban prescription of marijuana). Were it otherwise, then any prohibition of a particular medical treatment would raise First Amendment concerns because of its incidental effect on speech. Such an application of the First Amendment would restrict unduly the states' power to regulate licensed professions and would be inconsistent with the principle that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney*, 336 U.S. at 502.

Senate Bill 1172 regulates conduct. It bans a form of treatment for minors; it does nothing to prevent licensed therapists from discussing the pros and cons of SOCE with their patients. Senate Bill 1172 merely prohibits licensed mental health providers from engaging in SOCE with minors. It is the limited reach of SB 1172 that distinguishes the present cases from *Conant*, in which the government's policy prohibited speech *wholly apart* from the actual provision of treatment. Pursuant to its police power, California has authority to regulate licensed mental health providers' administration of therapies that the legislature has deemed harmful. Under *Giboney*, 336 U.S. at 502, the fact that speech may be used to carry out those therapies does not turn the regulation of conduct into a regulation of speech. In fact, the *Welch* Plaintiffs concede that the state has the power to ban aversive types of SOCE. And we reject the position of the *Pickup* Plaintiffs—asserted during oral argument—that

even a ban on aversive types of SOCE requires heightened scrutiny because of the incidental effect on speech.[5]  Here, unlike in *Conant*, 309 F.3d at 639, the law *allows* discussions about treatment, recommendations to obtain treatment, and expressions of opinions about SOCE and homosexuality.

Plaintiffs contend that *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010), supports their position.  It does not.

As we have explained, SB 1172 regulates only (1) therapeutic treatment, not expressive speech, by (2) licensed mental health professionals acting within the confines of the counselor-client relationship.  The statute does not restrain Plaintiffs from imparting information or disseminating opinions; the regulated activities are therapeutic, not symbolic.  And an act that "symbolizes nothing," even if employing language, is not "an act of communication" that transforms conduct into First Amendment speech.  *Nev. Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2350 (2011).  Indeed, it is well recognized that a state enjoys considerable latitude to regulate the conduct of its licensed health care professionals in administering treatment.  *See, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) ("Under our precedents it is clear the State has a significant role to play in regulating the medical profession.").

---

[5]  We do not mean to suggest that any Plaintiff here conducts aversive SOCE therapy.  The record shows that Plaintiffs who are licensed mental health providers practice SOCE only through talk therapy.  We mention aversive techniques merely to highlight the state's legitimate power to regulate professional conduct.

In sharp contrast, *Humanitarian Law Project* pertains to a different issue entirely: the regulation of (1) political speech (2) by ordinary citizens. The plaintiffs there sought to communicate information about international law and advocacy to a designated terrorist organization. The federal statute at issue barred them from doing so, because it considered the plaintiffs' expression to be material support to terrorists. As the Supreme Court held, the material support statute triggered rigorous First Amendment review because, even if that statute "*generally* functions as a regulation of conduct . . . as applied to plaintiffs the conduct triggering coverage under the statute consists of *communicating a message.*" *Humanitarian Law Project*, 130 S. Ct. at 2724 (second emphasis added).[6] Again, SB 1172 does not prohibit Plaintiffs from "communicating a message." *Id.* It is a state regulation governing the conduct of state-licensed professionals, and it does not pertain to communication in the public sphere. Plaintiffs may express their views to anyone, including minor patients and their parents, about any subject, including SOCE, insofar as SB 1172 is concerned. The *only* thing that a licensed professional cannot do is avoid professional discipline for *practicing* SOCE on a minor patient.

This case is more akin to *FAIR II*. There, the Supreme Court emphasized that it "extended First Amendment protection only to conduct that is *inherently expressive.*" 547 U.S. at 66 (emphasis added). The Court upheld the Solomon Amendment, which conditioned federal funding for institutions of higher education on their offering military recruiters the same access to campus and students that they

---

[6]    We also note that Plaintiffs here bring a facial, not an as-applied, challenge to SB 1172.

provided to nonmilitary recruiters. The Court held that the statute did not implicate First Amendment scrutiny, even as applied to law schools seeking to express disagreement with military policy by limiting military recruiters' access, reasoning that the law schools' "actions were expressive only because the law schools accompanied their conduct with speech explaining it." *Id.* at 51, 66. Like the conduct at issue in *FAIR II*, the administration of psychotherapy is not "inherently expressive." Nor does SB 1172 prohibit any speech, either in favor of or in opposition to SOCE, that might accompany mental health treatment. Because SB 1172 regulates a professional practice that is not inherently expressive, it does not implicate the First Amendment.

We further conclude that the First Amendment does not prevent a state from regulating treatment even when that treatment is performed through speech alone. As we have already held in *NAAP*, talk therapy does not receive special First Amendment protection merely because it is administered through speech. 228 F.3d at 1054. That holding rested on the understanding of talk therapy as "the *treatment* of emotional suffering and depression, *not* speech." *Id.* (internal quotation marks omitted) (first emphasis added). Thus, under *NAAP*, to the extent that talk therapy implicates speech, it stands on the same First Amendment footing as other forms of medical or mental health treatment. Senate Bill 1172 is subject to deferential review just as are other regulations of the practice of medicine.

Our conclusion is consistent with *NAAP*'s statement that "communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation." *Id.* Certainly, under *Conant*, content- or viewpoint-based regulation of communication *about*

treatment must be closely scrutinized. But a regulation of only *treatment itself*—whether physical medicine or mental health treatment—implicates free speech interests only incidentally, if at all. To read *NAAP* otherwise would contradict its holding that talk therapy is not entitled to "special First Amendment protection," and it would, in fact, make talk therapy virtually "immune from regulation." *Id.*

Nor does *NAAP*'s discussion of content and viewpoint discrimination change our conclusion. There, we used both a belt and suspenders. In addition to holding that the licensing scheme at issue was a permissible regulation of conduct, we reasoned that *even if* California's licensing requirements implicated First Amendment interests, the requirements did not discriminate on the basis of content or viewpoint. *Id.* at 1053, 1055–56. But here, SB 1172 regulates only treatment, and nothing in *NAAP* requires us to analyze a regulation of treatment in terms of content and viewpoint discrimination.[7]

Because SB 1172 regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against, SOCE, we conclude that any effect it may have on free speech interests is merely incidental. Therefore, we hold that SB 1172 is subject to only rational basis review and must be upheld if it bears a rational relationship to a legitimate state interest. *See Casey*, 505 U.S. at 884, 967–68 (a plurality of three justices, plus four additional justices concurring in part and dissenting in part,

---

[7] We acknowledge that Plaintiffs ask us to apply strict scrutiny, but they have not cited any case in which a court has applied strict scrutiny to the regulation of a medical or mental health treatment. Nor are we aware of any.

applied a reasonableness standard to the regulation of
medicine where speech may be implicated incidentally).

According to the statute, SB 1172 advances California's
interest in "protecting the physical and psychological well-
being of minors, including lesbian, gay, bisexual and
transgender youth, and in protecting its minors against
exposure to serious harms caused by sexual orientation
change efforts." 2012 Cal. Legis. Serv. ch. 835, § 1(n).
Without a doubt, protecting the well-being of minors is a
legitimate state interest. And we need not decide whether
SOCE actually causes "serious harms"; it is enough that it
could "reasonably be conceived to be true by the
governmental decisionmaker." *NAAP*, 228 F.3d at 1050
(internal quotation marks omitted).

The record demonstrates that the legislature acted
rationally when it decided to protect the well-being of minors
by prohibiting mental health providers from using SOCE on
persons under 18.[8] The legislature relied on the report of the
Task Force of the American Psychological Association,
which concluded that SOCE has not been demonstrated to be
effective and that there have been anecdotal reports of harm,
including depression, suicidal thoughts or actions, and
substance abuse. The legislature also relied on the opinions
of many other professional organizations. Each of those
organizations opposed the use of SOCE, concluding, among

---

[8] We need not and do not decide whether the legislature would have
acted rationally had it banned SOCE for adults. One could argue that
children under the age of 18 are especially vulnerable with respect to
sexual identity and that their parents' judgment may be clouded by this
emotionally charged issue as well. The considerations with respect to
adults may be different.

other things, that homosexuality is not an illness and does not
require treatment (American School Counselor Association),
SOCE therapy can provoke guilt and anxiety (American
Academy of Pediatrics), it may be harmful (National
Association of Social Workers), and it may contribute to an
enduring sense of stigma and self-criticism (American
Psychoanalytic Association).  Although the legislature also
had before it some evidence that SOCE is safe and effective,
the overwhelming consensus was that SOCE was harmful and
ineffective.  On this record, we have no trouble concluding
that the legislature acted rationally by relying on that
consensus.

Plaintiffs argue that the legislature acted irrationally when
it banned SOCE for minors because there is a lack of
scientifically credible proof of harm.  But, under rational
basis review, "[w]e ask only whether there are plausible
reasons for [the legislature's] action, and if there are, our
inquiry is at an end."  *Romero-Ochoa v. Holder*, 712 F.3d
1328, 1331 (9th Cir. 2013) (internal quotation marks
omitted).

Therefore, we hold that SB 1172 is rationally related to
the legitimate government interest of protecting the well-
being of minors.[9]

---

[9] The foregoing discussion relates as well to the *Pickup* Plaintiffs' claim
that SB 1172 violates minors' right to receive information. *See Monteiro
v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1027 n.5 (9th Cir. 1998)
(recognizing the "well-established rule that the right to receive
information is an inherent corollary of the rights of free speech and
press").

B. *Expressive Association*

We also reject the *Pickup* Plaintiffs' argument that SB 1172 implicates their right to freedom of association because the First Amendment protects their "choices to enter into and maintain the intimate human relationships between counselors and clients."[10]

First, SB 1172 does not prevent mental health providers and clients from entering into and maintaining therapeutic relationships. It prohibits only "practices . . . that seek to change [a minor] individual's sexual orientation." Cal. Bus. & Prof. Code § 865(b)(1). Therapists are free, but not obligated, to provide therapeutic services, as long as they do not "seek to change [the] sexual orientation" of minor clients.

Moreover, the therapist-client relationship is not the type of relationship that the freedom of association has been held to protect. The Supreme Court's decisions "have referred to constitutionally protected 'freedom of association' in two distinct senses." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984). The first type of protected association concerns "intimate human relationships," which are implicated in personal decisions about marriage, childbirth, raising

---

[10] The *Pickup* Plaintiffs arguably waived their expressive association argument by not raising it in the district court. But "the rule of waiver is a discretionary one." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012) (internal quotation marks omitted). We have discretion to address an argument that otherwise would be waived "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Id.* (internal quotation marks omitted). Whether SB 1172 violates the right to expressive association is such an issue, and we exercise our discretion to address it.

children, cohabiting with relatives, and the like. *Id.* at 617–19. That type of freedom of association "receives protection as a fundamental element of personal liberty." *Id.* at 618. The second type protects association "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618. Plaintiffs in *Pickup* claim an infringement of only the first type of freedom of association.

Although we have not specifically addressed the therapist-client relationship in terms of freedom of association, we have explained why the therapist-client relationship is not protected by the Due Process Clause of the Fourteenth Amendment: "The relationship between a client and psychoanalyst lasts only as long as the client is willing to pay the fee. Even if analysts and clients meet regularly and clients reveal secrets and emotional thoughts to their analysts, these relationships simply do not rise to the level of a fundamental right." *NAAP*, 228 F.3d at 1050 (internal quotation marks and citation omitted). Because the type of associational protection that the *Pickup* Plaintiffs claim is rooted in "personal liberty," *U.S. Jaycees*, 468 U.S. at 618, and because we have already determined that the therapist-client relationship does not "implicate the fundamental rights associated with . . . close-knit relationships," *NAAP*, 228 F.3d at 1050, we conclude that the freedom of association also does not encompass the therapist-client relationship.

C. *Vagueness*

We next hold that SB 1172 is not void for vagueness.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Nevertheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). "[U]ncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)). "A defendant is deemed to have fair notice of an offense if a reasonable person of ordinary intelligence would understand that his or her conduct is prohibited by the law in question." *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1994) (internal quotation marks omitted). But, "if the statutory prohibition involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them." *Id.* (internal quotation marks omitted).

Although the *Pickup* Plaintiffs argue that they cannot ascertain where the line is between what is prohibited and what is permitted—for example, they wonder whether the mere dissemination of information about SOCE would subject them to discipline—the text of SB 1172 is clear to a

reasonable person. Discipline attaches only to "practices" that "seek to change" a minor "patient['s]" sexual orientation. Cal. Bus. & Prof. Code §§ 865-865.1. A reasonable person would understand the statute to regulate only mental health treatment, including psychotherapy, that aims to alter a minor patient's sexual orientation. Although Plaintiffs present various hypothetical situations to support their vagueness challenge, the Supreme Court has held that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill*, 530 U.S. at 733 (internal quotation marks omitted).

Moreover, considering that SB 1172 regulates licensed mental health providers, who constitute "a select group of persons having specialized knowledge," the standard for clarity is lower. *Weitzenhoff*, 35 F.3d at 1289. Indeed, it is hard to understand how therapists who identify themselves as SOCE practitioners can credibly argue that they do not understand what practices qualify as SOCE.

Neither is the term "sexual orientation" vague. Its meaning is clear enough to a reasonable person and should be even more apparent to mental health providers. In fact, several provisions in the California Code—though not SB 1172 itself—provide a simple definition: "heterosexuality, homosexuality, or bisexuality." Cal. Educ. Code §§ 212.6, 66262.7; Cal. Gov't Code § 12926®; Cal. Penal Code §§ 422.56(h), 11410(b)(7). Moreover, courts have repeatedly rejected vagueness challenges that rest on the term "sexual orientation." *E.g.*, *United States v. Jenkins*, 909 F. Supp. 2d 758, 778–79 (E.D. Ky. 2012); *Hyman v. City of Louisville*,

132 F. Supp. 2d 528, 546 (W.D. Ky. 2001), *vacated on other grounds*, 53 F. App'x 740 (6th Cir. 2002) (unpublished).

D.  *Overbreadth*

We further hold that SB 1172 is not overbroad.[11]

Overbreadth doctrine permits the facial invalidation of laws that prohibit "a substantial amount of constitutionally protected speech." *City of Houston v. Hill*, 482 U.S. 451, 466 (1987).  "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).  Rather, "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

Senate Bill 1172's plainly legitimate sweep includes SOCE techniques such as inducing vomiting or paralysis, administering electric shocks, and performing castrations.  And, as explained above, it also includes SOCE techniques carried out solely through words.  As with any regulation of a particular medical or mental health treatment, there may be

---

[11] Intervenor Equality California argues that the *Pickup* Plaintiffs waived their overbreadth challenge by failing to raise it adequately in the district court.  Although they did not argue overbreadth with specificity, they did allege it in their complaint and in their memorandum in support of preliminary injunctive relief.  Moreover, whether the statute is overbroad is a question of law that "does not depend on the factual record developed below." *Ruiz*, 667 F.3d at 1322.  Therefore, we exercise our discretion to address Plaintiffs' overbreadth challenge.

an incidental effect on speech. Any incidental effect, however, is small in comparison with the "plainly legitimate sweep" of the law. *Broadrick*, 413 U.S. at 615.

Thus, SB 1172 is not overbroad.

E. *Parents' Fundamental Rights*

The *Pickup* Plaintiffs also argue that SB 1172 infringes on their fundamental parental right to make important medical decisions for their children. The state does not dispute that parents have a fundamental right to raise their children as they see fit, but argues that Plaintiffs "cannot compel the State to permit licensed mental health [professionals] to engage in unsafe practices, and cannot dictate the prevailing standard of care in California based on their own views." Because Plaintiffs argue for an affirmative right to access SOCE therapy from licensed mental health providers, the precise question at issue is whether parents' fundamental rights include the right to choose for their children a particular type of provider for a particular medical or mental health treatment that the state has deemed harmful. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (holding that courts should precisely define purported substantive due process rights to direct and restrain exposition of the Due Process Clause).

Parents have a constitutionally protected right to make decisions regarding the care, custody, and control of their children, but that right is "not without limitations." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005). States may require school attendance and mandatory school uniforms, and they may impose curfew laws applicable only to minors. *See id.* at 1204–05 (collecting cases demonstrating

the "wide variety of state actions that intrude upon the liberty interest of parents in controlling the upbringing and education of their children"). In the health arena, states may require the compulsory vaccination of children (subject to some exceptions), *see Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), and states may intervene when a parent refuses necessary medical care for a child, *see Jehovah's Witnesses v. King Cnty. Hosp.*, 278 F. Supp. 488, 504 (W.D. Wash. 1967) (three-judge panel) (per curiam), *aff'd*, 390 U.S. 598 (1968) (per curiam). "[A] state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

We are unaware of any case that specifically addresses whether a parent's fundamental rights encompass the right to choose for a child a particular type of provider for a particular treatment that the state has deemed harmful, but courts that have considered whether patients have the right to choose specific treatments for *themselves* have concluded that they do not. For example, we have held that "substantive due process rights do not extend to the choice of type of treatment or of a particular health care provider." *NAAP*, 228 F.3d at 1050. Thus, we concluded that "there is no fundamental right to choose a mental health professional with specific training." *Id.* The Seventh Circuit has also held that "a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993). Moreover, courts have held that there is no substantive due process right to obtain drugs that the FDA has not approved, *Carnohan v. United States*, 616 F.2d 1120, 1122 (9th Cir. 1980) (per curiam), even when those drugs are

sought by terminally ill cancer patients, *see Rutherford v. United States*, 616 F.2d 455, 457 (10th Cir. 1980) ("It is apparent in the context with which we are here concerned that the decision by the patient whether to have a treatment or not is a protected right, but his selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health."). Those cases cut against recognizing the right that Plaintiffs assert; it would be odd if parents had a substantive due process right to choose specific treatments for their children—treatments that reasonably have been deemed harmful by the state—but not for themselves. It would be all the more anomalous because the Supreme Court has recognized that the state has greater power over children than over adults. *Prince*, 321 U.S. at 170 (stating that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults").

Further, our decision in *Fields* counsels against recognizing the right that Plaintiffs assert. In that case, parents of school children argued that a school violated their parental rights when it administered to students a survey that contained several questions about sex. *Fields*, 427 F.3d at 1203. We rejected that argument, holding that, although parents have the right to inform their children about sex when and as they choose, they do not have the right to "compel public schools to follow their own idiosyncratic views as to what information the schools may dispense." *Id.* at 1206. Similarly, here, to recognize the right Plaintiffs assert would be to compel the California legislature, in shaping its regulation of mental health providers, to accept Plaintiffs' personal views of what therapy is safe and effective for minors. The aforementioned cases lead us to conclude that the fundamental rights of parents do not include the right to choose a specific type of provider for a specific medical or

mental health treatment that the state has reasonably deemed harmful.

Therefore, SB 1172 does not infringe on the fundamental rights of parents.

## CONCLUSION

Senate Bill 1172 survives the constitutional challenges presented here. Accordingly, the order granting preliminary relief in *Welch*, No. 13-15023, is **REVERSED**, and the order denying preliminary relief in *Pickup*, No. 12-17681, is **AFFIRMED**. We remand both cases for further proceedings consistent with this opinion.